# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FIRST SEALORD SURETY, INC., )
)
      **Plaintiff,** )
)
      v. )
)
DURKIN & DEVRIES INSURANCE AGENCY, )
  LLC, )
      **Defendant.** )
)

**No. 2:10-cv-00832-TON**

---

## PLAINTIFF, FIRST SEALORD SURETY, INC.'S OPPOSITION TO DEFENDANT, DURKIN & DEVRIES INSURANCE AGENCY, LLC'S MOTION TO DISMISS COUNT I OF PLAINTIFF'S FIRST AMENDED COMPLAINT (Doc. 40)

---

**WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.**
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
Telephone:    (703) 749-1000
Facsimile:    (703) 893-8029
Counsel for Plaintiff, First Sealord Surety, Inc.

On the Brief:
Robert G. Barbour, Esq.
Brian N. Krulick, Esq.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................ 1

II.   STATEMENT OF FACTS ................................................................. 2

III.  STANDARD OF REVIEW ............................................................... 7

IV.  LEGAL ARGUMENT....................................................................... 8

    A. First Sealord's First Amended Complaint Alleges All of the Elements of a Claim for Negligent Misrepresentation and is Sufficient to Survive a Rule 12(b)(6) Motion to Dismiss. ........................................................... 8

    B. First Sealord's Claim for Negligent Misrepresentation is Supported by the Record Evidence, is Legally Sufficient, and is Not Subject to Dismissal on Summary Judgment Under Rule 56.................................................... 11

       1. The Facts Reflect that Durkin & DeVries Made Critical, Material Misrepresentations on First Sealord's Agency Questionnaire to Induce First Sealord to Enter into the Agency Agreement. ............................... 12

       2. Durkin & DeVries' Misrepresentations were a Substantial Factor in Bringing about First Sealord's Harm. .................................................. 19

       3. Pennsylvania's Economic Loss Rule Does Not Preclude Claims for Negligent Misrepresentation that Induce a Party to Enter Into a Contract. ......... 29

          a. Durkin & DeVries' misrepresentations arise independent of the Agency Agreement. ...................................................................... 30

          b. The "Bilt-Rite Exception" to the Economic Loss Rule is not applicable. .................................................................................. 34

       4. The Statute of Limitations was Tolled Because Durkin & DeVries' Misrepresentations and Concealment of the Same Prevented First Sealord From Discovering its Negligent Misrepresentation Claim. .................................. 35

V.   CONCLUSION.................................................................................. 39

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

Air Products and Chemicals, Inc. v. Eaton Metal Products, Co.,
   256 F.Supp.2d 329 (E.D. Pa. 2003) ................................................................. 31

ALA, Inc. v. CCAIR, Inc.,
   29 F.3d 855, 859 (3d Cir. 1994)...................................................................... 7

Beauty Time, Inc. v. VU Skin Systems, Inc.,
   118 F.3d 140 (3d Cir. 1997)........................................................................... 35

Bilt-Rite Contractors, Inc., v. The Architectural Studio,
   866 A.2d 270 (2005) ............................................................................. 29, 34

Bortz v. Noon,
   729 A.2d 555 (Pa. 1999) ................................................................................ 8

Bouriez v. Carnegie Mellon University,
   585 F.3d 765 (3d Cir. 2009) ......................................................................... 19

Cast Art Indus., LLC v. KPMG LLP,
   36 A.3d 1049 (N.J. 2012) ............................................................................. 25

Cast Art Indus., LLC v. KPMG LLP,
   3 A.3d 562 (N.J. Super. Ct. App. Div. 2010) ................................................ 25

Charlie's Dream, Inc. v. Philadelphia,
   30 F.Supp.2d 865 (E.D. Pa. 1998) ................................................................. 8

Citibank, N.A. v. K-H Corp.,
   968 F.2d 1489 (2d Cir. 1992) ....................................................................... 26

Commonwealth v. United States Mineral Product Co.,
   809 A.2d 1000 (Pa. Commw. Ct. 2002) ....................................................... 22

Corrigan v. Methodist Hosp.,
   869 F.Supp. 1208 (E.D. Pa. 1994) ................................................................. 8

Duquesne Light Co. v. Westinghouse Elec. Corp.,
   66 F.3d 604 (3d Cir. 1995) ........................................................................... 29

First v. Zem Zem Temple,
 454 A.2d 18 (Pa. 1996) ............................................................. 19

Fisher v. Reich,
 1995 WL 23966 *14 (S.D.N.Y. 1995)........................................ 25

Granite Companies, LLC v. City Capital Corp.,
 2008 WL 3285914 *3 (E.D. Pa. 2008) ...................................... 33

Hamil v. Bashline,
 392 A.2d 1280 (Pa. 1978) ......................................................... 23

Howe v. Philly,
 2011 WL 1465446 *6 (E.D. Pa. 2011) ................................. 29, 30

In re Asousa Partnership,
 2005 WL 775429 *6 (Bankr. E.D. Pa. 2005) ............................ 22

Metro. Life Ins. Co.,
 863 A.2d 1 (Pa. Super. Ct. 2004) .............................................. 38

Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts,
 769 F.Supp. 498 (S.D.N.Y. 1991). ............................................ 25

Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP,
 83 P.3d 322 (Or. 2004) ............................................................. 26

Padalino v. Standard Fire Ins. Co.,
 616 F.Supp.2d 538 (E.D. Pa. 2008)........................................... 38

Partners Coffee Co., LLC v. Oceana Services and Products Co.,
 700 F.Supp.2d 720 (W.D. Pa. 2010)......................................... 29

Professional Systems Corp. v. Opex Postal Technologies,
 2006 WL 573798 *4 (E.D. Pa. 2006) ........................................ 32

Rocks v. Philadelphia,
 868 F.2d 644 (3d Cir. 1989)........................................................ 7

U.S. Claims, Inc. v. Saffren & Weinberg, LLP,
 2007 WL 4225536 * 11 (E.D. Pa. 2007) .................................... 32

Taylor v. Jackson,
 643 A.2d 771 (Pa. Commw. Ct. 1994) ...................................... 23

Toy v. Metro. Life Ins. Co.,
    863 A.2d 1 (Pa. Super. Ct. 2004) ................................................................... 38

Tran v. Metropolitan Life Ins. Co.,
    408 F.3d 130 (3d Cir. 2005) ........................................................................ 8

U.S. Claims, Inc. v. Saffren & Weinberg, LLP,
    2007 WL 4225536 * 11 (E.D. Pa. 2007) ....................................................... 32

Urland v. Merrell-Dow Pharmaceuticals,
    822 F.2d 1268 (3d Cir. 1987) ...................................................................... 35

Werwinski v. Ford Motor Co.,
    286 F.3d 661 (3d Cir. 2002) ................................................................. 29, 30

**Other Authorities**

RESTATEMENT (SECOND) OF TORTS § 433 .............................................. 19, 22, 23, 24


RESTATEMENT (SECOND) OF TORTS § 433(c) cmt. (f) ................................................ 25

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................. 7


Fed. R. Civ. P. 12(d) ................................................................................. 7


Fed. R. Civ. P. 56 .............................................................................. *passim*

## I.     INTRODUCTION

In August 2005, Durkin & DeVries Insurance Agency, LLC ("Durkin & DeVries") essentially duped First Sealord Surety, Inc. ("First Sealord") into signing an Agency Agreement through which Durkin & DeVries was appointed as an agent to solicit business for First Sealord's surety bond products.  Durkin & DeVries lied on First Sealord's Agency Questionnaire and withheld from First Sealord material information regarding its agency history, its past relationships with other sureties, and the substance of a then-existing claim against it that ultimately led one of the largest surety companies in the country to sue Durkin & DeVries for millions of dollars.  Operating under the guise of a trusted agent, Durkin & DeVries subsequently brought a number of contractor clients to First Sealord, including Heller & Smith, whose business eventually unraveled leaving First Sealord with millions of dollars of losses of its own.

After an initial investigation of its files, First Sealord brought suit against Durkin & DeVries for breach of its obligations under the Agency Agreement, including its failure to disclose to First Sealord adverse information in its possession regarding Heller & Smith's deteriorating financial situation, cash flow problems and handling of a mounting number of payment claims.  It was not until discovery was undertaken in this case, however, that First Sealord discovered the sheer duplicity through which Durkin & DeVries had induced First Sealord to enter into the Agency Agreement in the first place.  In that regard, First Sealord, in depositions, learned that Durkin & DeVries had been involved in a years-long dispute with St. Paul Fire and Marine Insurance Company ("St. Paul").  First Sealord learned about St. Paul's claim, raised barely more than a year before Durkin & DeVries approached First Sealord, that Durkin & DeVries had abused its powers of attorney by issuing a bond to one of its clients in excess of $77 million -- without St. Paul's knowledge and without timely reporting to St. Paul

the premiums received.  First Sealord also discovered that, as a result of that claim, St. Paul had revoked Durkin & DeVries' powers of attorney and had canceled its agency.  In response to First Sealord's Agency Questionnaire, which asked pointed questions seeking this very type of information (*e.g.,* the identity of sureties Durkin & DeVries was representing in previous years, whether Durkin & DeVries' powers of attorney had ever been revoked, whether Durkin & DeVries had been involved in claims regarding unauthorized bonds), Durkin & DeVries simply lied, fully intending that First Sealord appoint Durkin & DeVries as its agent with no knowledge of Durkin & DeVries' dealings with St. Paul.

Based upon this newly-discovered information regarding Durkin & DeVries' deceptions, First Sealord sought and was granted leave to amend its Complaint to assert a cause of action against Durkin & DeVries for negligent misrepresentation.  It is this cause of action, included at Count I of First Sealord's First Amended Complaint (Doc. 34-3), that Durkin & DeVries attacks through its Motion to Dismiss (Doc. 40)("Motion").  First Sealord's negligent misrepresentation claim, which Durkin & DeVries dismissively refers to as "preposterous," is both well-pleaded and supported by substantial evidence.  In fact, most of the facts supporting First Sealord's claim are drawn directly from sworn testimony given by Durkin & DeVries' representative and certified documents Durkin & DeVries filed in its litigation with St. Paul.  At bottom, Durkin & DeVries' assertions regarding the sufficiency of First Sealord's pleading are unfounded and its legal challenges to First Sealord's ability to pursue this claim are unsound.  For all the reasons discussed below, Durkin & DeVries' Motion must be denied.

## II.    STATEMENT OF FACTS

1.    On or about August 1, 2005, First Sealord and Durkin & DeVries entered into the Agency Agreement.  <u>See</u> Barbour Dec., Ex. A.

2.      Prior to First Sealord's execution of the Agency Agreement, Durkin & DeVries completed an Agency Questionnaire, which required Durkin & DeVries to provide certain information to First Sealord regarding Durkin & DeVries' employees, representation of surety companies and agency history.  See Barbour Dec., Ex. A.

3.      Question 16 of the Agency Questionnaire required Durkin & DeVries to provide, along with other information, the identity of the surety companies Durkin & DeVries represented in 2002, 2003, and 2004, along with the amount of premium collected on behalf of those sureties and the amount of any losses sustained by those sureties during those same years.  See Barbour Dec., Ex. A.

4.      In response to Question 16 of the Agency Questionnaire, Durkin & DeVries identified CNA as a surety company the agency represented in 2003 and 2004 and Monitor and Hanover as surety companies the agency represented in 2002, 2003 and 2004.  Durkin & DeVries' response failed to disclose the identity of any other surety companies that the agency represented during the 2002 to 2004 timeframe.  See Barbour Dec., Ex. A.

5.      Question 17 of the Agency Questionnaire required Durkin & DeVries to state whether anyone associated with the Durkin & DeVries agency ever had powers of attorney revoked.  See Barbour Dec., Ex. A.

6.      In response to Question 17 of the Agency Questionnaire, Durkin & DeVries represented that no one associated with the agency had ever had powers of attorney revoked by putting an "x" in a box marked "No."  See Barbour Dec., Ex. A.

7.      Question 18 of the Agency Questionnaire required Durkin & DeVries to state whether anyone associated with the Durkin & DeVries agency had ever been involved in litigation or claims concerning unauthorized bonds or misuse of powers of attorney.  See Barbour Dec., Ex. A.

8.      In response to Question 18 of the Agency Questionnaire, Durkin & DeVries represented that no one associated with the agency had ever been involved in litigation or claims concerning unauthorized bonds or misuse of powers of attorney by putting an "x" in a box marked "No."  See Barbour Dec., Ex. A.

9.      Question 19 of the Agency Questionnaire required Durkin & DeVries to state whether the Durkin & DeVries agency had ever been canceled by a company.  See Barbour Dec., Ex. A.

10.     In response to Question 19 of the Agency Questionnaire, Durkin & DeVries represented that the agency had never been canceled by a company by putting an "x" in a box marked "No."  See Barbour Dec., Ex. A.

11.     At the bottom of the Agency Questionnaire, above the signature block, the following statement appears, bolded and in all caps:

> **I HAVE REVIEWED THE INFORMATION CONTAINED IN THE QUESTIONNAIRE, AND TO THE BEST OF MY KNOWLEDGE I AM NOT AWARE OF ANY DISCREPANCIES OR INACCURACIES.**

See Barbour Dec., Ex. A.

12.     The Agency Questionnaire was signed by Thomas P. Durkin as Managing Partner for Durkin & DeVries on August 1, 2005.  See Barbour Dec., Ex. A.

13.     In 1998, Durkin & DeVries entered into an agency agreement with another surety company, St. Paul Fire and Marine Insurance Company ("St. Paul").  Pursuant to that agreement (the "St. Paul Agreement"), which was subsequently amended by addendum and became effective January 1, 1999, Durkin & DeVries was authorized to issue surety bonds for St. Paul. See First Amended Complaint (Doc. 34-3), Ex. 5 at exhibit A; Barbour Dec., Ex. B - Deposition of Thomas Durkin dated May 9, 2012 (hereinafter "Durkin Dep. II), 28:12 – 30:8.

4

14.     Pursuant to the St. Paul Agreement, on May 7, 2003, St. Paul issued a Power-of-Attorney to Durkin & DeVries, appointing Thomas P. Durkin, Marie Ferguson, John S. DeVries Jr., John S. Mahoney, and Virginia M. Michaels as its attorney(s)-in-fact.  See First Amended Complaint (Doc. 34-3), Ex. 2; Durkin Dep. II, 31:4 – 35:5.

15.      During 2002, 2003 and the first part of 2004, Durkin & DeVries represented St. Paul as an agent for purposes of soliciting business for the surety bond products offered by St. Paul.  During this time period, St. Paul was among the largest, if not the largest, surety company Durkin & DeVries represented.  See Durkin Dep. II, 17:6 – 20:10.

16.     In April or May 2004, a dispute arose between Durkin & DeVries and St. Paul regarding a Performance Bond issued by Durkin & DeVries securing the performance by Eastern Contractors, Inc. of a construction contract with the City of Lawrence, Massachusetts.  The Performance Bond at issue, which was issued by Durkin & DeVries between October 2003 and December 2003, was in the amount of $77,252,000.00.  See Durkin Dep. II, 40:24 – 41:7.

17.     By letter dated May 3, 2004 addressed to Thomas P. Durkin, a Senior Vice President of St. Paul advised Durkin & DeVries of St. Paul's position that the City of Lawrence Performance Bond had been issued without St. Paul's authority.  Specifically, the letter advised that there had been explicit approval conditions associated with approval of the City of Lawrence Performance Bond that were not satisfied.  See First Amended Complaint (Doc. 34-3), Ex. 3; Durkin Dep. II, 46:16-47:10.

18.     By letter dated May 6, 2004, Durkin & DeVries' Managing Partner, Thomas P. Durkin, wrote to St. Paul addressing, among other issues, the explicit approval conditions set by St. Paul regarding the City of Lawrence Performance Bond.  See First Amended Complaint (Doc. 34-3), Ex. 4; Durkin Dep. II, 47:12 – 48:3.  As of the date of this letter, at the latest, Mr. Durkin and Durkin & DeVries understood that St. Paul was claiming that the $77,252,000.00

Performance Bond issued to the City of Lawrence was unauthorized.  <u>See</u> Durkin Dep. II, 46:23 – 47:10.

19.     In or around June 30, 2004, as a result of Durkin & DeVries' unauthorized issuance of the Performance Bond to the City of Lawrence, and on other grounds, St. Paul revoked and terminated Durkin & DeVries' Power-of-Attorney.  <u>See</u> First Amended Complaint (Doc. 34-3), Ex. 5 at ¶ 20, Ex. 6 at ¶ 20.

20.     Neither the fact of Durkin & DeVries' representation of St. Paul during the 2002 to 2004 timeframe nor the facts surrounding St. Paul's claims that Durkin & DeVries had issued an unauthorized bond and termination of Durkin & DeVries' Power-of-Attorney were disclosed to First Sealord prior to First Sealord's execution of the Agency Agreement or reflected in Durkin & DeVries' responses to the Agency Questionnaire.  <u>See</u> Barbour Dec., Ex.  A; Motion for Leave to File First Amended Complaint (Doc. 34).

21.     St. Paul ultimately filed suit against Thomas P. Durkin and Durkin & DeVries in the United States Court for the District of Massachusetts asserting causes of action for Breach of Contract, Negligence, Breach of Fiduciary Duty, Contractual Indemnity and Common Law Indemnity.  <u>See</u> First Amended Complaint (Doc. 34-3), Ex. 5.

22.     On April 13, 2007, Mr. Durkin and Durkin & DeVries filed an Answer and Affirmative Defenses to St. Paul's lawsuit.  <u>See</u> First Amended Complaint (Doc. 34-3), Ex. 6.

23.     First Sealord did not discover the facts surrounding Durkin & DeVries' prior relationship with St. Paul until May 2012, when First Sealord completed the deposition of Durkin & DeVries' Rule 30(b)(6) corporate representative.  <u>See</u> Motion for Leave to File First Amended Complaint (Doc. 34).

24.     Durkin & DeVries opposed First Sealord's Motion for Leave to File First Amended Complaint, claiming, in part, that the claim for negligent misrepresentation was barred

by the statute of limitations.  <u>See</u> Response in Opposition re Motion for Leave to Filed First

Amended Complaint (Doc. 37).

     25.     On June 20, 2012, the Court granted First Sealord's motion.  <u>See</u> Order Granting

Motion for Leave to Amend (Doc. 39).

## III.    STANDARD OF REVIEW

     In ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the Court must only

consider those facts alleged in the complaint and accept all of those allegations as true."  <u>ALA,</u>

<u>Inc. v. CCAIR, Inc.</u>, 29 F.3d 855, 859 (3d Cir. 1994).  The Court must also accept as true all

reasonable inferences that may be drawn from the allegations, and view those facts and

inferences in the light most favorable to the non-moving party.  <u>Rocks v. Philadelphia</u>, 868 F.2d

644, 645 (3d Cir. 1989).

     Durkin & DeVries' Motion, which is styled as a Rule 12(b)(6) motion to dismiss, is

accompanied by materials outside the pleadings that purport to contravene First Sealord's claims.

As such, Rule 12(d) applies:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the
> pleadings are presented to and not excluded by the court, the
> motion must be treated as one for summary judgment under Rule
> 56.  All parties must be given a reasonable opportunity to present
> all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).  First Sealord, mindful of Rule 12(d), has also attached materials outside

the four corners of the First Amended Complaint in support of this opposition, cognizant that the

Court may consider Durkin & DeVries' Motion as a motion for summary judgment under Rule

56.

     Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." <u>Charlie's Dream, Inc. v. Philadelphia</u>, 30 F.Supp.2d 865, 868 (E.D. Pa. 1998);

<u>Corrigan v. Methodist Hosp.</u>, 869 F.Supp. 1208, 1210 (E.D. Pa. 1994).  Furthermore, like a

motion to dismiss under Rule 12(b)(6), in ruling on a motion for summary judgment, "all of the

facts must be viewed in the light most favorable to the non-moving party and all reasonable

inferences must be drawn in favor of the non-moving party."  <u>Id.</u>

　　　Whether the Court views Durkin & DeVries' Motion as one to dismiss Count I of First

Sealord's First Amended Complaint under Rule 12(b)(6) or as a motion for summary judgment

on that Count under Rule 56, viewing the facts presented in the light most favorable to First

Sealord and drawing all reasonable inferences in favor of First Sealord, Durkin & DeVries'

Motion must be denied.

## IV.　LEGAL ARGUMENT

### A.　First Sealord's First Amended Complaint Alleges All of the Elements of a Claim for Negligent Misrepresentation and is Sufficient to Survive a Rule 12(b)(6) Motion to Dismiss.

　　　First Sealord's First Amended Complaint sufficiently alleges a cause of action for

negligent misrepresentation.  Under Pennsylvania law, the negligent misrepresentation cause of

action has four elements: 1) a misrepresentation of a material fact; 2) made under circumstances

where the represener ought to have know its falsity; 3) with an intent to induce another to act on

it; and 4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

<u>Tran v. Metropolitan Life Ins. Co.</u>, 408 F.3d 130, 136 (3d Cir. 2005) (quoting <u>Bortz v. Noon</u>, 729

A.2d 555, 561 (Pa. 1999)).  First Sealord's First Amended Complaint clearly meets the pleading

requirements under Pennsylvania law.

　　　In that regard, in Paragraph 48 of the First Amended Complaint, First Sealord specifically

alleges and identifies a series of misrepresentations of material fact that were made in connection

with Durkin & DeVries' responses to the Agency Questionnaire on which the parties' relationship was grounded:

      a.    In response to Question 16 of the Agency Questionnaire, Durkin & DeVries represented that CNA, Monitor and Hanover were the only surety companies it had represented in 2002, 2003 and 2004.  In fact, during that time period, Durkin & DeVries had also represented North American Specialties, Crum and Forrester and St. Paul.  Durkin and DeVries' failure to identify St. Paul was material because of the facts set forth in Paragraphs 24 through 32, above;

      b.    In response to Question 17 of the Agency Questionnaire, Durkin & DeVries represented that no one associated with Durkin & DeVries ever had powers of attorney revoked.  In fact, every individual identified in the Agency Questionnaire as a member of Durkin & DeVries' Bond Department (Marie Ferguson, John S. Mahoney and John S. DeVries), as well as Durkin & DeVries' Managing Partner (Thomas P. Durkin) had their power of attorney revoked by St. Paul in 2004;

      c.    In response to Question 18 of the Agency Questionnaire, Durkin & DeVries represented that no one associated with the agency had ever been involved in litigation or claims concerning unauthorized bonds or misuse of powers of attorney.  In fact, St. Paul had claimed in 2004 and continued to claim thereafter that Tom Durkin and Durkin & DeVries had issued an unauthorized Performance Bond to the City of Lawrence in the amount of $77,252,000.00; and

      d.    In response to Question 19 of the Agency Questionnaire, Durkin & DeVries represented that Durkin & DeVries had never been canceled by a company.  In fact, St. Paul had cancelled Durkin & DeVries at the same time St. Paul revoked Durkin & DeVries' Power-of-Attorney in 2004.

<u>See</u> First Amended Complaint (Doc. 34-3) at ¶ 48.

      The allegations regarding Durkin & DeVries' misrepresentations are supported by the exhibits to First Sealord's First Amended Complaint, which reflect the facts that: i) Durkin & DeVries was an agent of St. Paul from 2002 through at least 2004 (<u>see</u> First Amended Complaint (Doc. 34-3), Ex. Nos. 2, 5, 6); ii) every employee at Durkin & DeVries had his or her powers of

attorney revoked by St. Paul prior to the date that Durkin & DeVries filled out the Agency Questionnaire (see First Amended Complaint (Doc. 34-3), Ex. Nos. 5, 6); iii) Durkin & DeVries had been involved in claims asserted by St. Paul regarding unauthorized bonds and misuse of powers of attorney (see First Amended Complaint (Doc. 34-3), Ex. Nos. 3, 4, 5, 6); and iv) St. Paul cancelled Durkin & DeVries as its agent (see First Amended Complaint (Doc. 34-3), Ex. Nos. 5, 6).   The pleading requirements with regard to the first element of a negligent misrepresentation claim are, thus, clearly met.

The facts supporting the second element of a cause of action for negligent misrepresentation are alleged in Paragraph 49 of the First Amended Complaint:  "Durkin & DeVries acted negligently in responding to the Agency Questionnaire because it knew or should have known that each of the representations set forth in Paragraph 48 above were false when made."  See First Amended Complaint (Doc. 34-3) at ¶ 49.  This allegation is supported by Exhibit Nos. 2 through 6 to the First Amended Complaint.

First Sealord alleges the facts supporting the third element of the cause of action for negligent misrepresentation in Paragraph 50 of the First Amended Complaint:

> Durkin & DeVries made the representations set forth in Paragraph 48 above to induce First Sealord to enter into the Agency Agreement, to appoint Durkin & DeVries its agent to solicit business for the surety bond products offered by First Sealord, and to write bonds for contractors identified through the Durkin & DeVries agency relationship.

See First Amended Complaint (Doc. 34-3)  at ¶ 50.  This allegation is supported by the terms of the Agency Questionnaire itself, wherein Durkin & DeVries certified that:

> **I HAVE REVIEWED THE INFORMATION CONTAINED IN THE QUESTIONNAIRE, AND TO THE BEST OF MY KNOWLEDGE I AM NOT AWARE OF ANY DISCREPANCIES OR INACCURACIES.**

See Barbour Dec., Ex. A.  The Court can reasonably and properly infer that by certifying the responses and information provided in the Agency Questionnaire, Durkin & DeVries intended First Sealord to rely on the information and to act on it by appointing Durkin & DeVries as its agent.

Finally, First Sealord alleges the facts that support the fourth element of a cause of action for negligent misrepresentation in Paragraphs 51 through 54 of the First Amended Complaint, where it alleges that it justifiably relied on Durkin & DeVries' misrepresentations, that it would not have signed the Agency Agreement had it known of the misrepresentations, and that it suffered damages as a direct and proximate result of Durkin & DeVries' negligent misrepresentations.  Here too it is reasonable and proper for the Court to infer that by including the certification referenced above in the Agency Questionnaire, First Sealord would rely on Durkin & DeVries' representations.

Thus, not only does First Sealord's claim for negligent misrepresentation allege all the required elements of the cause of action, but the allegations are also supported by well-pled facts.  This, no doubt, explains why Durkin & DeVries' Motion, though styled as a motion to dismiss, fails even to question the sufficiency First Sealord's allegations.  Viewing the well-pled facts, and all inferences therefrom, in a light most favorable to First Sealord, the First Amended Complaint sufficiently alleges a claim for negligent misrepresentation, and Durkin & DeVries' Motion must be denied.

**B.    First Sealord's Claim for Negligent Misrepresentation is Supported by the Record Evidence, is Legally Sufficient, and is Not Subject to Dismissal on Summary Judgment Under Rule 56.**

The Court must deny Durkin & DeVries' Motion, even if viewed as a motion for summary judgment under Rule 56.  The standard for a motion for summary judgment is substantially similar to that of a motion to dismiss – all facts and inferences therefrom are to be

viewed in a light most favorable to the non-moving party, see Charlie's Dream, Inc., supra at 868.  The only difference in application of those standards is that in addition to the pleadings, the Court should look at all record evidence, including depositions, answers to interrogatories, and admissions on file, together with any affidavits, to determine whether there are any genuine issues of material fact such that the moving party is entitled to judgment as a matter of law.  Id.

As set forth above, the First Amended Complaint and the attached exhibits present, at the very least, disputed issues of material fact that would prevent the Court from granting summary judgment on First Sealord's negligent misrepresentation claim in favor of Durkin & DeVries.  As stated in more detail below, however, the evidence developed in discovery confirms and further substantiates First Sealord's claim against Durkin & DeVries for negligent misrepresentation. As such, even if the Court views Durkin & DeVries' Motion as one for summary judgment, it must be denied.

      **1.**     **The Facts Reflect that Durkin & DeVries Made Critical, Material Misrepresentations on First Sealord's Agency Questionnaire to Induce First Sealord to Enter into the Agency Agreement.**

Durkin & DeVries asserts that First Sealord's negligent misrepresentation claim should be dismissed because "as an initial matter, there were no misrepresentations" and because "the facts do not support the claim."  Motion to Dismiss (Doc. 40-1) at pp. 2, 8.  Both of these assertions are patently wrong.  In fact, the evidence developed in discovery, including testimony from Durkin & DeVries' owner and corporate designee, clearly establishes not only that Durkin & DeVries misrepresented material facts when responding to First Sealord's Agency Questionnaire, but that Durkin & DeVries knew or should have know that the representations were false.  Further, the evidence reflects that Durkin & DeVries intended First Sealord to, and knew that First Sealord would, rely on its misrepresentations.

The Agency Questionnaire is not a complicated document – its questions are clear, concise and direct.   Only now that First Sealord has uncovered Durkin & DeVries' misrepresentations, does Durkin & DeVries claim confusion and misunderstanding.   Despite its best efforts to distract and obfuscate from the issues at hand, by arguing over present versus past tense and setting up straw arguments, the evidence is clear that Durkin & DeVries understood the questions in First Sealord's Agency Questionnaire and negligently misrepresented material facts in its responses to those questions.

### *Misrepresentation Regarding its Agency Relationship with St. Paul*

The most compelling evidence of Durkin & DeVries' misrepresentations is the testimony of Durkin & DeVries through its owner and its Rule 30(b)(6) corporate designee, Thomas P. Durkin.   At his deposition, Mr. Durkin admitted that even though Durkin & DeVries represented St. Paul in 2002, 2003 and 2004, it did not list St. Paul on the Agency Questionnaire in response to question 16:

> Q:   Okay.  So number 16, this says: "List surety companies that you represent," and you list them in 2002, 2003, and 2004, Right?  You said "CNA, Monitor and Hanover."  Right?
>
> A:   Right.
>
> Q:   You didn't list St. Paul.
>
> A:   When I signed this –
>
> Q:   Yes.
>
> A:   -- St. Paul had begun to melt down.
>
> Q:   That's not what I'm asking.   You represented St. Paul in 2002.  Right?
>
> A:   Yes.
>
> Q:   And 2003?
>
> A:   Yes.

13

Q:      And 2004?

A:      Right.

Q:      And they sued you for a bond that you issued in what year?

A:      2003.

Q:      2003, and there's the lawsuit out there with Brad Carver's name on it saying [St. Paul] incurred a loss in connection with a $74 million bond, the penal sum of which went up as a result of change orders, and you didn't list that on your application with First Sealord.  Right?

A:      At the time –

Q:      I just want to you to tell me whether you listed it or not.

A:      I did not.

See Barbour Dec., Ex. C – Deposition of Thomas B. Durkin dated March 21, 2012 (hereinafter "Durkin Dep."), 62:3-63:9.  Clearly, when he testified before First Sealord sought leave to add its negligent misrepresentation claim, Mr. Durkin was not confused by question 16 on the Agency Questionnaire.  Nor should he have been.  First Sealord was not the first surety for whom Durkin & DeVries was an agent, and Mr. Durkin was well aware of the fact that First Sealord was seeking information regarding all of the sureties that Durkin & DeVries was representing in 2002, 2003 and 2004.

Nevertheless, Durkin & DeVries now argues that it did not misrepresent its relationship with St. Paul because the Agency Questionnaire, despite requesting information for 2002, 2003 and 2004, only sought information regarding the sureties that Durkin & DeVries was actually representing on the day it completed the Agency Questionnaire in August 2005.[1]  See Motion to

---

[1] Even setting aside Durkin & DeVries' strained interpretation, the assertion in its motion that "Durkin without dispute accurately identified the surety companies that he represented at the time he completed the Questionnaire (August 1, 2005)" is not true.  Motion to Dismiss (Doc. 40-1) at p. 9.  In fact, Mr. Durkin testified that the list of sureties he included in his response to question 16 on the Agency Questionnaire was inaccurate and incomplete.  See Durkin Dep. II, 14:4-17:5.

Dismiss (Doc. 40-1) at pp. 9-10.  Mr. Durkin admitted, however, that this is not the way that the question is actually worded, and that such an interpretation can only be reached by inserting words into the question that were not there in the first place:

> A:    Yeah.  The way I interpreted this question is, who are you doing business with now, 2005.
>
> Q:    Does the word "now" appear on there?
>
> A:    No, it doesn't.  But it doesn't say, you know anything about—

See Durkin Dep. II, 16:18-24.

Equally important, Durkin & DeVries' argument that "[c]urrent representation was the premise of the question" makes no sense.  Motion to Dismiss (Doc. 40-1) at p. 10.  In that regard, why would First Sealord ask a potential agent about losses incurred and premiums paid by sureties in 2002, 2003 and 2004 if it only wanted to know about Durkin & DeVries' surety relationships that existed in August 2005?  Obviously, it would not.  Instead, the clear purpose of the Agency Questionnaire was to solicit information so that First Sealord could evaluate Durkin & DeVries' *history* with sureties, not its present, so it could make a well-informed decision whether to accept the risk of appointing Durkin & DeVries as its agent.  For that purpose, First Sealord requested information from Durkin & DeVries regarding its relationships with sureties in 2002, 2003 and 2004.  Durkin & DeVries' contrived interpretation of the "premise" of question 16 conveniently allowed it not to disclose to First Sealord the fact of its then-revoked agency relationship with St. Paul and St Paul's claimed losses in 2004 stemming from an allegedly unauthorized bond issued by Durkin & DeVries.  Construing all these facts in a light most favorable to First Sealord, as the Court must, it is eminently reasonable to conclude that Durkin & DeVries made material misrepresentations on the Agency Questionnaire when it failed to list St. Paul as a surety Durkin & DeVries represented in 2002, 2003 and 2004.

### *Misrepresentation Regarding St. Paul's Revocation of its Powers of Attorney*

Question 17 of the Agency Questionnaire asked simply whether "anyone associated with the agency ever had powers of attorney revoked?"  See Barbour Dec., Ex. A.  Durkin & DeVries responded in the negative, clearly misrepresenting a material fact – a fact that had been admitted in a previous lawsuit.  In that regard, when St. Paul filed suit against Durkin & DeVries for issuing a $77 million bond without authorization in the United States District for the District of Massachusetts, St. Paul alleged at Paragraph 20 of its First Amended Complaint that "[i]n or around June 30, 2004, as a result of Durkin's unauthorized issuance of the Project Bonds, and failure to report the Project Bonds and remit the premium, St. Paul terminated Durkin's Power-of-Attorney."  See First Amended Complaint (Doc. 34-3), Ex. 5.

Durkin & DeVries filed an Answer and Affirmative Defenses to St. Paul's First Amended Complaint, which Mr. Durkin confirmed he reviewed before it was filed.  See First Amended Complaint (Doc. 34-3), Ex. 6; Durkin Dep. II, 55:8-10.  At his deposition, Mr. Durkin read into the record Durkin & DeVries' answer to St. Paul's allegation regarding the termination of Durkin's Power of Attorney:

> Q:    Go ahead and read it.
>
> A:    "The Defendants admit that the Plaintiff terminated Defendants' Power-of-Attorney in or about June 30, 2004; otherwise the Defendants deny the remaining allegations…"

See Durkin Dep. II, 55:18-24.  Mr. Durkin then confirmed that his answer to question 17 on First Sealord's Agency Questionnaire contradicted the Answer filed in federal court:

> Q:    Read me the question.
>
> A:    "Has anyone with the Agency ever had their powers of attorney revoked?"
>
> Q:    Which box did you check?

A:      "No."

<u>See</u> Durkin Dep. II, 57:17-22.

Thus, Durkin & DeVries admitted in a sworn Answer, filed with the District Court in Massachusetts, that St. Paul revoked Durkin & DeVries' powers of attorney in or about June 30, 2004.   When asked in First Sealord's Agency Questionnaire just over a year later whether anybody at Durkin & DeVries had ever had their powers of attorney revoked, Mr. Durkin responded "No."  The fact of Mr. Durkin's misrepresentation could hardly be more clear.  Truth notwithstanding, Durkin & DeVries simply ignores its sworn admission to the contrary and now points to Mr. Durkin's testimony, given in this case, that "St. Paul never formally revoked his powers of attorney." <u>See</u> Motion to Dismiss (Doc. 40-1) at p. 12.  Clearly, when taken in a light most favorable to First Sealord, however, the contradiction between Durkin & DeVries' sworn Answer in the St. Paul litigation and its response to question 17 of the Agency Questionnaire is sufficient evidence of a misrepresentation to overcome a motion for summary judgment.

### *Misrepresentation regarding St. Paul's Claim*

Mr. Durkin responded "No" to question 18 of the Agency Questionnaire, which asked whether anyone at Durkin & DeVries had ever "been involved in litigation or claims concerning unauthorized bonds or misuse of powers of attorney." <u>See</u> Barbour Dec., Ex. A; Durkin Dep. II, 57:23-58:7.  This too was a blatant misrepresentation.  Durkin & DeVries asserts in its Motion that this response was accurate and that, based upon a post-hoc explanation of "what happened," St. Paul did not assert any "claim." <u>See</u> Motion to Dismiss (Doc. 40-1) at pp. 11-12.  This assertion, like so many others in Durkin & DeVries' Motion, is contradicted by the straightforward testimony of Mr. Durkin.  In that regard, Mr. Durkin testified that by May 2004, he "very clearly" understood that St. Paul was claiming that Durkin & DeVries issued a $77

million bond without authority.  See Durkin Dep. II, 46:23-47:10.[2]  Thus, viewed in a light most favorable to First Sealord,   Durkin & DeVries' response to question 18 of the Agency Questionnaire was a misrepresentation.

### *Misrepresentation regarding St. Paul's revocation of Durkin & DeVries' Agency*

Question 19 of the Agency Questionnaire asked whether "the agency has ever been cancelled by a company?"  See Barbour Dec., Ex. A.  Durkin & DeVries' unequivocal response in the negative on the Agency Questionnaire was yet another misrepresentation.  Id.  Contrary to the assertion in Durkin & DeVries' Motion that "St. Paul never formally terminated Durkin's Agency Agreement," Mr. Durkin admitted in his sworn testimony that St. Paul did, in fact, formally terminate Durkin & DeVries, and that the termination had occurred sometime between 2004 and 2006.  See Durkin Dep. II, 21:13-22:5.  Construing the facts in a light most favorable to First Sealord, including Durkin & DeVries' sworn Answer in the St. Paul litigation that admitted that Durkin & DeVries' powers of attorney were revoked in June 2004, the Court can reasonably conclude that St. Paul cancelled Durkin & DeVries prior to the August 2005 Agency Questionnaire, making Durkin & DeVries' response to question 19 of the Agency Questionnaire a material misrepresentation.

Viewing the facts in a light most favorable to First Sealord, only one conclusion can be reached -- the evidence overwhelmingly demonstrates that Durkin & DeVries misrepresented material facts when Mr. Durkin completed First Sealord's Agency Questionnaire.  At a minimum, there are material issues of fact in dispute regarding Durkin & DeVries'

---

[2] Durkin & DeVries' Motion asserts that "it was not until 2007 that St. Paul commenced litigation to assert a claim." Motion to Dismiss (Doc. 40-1) at p. 12.  The effort to equate litigation and claims is wholly untenable, however, as the Agency Questionnaire clearly distinguishes between these two distinct concepts by asking about involvement in "litigation or claims."  See Barbour Dec., Ex. A.  St. Paul's claim was understood to exist in 2004, years before its lawsuit was filed.

misrepresentations that prevent the Court from dismissing First Sealord's negligent misrepresentation claim on summary judgment.

### 2. Durkin & DeVries' Misrepresentations were a Substantial Factor in Bringing about First Sealord's Harm.

Durkin & DeVries' misrepresentations proximately caused First Sealord's injuries. Proximate cause is an essential element for negligent misrepresentation claims. Bouriez v. Carnegie Mellon University, 585 F.3d 765, 771 (3d Cir. 2009). In determining whether a defendant's acts or omissions will be considered the proximate cause of a plaintiff's harm, the trial court must ascertain whether the "defendant's acts or omissions were a 'substantial factor' in bringing about the plaintiff's harm." Id. (citing First v. Zem Zem Temple, 454 A.2d 18, 21 n.2 (Pa. 1996). In evaluating whether an act or omission is a substantial factor in causing a harm, Pennsylvania courts apply the factors listed in the RESTATEMENT (SECOND) OF TORTS § 433:

>   a) the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it;
>
>   b) whether the actor's conduct has created a force or series of events which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible; and
>
>   c) lapse of time.

Id. (quoting RESTATEMENT (SECOND) OF TORTS § 433). The record evidence in this case demonstrates that Durkin & DeVries' misrepresentations were, in fact, a substantial factor in causing First Sealord's harm.

With regard to causation, Durkin & DeVries' motion asserts that "[a]t most, the Agency Questionnaire put First Sealord in the 'time and place' to suffer a totally unrelated loss." Motion to Dismiss (Doc. 40-1) at p. 14. In so arguing, and in attempting to equate this case with totally distinguishable securities litigations, Durkin & DeVries ignores the very nature of the

surety/agent relationship and the role that the agent plays in the issuance of each and every bond. In that regard, the surety/agent relationship is, particularly from the surety's perspective, fundamentally based on trust.  As reflected by the terms of the Agency Agreement, from the inception of the relationship through its end, the surety places enormous trust in the agent to be totally transparent and honest with the surety, to continually provide reliable and accurate information to the surety regarding the contractors on whose behalf the agent seeks bonds, and to always act in the surety's best interests.  See Barbour Dec., Ex. A.  Trust in the agent is crucial because the surety, by executing a power of attorney, gives the agent the awesome power to write bonds in the surety's name and to bind the surety to pay potentially millions of dollars in claims should a project go bad.  Id. at ¶3.  Importantly, this is not a one time proposition – for until the power of attorney is revoked, the agent continually wields with this awesome power. Id.  Thus, the surety's ability continually to trust its agent and any and all representations made by the agent continues as a cornerstone of the surety/agent relationship throughout its lifetime, any violation of which is grounds for immediate termination and revocation of the power of attorney.  Id. at ¶ 16(j).  Simply put, no surety would grant powers of attorney to an agent that it knows it cannot trust.

Durkin & DeVries intended and knew at the time that it responded to the Agency Questionnaire that First Sealord would rely on Durkin & DeVries' responses in determining whether to enter into the Agency Agreement, to appoint Durkin & DeVries its agent to solicit business for First Sealord's surety bond products, and to write bonds for contractors identified through the Durkin & DeVries agency relationship:

> Q:     Okay.  And you understood that the answers you were
>        giving were going to be reviewed by First Sealord; is that
>        right?
>
> A:     Yes.
>
>                          …

> Q:     Okay.  And in doing that, you're making representations about your agency, about who the individuals within your agency are, about certain facts about the agency, correct?
>
> A:     Very limited, yeah.
>
> MR. TORKELSON:   Objection to form.
>
> Q:     Okay.  Limited, understood.  And you understood, did you not, that First Sealord was going to rely on your answers to those questions.
>
> MR. TORKELSON:   Objection to form.
>
> A:     Yeah.

See Durkin Dep. II, 11:6-9; 11:18-12:9.

At the time it approached First Sealord, Durkin & DeVries had been in the surety agency business for approximately 17 years.  See Durkin Dep., 49:7-17.  As such, Durkin & DeVries knew the importance of trust to the surety/agent relationship.  Moreover, Durkin & DeVries knew from then-recent experience that the moment that trust was broken, First Sealord would revoke its power of attorney and cancel Durkin & DeVries.  In that regard, immediately before soliciting First Sealord to be First Sealord's agent, St. Paul had revoked Durkin & DeVries' powers of attorney and cancelled Durkin & DeVries' agency for violating its trust – by allegedly issuing a substantial bond without St. Paul's authorization.  See First Amended Complaint (Doc 34-3), Ex. 5.  Durkin & DeVries' relationship with St. Paul and the events surrounding the termination of that relationship underscore how First Sealord's trust in Durkin & DeVries played a role in each and every bond that Durkin & DeVries wrote on First Sealord's behalf.  Like St. Paul before it, the moment that First Sealord discovered that Durkin & DeVries could not be trusted, First Sealord would have immediately revoked Durkin & DeVries' powers of attorney, thereby extinguishing Durkin & DeVries' ability to write bonds.  See Barbour Dec., Ex. A at ¶ 16(j).

21

Another fact critical in the causation analysis is that First Sealord had no direct relationships with contractors.  All of the bonds that First Sealord issued were through agents like Durkin & DeVries.  Accordingly, First Sealord would never write bonds for a contractor unless one of First Sealord's agents brought that contractor to First Sealord, and First Sealord would never issue a particular bond unless an agent sought approval of that particular bond. Thus, Durkin & DeVries' responses to the Agency Questionnaire and the purported foundation of trust it established with First Sealord were inextricably intertwined with every bond that Durkin & DeVries issued to Heller & Smith on First Sealord's behalf, from the first to the last. The only way Durkin & DeVries could issue bonds for Heller & Smith was through its power of attorney with First Sealord.  <u>See</u> Barbour Dec., Ex. A.  First Sealord, necessarily then, continuously relied on Durkin & DeVries' representations in allowing Durkin & DeVries to be its agent, and to have the power to write bonds on its behalf.

Turning now to the substantial factor analysis, a defendant's conduct "may be a substantial factor as long as it is significant and recognizable.  It need not be quantified as large or considerable."  <u>In re Asousa Partnership</u>, 2005 WL 775429 *6 (Bankr. E.D. Pa. 2005) (citing <u>Commonwealth v. United States Mineral Product Co.</u>, 809 A.2d 1000, 1011 (Pa. Commw. Ct. 2002).  With respect to the first factor in the substantial factor analysis, "the number of other factors which contribute in producing the harm and the extent of the effect which they have in producing it," RESTATEMENT (SECOND) OF TORTS § 433), the plaintiff "need not exclude every possible alternative cause of its injury."  <u>Id.</u>; <u>see also</u> <u>Zem Zem Temple</u>, 686 A.2d at 22 n.3 (reversing trial court finding that no proximate cause existed because other factors may have contributed to plaintiff's injury and holding that plaintiff presented evidence to enable the fact finder to infer reasonably that the defendant was a substantial factor in causing the harm).

Durkin & DeVries' misrepresentations were directly related to and the predicate for the power of attorney through which Durkin & DeVries issued bonds for Heller & Smith that resulted in losses to First Sealord.  Thus, Durkin & DeVries' misrepresentations were, at a minimum, significant and recognizable factors in causing First Sealord's injuries.  Durkin & DeVries asserts in its motion that "the only factors contributing to First Sealord's decision to issue the bonds were its own underwriting process and, allegedly, Durkin's failure to convey 'Adverse Information' about H&S."  Motion to Dismiss (Doc. 40-1) at p. 14.  This, of course, is patently false, and Durkin & DeVries is not entitled to the benefit of such bald and unsupported statements as the moving party.  One factor contributing to First Sealord's decision to issue each and every bond to Heller & Smith was obviously the fact that its agent, Durkin & DeVries, requested the bond.[3]  While it can be argued that other causes may have contributed to First Sealord's losses, that does not absolve Durkin & DeVries of responsibility for its misrepresentations in getting itself appointed as First Sealord's agent.  See Hamil v. Bashline, 392 A.2d 1280, 1285 (Pa. 1978).  Indeed, the substantial factor test allows for a court to find proximate causation even in the presence of intervening events.  Taylor v. Jackson, 643 A.2d 771, 776-77 (Pa. Commw. Ct. 1994).  Accordingly, the first factor weighs heavily in favor of First Sealord.

The next factor in the substantial factor analysis is "whether the actor's conduct has created a force or series of events which are in continuous and active operation up to the time of the harm, or has created a situation harmless unless acted upon by other forces for which the actor is not responsible."  RESTATEMENT (SECOND) OF TORTS § 433.  As set forth above, Durkin

---

[3] Durkin & DeVries attempts to distance itself from the bonds on which losses were sustained by asserting that "most of the bonds issues by First Sealord to H&S did not result in any losses."  Motion to Dismiss (Doc. 40-1) at p. 14.  This, of course, is totally irrelevant and, and does not change the fact that each and every bond on which losses were sustained was requested by Durkin & DeVries and, ultimately, written by Durkin & DeVries using the powers of attorney it gained through its many misrepresentations.

& DeVries' misrepresentations resulted in the surety/agent relationship through which First Sealord continually relied on these misrepresentations in allowing Durkin & DeVries to be First Sealord's agent with the ability to bring bond requests to First Sealord and power of attorney required to issue bonds on First Sealord's behalf.  These misrepresentations are inextricably and continually linked to every bond that Durkin & DeVries' issued in First Sealord's name.  Further, because First Sealord had no direct relationship with Heller & Smith, all of the bonds that First Sealord issued in favor of Heller & Smith were issued by and through its agent, Durkin & DeVries.  Thus, First Sealord's issuance of bonds for Heller & Smith, from the first to the last, was predicated upon Durkin & DeVries' good standing as First Sealord's agent.  That good standing, of course, along with Durkin & DeVries' contractual relationship as First Sealord's agent, was predicated on Durkin & DeVries' misrepresentations on the Agency Questionnaire.  Thus, Durkin & DeVries' misrepresentations created a continuous series of events that led to First Sealord's losses.  As such, the second factor weighs in favor of First Sealord.

The final factor in the substantial factor analysis is the "lapse of time."  RESTATEMENT (SECOND) OF TORTS § 433.  Here, lapse of time is not applicable because Durkin & DeVries' agency was continual and because First Sealord never stopped relying on Durkin & DeVries' misrepresentations.  First Sealord relied on the representations in the Agency Questionnaire throughout its relationship with Durkin & DeVries, in connection with each and every bond request submitted by Durkin & DeVries and for each and every bond issued in favor of Heller & Smith.  At best, the appropriate measure would be the lapse of time between when First Sealord approved Durkin & DeVries to issue a particular bond for Heller & Smith and the time the first claim was received on that particular bond, which in all instances was relatively short.  Either way, however, "where it is evident that the influence of the actor's negligence is still a significant factor, *mere lapse of time, no matter how long it is*, is not sufficient to prevent it from

being the legal cause of the other harm." RESTATEMENT (SECOND) OF TORTS § 433(c) cmt. (f). Moreover, courts have held a misrepresentation to be a substantial factor causing a party's injury three years after it was initially made. Bouriez, 585 F.3d at 773. Thus, because the lapse of time between the representation and injuries to First Sealord was minimal at best, this factor weighs in favor of First Sealord.

In its proposal to the Court how the causation analysis should be undertaken, Durkin & DeVries relies on cases evaluating proximate cause in the context of securities litigation and applying the loss causation test. Durkin & DeVries asserts that, applying the loss causation test, First Sealord cannot establish the proximate cause prong of its negligent misrepresentation claim. See Motion to Dismiss (Doc. 40-1) at p. 15. The cases upon which Durkin & DeVries relies, however, are factually distinguishable and, as a result, shed no light on the issue whether Durkin & DeVries' misrepresentations proximately caused First Sealord's injuries.

As a threshold matter, Pennsylvania courts have never applied the securities litigation loss causation test, which authorities have held is more stringent than the substantial factor test for proximate cause, to common law negligent misrepresentation claims. See Cast Art Indus., LLC v. KPMG LLP, 3 A.3d 562, 576 (N.J. Super. Ct. App. Div. 2010) (revs'd on other grounds by Cast Art Indus., LLC v. KPMG LLP, 36 A.3d 1049 (N.J. 2012) (refusing to apply the more stringent loss causation standard from federal securities cases to a common law cause of action); Fisher v. Reich, 1995 WL 23966 *14 (S.D.N.Y. 1995) (common law claims are actionable so long as defendant's conduct was a substantial factor in the sequence of causation; the loss causation standard need not be met to bring a common law claim) (citing Northwestern Nat'l Ins. Co. of Milwaukee, Wisconsin v. Alberts, 769 F.Supp. 498, 506 (S.D.N.Y. 1991).

More important, the facts of the cases cited by Durkin & DeVries are easily distinguishable from those in this case. In Citibank, N.A. v. K-H Corp., 968 F.2d 1489 (2d Cir.

25

1992), one of the principal cases upon which Durkin & DeVries relies, Citibank agreed to finance Grabill Aerospace Industries, Ltd.'s ("GAIL") stock purchase of five aerospace subsidiaries from K-H Corporation ("K-H"). Id. at 1491. GAIL pledged its own stock and the stock of the subsidiaries it was acquiring as collateral for the $130 million loan. Id. at 1492. After the closing, GAIL defaulted and Citibank took the stock as collateral. Id. The stock prices for GAIL and the subsidiaries had fallen, however, such that Citibank was unable to realize the $150 million that it claimed K-H represented as the value of the subsidiaries' stock during the purchase transaction. Id. at 1492. Citibank then sued K-H under section 10(b) of the Securities Exchange Act of 1934, for misrepresenting the value of the subsidiaries' stock during the purchase transaction, seeking the difference between $150 million and the amount Citibank actually recovered from the stock sale. Id. K-H moved to dismiss claiming that Citibank could not establish that K-H proximately caused the decrease in stock price. Id.

The Court held that section 10(b) claims required a plaintiff to prove loss causation – that the economic harm it suffered occurred as a result of the alleged misrepresentations – an element similar to the tort law requirement of proximate causation. Id. at 1495-96. Applying the Citibank facts to the law, however, the Court held that K-H was not the proximate cause of Citibank's losses because K-H's misrepresentations were in no way related to the drop in the stock prices which were the cause of Citibank's losses. Id. at 1496. In other words, the subsidiaries' stock price that constituted Citibank's collateral would have fallen regardless of whether K-H made the alleged misrepresentations. Id.

Similarly, in Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP, 83 P.3d 322 (Or. 2004), the plaintiff sued its accounting firm for negligently conducting an audit that delayed its public offering. The plaintiff argued that but for the accountant's negligence, the stock would have been offered sooner at a higher price, and sued the defendant for the difference. Id. at 324.

26

The court held that, although the accountant's actions led to the delay in the offering, the accountant's actions did not cause the decline in the stock.  Id. at 330.  Rather, it was market forces that had absolutely nothing to do with the accountant's negligence that caused the stock price to fall.  Id.  Thus, the accountant was held not to be the proximate cause of the plaintiff's injury.  Id.

Both Citibank and Oregon Steel Mills follow a fact pattern familiar in securities cases – a plaintiff relies on the defendant's representations concerning transactions that involve publicly traded stocks and, at some point in time after the transaction, the stock price declines due to market conditions completely unrelated to the defendant's representations.  Under these circumstances, courts are reluctant to allow plaintiffs to recover because the cause of the harm -- market conditions outside of the defendant's control, have no relation to the defendant's representations and are, therefore, not a foreseeable consequence of the defendant's negligent acts.  Oregon Steel Mills, 83 P.3d at 330.

The securities case fact pattern, however, is completely inapposite to the facts in this case.  As discussed above, Durkin & DeVries' misrepresentations in getting itself appointed as First Sealord's agent were inextricably linked to each and every bond that First Sealord approved for Heller & Smith.  The bonds that caused First Sealord's losses existed only because Durkin & DeVries requested them in the first instance and because Durkin & DeVries, using the power of attorney that First Sealord was induced into granting, issued them on First Sealord's behalf.  In the securities cases on which Durkin & DeVries so heavily relies, the stock prices were going to decline regardless of whether the misrepresentations were ever made.  It can not similarly be claimed that First Sealord would have incurred losses, or that First Sealord would have made "independent underwriting decisions" regarding Heller & Smith (which Durkin & DeVries identifies as the cause of First Sealord's losses), had Durkin & DeVries never made

misrepresentations in responding to First Sealord's Agency Questionnaire. Had those misrepresentations not been made, Durkin & DeVries would not have been in the position as agent to request the bonds at issue, Durkin & DeVries would not have held the power of attorney necessary to issue the bonds, and the bonds that ultimately resulted in losses for First Sealord would not have been issued. Nor, under any set of circumstances could it be reasonably claimed that First Sealord would have sustained its injuries in the absence of Durkin & DeVries' actions. See Hamil, 392 A.2d at 265. Moreover, by Durkin & DeVries' own admission, First Sealord's losses in this case were a foreseeable consequence of Durkin & DeVries' misrepresentations. In that regard, Durkin & DeVries knew that First Sealord would rely on Durkin & DeVries' misrepresentations in its determination whether to enter into the Agency Agreement, to appoint Durkin & DeVries its agent to solicit business for First Sealord, and to write bonds for contractors identified through the Durkin & DeVries agency relationship. See Durkin Dep. II, 11:6-9; 11:18-12:9. Thus, there is clearly sufficient evidence upon which a jury could find that Durkin & DeVries' misrepresentations proximately caused First Sealord's losses to avoid summary judgment.

Perhaps most important, the Pennsylvania Supreme Court has stated that whether a plaintiff has met its burden in proving "the element of causation is normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." Hamil, 392 A.2d at 1284-85. Viewing the facts in the light most favorable to First Sealord, and drawing all inferences in First Sealord's favor, because a jury could reasonably conclude that Durkin & DeVries' negligent misrepresentations were a substantial factor in causing First Sealord's injuries, Durkin & DeVries' Motion to Dismiss must be denied. Id.

28

3.       **Pennsylvania's Economic Loss Rule Does Not Preclude Claims for Negligent Misrepresentation that Induce a Party to Enter Into a Contract.**

Durkin & DeVries also asserts that First Sealord's negligent misrepresentation claim is barred by Pennsylvania's economic loss rule. This assertion is untenable. The economic loss rule prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract and are unaccompanied by physical or property damage. Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir. 1995). The Third Circuit, however, has recognized two exceptions to Pennsylvania's economic loss rule. Howe v. Philly, 2011 WL 1465446 *6 (E.D. Pa. 2011); Partners Coffee Co., LLC v. Oceana Services and Products Co., 700 F.Supp.2d 720, 733-35 (W.D. Pa. 2010). The first exception applies to claims of fraud in the inducement or negligent misrepresentation where one party fraudulently or negligently induces another party to enter into a contract, and the fraudulent/negligent misrepresentation claim arises independent of the underlying contract.[4] Id.; see also Werwinski v. Ford Motor Co., 286 F.3d 661, 676-77 (3d Cir. 2002). The second exception applies to a narrow class of negligent misrepresentation cases in which a party that has no contractual relationship with a third party relies to its detriment on information provided by the third party. Howe, 2011 WL 1465446 at *6 n.7; Partners, 700 F.Supp.2d at 735; Bilt-Rite Contractors, Inc., v. The Architectural Studio, 866 A.2d 270 (2005).

In the instant case, the first exception – which carves out of the economic loss rule's scope claims based on a party's negligent misrepresentations induce another to enter into a contract – is applicable. See generally Howe, Werwinski, supra. In that regard, the First Amended Complaint alleges that Durkin & DeVries negligently misrepresented several material

facts in its responses to First Sealord's Agency Questionnaire in an effort to induce First Sealord

to sign the Agency Agreement, to appoint Durkin & DeVries as First Sealord's agent to solicit

business for its surety bond products, and to write bonds for contractors identified through the

Durkin & DeVries agency relationship.  See First Amended Complaint (Doc. 34-3) at ¶ 49.  As

discussed below, Durkin & DeVries' misrepresentations on the Agency Questionnaire were

independent of, and separate and apart from, its obligations under the Agency Agreement.  As

such, First Sealord's negligent misrepresentation claim is not barred by the economic loss rule.

See generally Howe, Werwinski, supra.

> ### a.      Durkin & DeVries' misrepresentations arise independent of the Agency Agreement.

The economic loss rule will not bar claims for negligent misrepresentation to induce a

party to enter into a contract where the misrepresentations are "ancillary to any claim relating to

the performance of the contract."  Howe, 2011 WL 1465446 at *6.  In Howe, the defendant sent

a written offer to the plaintiff to partner with the defendant and open multiple pizza delivery

franchises.  Id. at *1.  The plaintiff, relying on the defendant's representation that they would be

business partners, accepted the offer and signed the contract, which set forth the plaintiff's duties

and responsibilities in setting up the business.  Id.  Almost a year after the contract was signed,

the defendant fired the plaintiff, treating him as an employee and not an actual partner in the

business.  Id.  The plaintiff then sued the defendant for, *inter alia*, negligent misrepresentation

claiming that the defendant falsely represented that the plaintiff would be a partner in the

business, not a mere employee, and that the plaintiff relied on this representation in agreeing to

sign the contract.  Id.

---

[4] Fraud in the inducement and negligent misrepresentation claims are analyzed similarly under the economic loss rule.  Howe v. Philly, 2011 WL 1465446 *6 (E.D. Pa. 2011); Werwinski v. Ford Motor Co., 286 F.3d 661, 676-77 (3d Cir. 2002) (there is no reason to treat fraud in the inducement claims differently from negligent misrepresentation claims for purposes of economic loss rule analysis).

The defendant in Howe moved to dismiss the claim for negligent misrepresentation on the grounds that the claim was barred by the economic loss rule.  Id.  The District Court analyzed the plaintiff's negligent misrepresentation claim and observed that the alleged misrepresentation -- that the plaintiff would be a partner in the business -- was ancillary to and not part of any claim regarding the plaintiff's duties in the performance of the contract, which included attending training classes and the running the day to day operations of the pizza restaurant.  Id. at *6.  Thus, relying on established Third Circuit precedent in Werwinski, supra, the District Court held that the economic loss rule did not bar the plaintiff's claims for negligent misrepresentation.

Another instructive case is Air Products and Chemicals, Inc. v. Eaton Metal Products, Co., 256 F.Supp.2d 329 (E.D. Pa. 2003).  In that case, the plaintiff contracted in 1994 with the defendant for the manufacture and purchase of pressure vessels in compliance with the American Society of Mechanical Engineers Boiler and Pressure Vessel Code ("ASME").  Id. at 333.  The ASME provided rigorous standards for the design, fabrication, testing and inspection of pressure vessels.  Id.  Prior to signing the contract, the defendant represented to the plaintiff that it was ASME certified.  Id. at 334.  In 2001, seven years after entering into the contract, the plaintiff learned that thousands of pressure vessels supplied by the defendant had cracks, and sued the defendant for the resulting economic losses.  Id.  During discovery, the plaintiff learned that, despite the defendant's prior representations, one of the defendant's manufacturing plants in which much of the construction of the pressure vessels took place, was not ASME certified.  Id.  The plaintiff moved for leave to amend its complaint to add a claim for fraudulent misrepresentation in the inducement to contract.  Id.  The defendant opposed the amendment claiming, *inter alia*, that the fraud in the inducement claim was barred by the economic loss rule.  Id.  As stated previously, for purposes of analysis under the economic loss rule, fraudulent

misrepresentation and negligent misrepresentation in the inducement to contract are treated the same.  See Howe, supra.

In analyzing whether the plaintiff's claim was barred by the economic loss rule, the District Court recognized the Third Circuit's holding in Werwinski that fraudulent/ negligent misrepresentation in the inducement claims are not barred by the economic loss rule if the misrepresentation at issue is extraneous to and not interwoven with the breach of contract.  Air Products, 256 F.Supp.2d at 337 (internal citations omitted).  After reviewing the facts, the District Court noted that the defendant's "representation that it was ASME certified was separate and apart from the subject matter of the contract, i.e. the production of ASME compliant vessels."  Id. at 338.  Further, the District Court recognized that there is a difference between a misrepresentation as to the quality of goods and services that might induce concession to a contract and the quality of the parties that may induce concession to a contract.  Id. at 339.  The former, in Air Products, related to the defendant's performance under the contract and must be brought as a breach of contract claim.  Id.  The latter, however, did not relate to contractual performance or obligations.  Id.  Thus, because the plaintiff's misrepresentation claim addressed the latter scenario, it was not barred by the economic loss rule.  Id. at 340.

Other Pennsylvania courts have held similarly.  See  U.S. Claims, Inc. v. Saffren & Weinberg, LLP, 2007 WL 4225536 * 11 (E.D. Pa. 2007) (recognizing the difference between fraud in the inducement and fraud in the performance and denying a motion to dismiss a claim for fraud in the inducement based on the economic loss rule because the economic loss rule does not bar claims for fraud in the inducement); Professional Systems Corp. v. Opex Postal Technologies, 2006 WL 573798 *4 (E.D. Pa. 2006) (holding that the economic loss rule did not bar a claim for fraud in the inducement where the claimed misrepresentations did not relate to the quality of the goods and services that were sold under the contract); Granite Companies, LLC v.

<u>City Capital Corp.</u>, 2008 WL 3285914 *3 (E.D. Pa. 2008) (denying a motion to dismiss a fraud in the inducement claim based on the economic loss rule where the claim is based on representations made before entering a contract).

The facts of this case mirror those in <u>Air Products</u>.  Before entering into the Agency Agreement, Durkin & DeVries misrepresented material facts regarding its history, including its prior relationship with St. Paul, the revocation of its powers of attorney, the cancellation of its agency, and its involvement in claims relating to unauthorized bonds and misuse of powers of attorney.  <u>See</u> First Amended Complaint (Doc. 34-3) at ¶ 48.  Like the defendant's representation in <u>Air Products</u> that it was ASME certified, these representations speak directly to Durkin & DeVries' character and quality and were made to induce First Sealord to believe that Durkin & DeVries was a high quality surety bond agent that could be trusted.  <u>See</u> First Amended Complaint (Doc. 34-3) at ¶ 50; <u>Air Products</u>, 256 F.Supp.2d at 339.  Durkin & DeVries' obligations under the Agency Agreement that was subsequently executed are unrelated to its misrepresentations and include, amongst other obligations, the obligation to disclose adverse information about clients that it was bringing to First Sealord and to maintain complete and accurate records, the multiple breaches of which obligations are appropriately addressed in First Sealord's breach of contract count.  Thus, First Sealord's negligent misrepresentation claim addresses Durkin & DeVries' inducement of First Sealord to enter into the Agency Agreement, not Durkin & DeVries' performance under the Agency Agreement.

Durkin & DeVries' misrepresentations in its responses to First Sealord's Agency Questionnaire concern Durkin & DeVries' quality and not Durkin & DeVries' performance obligations under the subsequently executed Agency Agreement.  As such, the misrepresentations are extraneous to and not interwoven with the breach of contract claim.  <u>See</u> <u>Air Products</u>, 256 F.Supp.2d at 339.  Accordingly, First Sealord's claim for negligent

misrepresentation claim is not barred by the economic loss rule, and Durkin & DeVries' Motion on that basis must be denied.

>    **b.** **The "Bilt-Rite Exception" to the Economic Loss Rule is not applicable.**

Durkin & DeVries relies on <u>Bilt-Rite Contractors, Inc., v. The Architectural Studio</u>, 866 A.2d 270 (2005) and its progeny to arguing that First Sealord's negligent misrepresentation claim is barred by the economic loss rule. In <u>Bilt-Rite</u>, a contractor not in privity with an architect relied on the architect's drawings in constructing a school. 866 A.2d at 272. The contractor later discovered that the drawings were false and misleading and sued the architect for negligent misrepresentation. <u>Id.</u> In deciding the case, the Pennsylvania Supreme Court announced an exception to the economic loss rule, known as the "Bilt-Rite exception," which applies to a narrow class of negligent misrepresentation cases:

>    where information is negligently supplied by one in the business of supplying information, … and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of the information.

<u>Id.</u> at 287. As set forth below, however, Durkin & DeVries' analysis of the economic loss rule through the prism of the <u>Bilt-Rite</u> case is misplaced.

In that regard, the Bilt-Rite exception applies in limited circumstances where a party relies on the representations of a third party with whom it has no contractual relationship. <u>Bilt-Rite</u>, 866 A.2d at 287. First Sealord and Durkin & DeVries, however, have a contractual relationship by virtue of the Agency Agreement that First Sealord was induced to sign. Were the Bilt-Rite exception the only exception to the economic loss rule recognized under Pennsylvania law, Durkin & DeVries *might* have an argument. As set forth above, however, the Third Circuit recognizes two exceptions to Pennsylvania's economic loss rule: i) the Bilt-Rite exception; and ii) an exception that carves out claims for fraud in the inducement or negligent misrepresentation

that involve one party fraudulently or negligently inducing another party to enter into a contract where the fraudulent/ negligent misrepresentation claim arises independent of the obligations under the contract.  See Howe; Partners, supra.  This case falls squarely within the latter exception and, as such, Durkin & DeVries' arguments regarding the economic loss rule necessarily fail.  First Sealord's claim for negligent misrepresentation is not barred by the economic loss rule and, on that basis, Durkin & DeVries' Motion must be denied.

> **4.   The Statute of Limitations was Tolled Because Durkin & DeVries' Misrepresentations and Concealment of the Same Prevented First Sealord From Discovering its Negligent Misrepresentation Claim.**

Under Pennsylvania law, claims for negligent misrepresentation are governed by a two-year statute of limitations, 42 PA. CONS. STAT. § 5524(7).  Pennsylvania recognizes an exception to the statue of limitations, however, that "delays the running of the statute until the plaintiff knew, or through the exercise of reasonable diligence should have known, of the injury and its cause."  Beauty Time, Inc. v. VU Skin Systems, Inc., 118 F.3d 140, 144 (3d Cir. 1997) (quoting Urland v. Merrell-Dow Pharmaceuticals, 822 F.2d 1268, 1271 (3d Cir. 1987).  As discussed in its Motion for Leave to File First Amended Complaint (Doc. 34), First Sealord first learned the facts and circumstances surrounding the St. Paul Litigation on March 21, 2012, investigated those facts and circumstances over the ensuing few weeks, and did not have a full understanding of the import of those facts and circumstances and their relevance to First Sealord's negligent misrepresentation action until Mr. Durkin's deposition was completed on May 9, 2012.  Shortly thereafter, on May 30, 2012, First Sealord sought leave of the Court to add its negligent misrepresentation claim.   Thus, the statute of limitations on First Sealord's negligent misrepresentation claim did not begin to run until March 21, 2012, at the earliest, and First Sealord commenced its pursuit of that claim well within the two-year statute of limitations.

Durkin & DeVries' argument that the limitations period has run hinges in the first instance on the false premise that the simple knowledge of Durkin & DeVries' prior agency relationship with St. Paul would have sent off "red flags" that would have caused First Sealord to further investigate that relationship and, ultimately, not sign the Agency Agreement. In an attempt to shift the focal point of First Sealord's claims, Durkin & DeVries asserts that "[t]he disclosure of the St. Paul relationship is at the heart of First Sealord's misrepresentation claim." Motion to Dismiss (Doc. 40-1) at p. 21. Durkin & DeVries then points to a letter written in October 2005 that purportedly disclosed the St. Paul relationship and, on that, bases its assertion that First Sealord's "claim is now time-barred as a matter of law." Id. It was not the mere existence of the agency relationship with St. Paul, however, that necessarily would have been a red flag to First Sealord (the mere disclosure of Durkin & DeVries' other surety relationships on the Agency Questionnaire did no such thing), it was the fact that at the time Durkin & DeVries filled out the Agency Questionnaire: 1) St. Paul had claimed that Durkin & DeVries unauthorizedly issued a $77,252,000 bond; 2) almost all of Durkin & DeVries' employees previously had their powers of attorney revoked by St. Paul; and 3) St. Paul had cancelled Durkin & DeVries. These facts, of course, were not mentioned in the October 2005 letter, were never disclosed by Durkin & DeVries to First Sealord, and were only discovered by First Sealord during discovery in this case.

Durkin & DeVries, despite being asked point-blank on the Agency Questionnaire to identify its surety relationships in 2002, 2003 and 2004, never told First Sealord it was an agent for St. Paul – not in its responses to the Agency Questionnaire and certainly not in the October 2005 letter on which Durkin & DeVries bases its limitation argument. In that regard, the October 2005 letter, which was actually sent *after* the Agency Agreement was already signed, does not state, despite Durkin & DeVries' attempt to cobble together disjointed sentences to alter

36

its meaning, that Durkin & DeVries was an agent of St. Paul, nor was that its intent.  <u>See</u> Barbour Dec., Ex. D.

Rather, the October 2005 letter states that "H&S was bonded by St. Paul until Traveler's took them over and then with Acadia."  <u>Id.</u>  This sentence describes *Heller & Smith's* prior relationship with St. Paul, not Durkin & DeVries' relationship.  Durkin & DeVries' argument that this statement about Heller & Smith's relationship with St. Paul, combined with a statement made seven sentences earlier that Durkin & DeVries handled the Heller & Smith "account since inception," can hardly be construed to be a disclosure of Durkin & DeVries' relationship with St. Paul.  Further, as the Durkin & DeVries employee responsible for the Heller & Smith account testified at his deposition, the letter was sent to First Sealord to provide First Sealord with background information on *Heller & Smith*.  <u>See</u> Barbour Dec., Ex. E – Deposition of John S. Mahoney dated March 20, 2012, 91:15 – 92:9.  Thus, First Sealord had no reason to scrutinize this letter for the subliminal message that Durkin & DeVries now argues should have been obvious when it was originally sent.

Interestingly, when asked about the October 2005 letter in his deposition, Mr. Durkin testified that the statements in the October 2005 letter regarding Heller & Smith's bonding relationship with St. Paul were *not true*:

> Q: So the facts and circumstances of Heller & Smith's bonding with St. Paul coming to an end are different from those represented by Mr. Mahoney in the letter that we marked as FS-2?
>
> A: In my opinion, yes.
>
> Q: In fact, it had nothing to do with Travelers purchasing St. Paul, correct?
>
> A: I don't believe it did.

See Durkin Dep. II, 24:14-22.  In other words, Durkin & DeVries' argument that First Sealord knew of Durkin & DeVries' relationship with St. Paul is based entirely on a statement in the October 2005 letter that Mr. Durkin has testified is false.

In Pennsylvania, the statute of limitations is tolled and the discovery rule applies when "an injured party is unable, despite the exercise of reasonable diligence, to know that he has been injured and by what cause." Padalino v. Standard Fire Ins. Co., 616 F.Supp.2d 538, 547 (E.D. Pa. 2008) (other citations omitted).  However, "there must be must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful." Id. (citing Toy v. Metro. Life Ins. Co., 863 A.2d 1, 7 (Pa. Super. Ct. 2004).  In this case, the October 2005 letter did not disclose the fact that Durkin & DeVries was an agent for St. Paul in 2002, 2003 and 2004.  See Barbour Dec., Ex. D.  Even assuming Durkin & DeVries' strained reading that the October 2005 letter did alert First Sealord to Durkin & DeVries' prior relationship with St. Paul, nothing in that letter, or any other evidence identified in Durkin & DeVries' Motion, gave First Sealord any reason to believe that Durkin & DeVries made misrepresentations in other responses on the Agency Questionnaire.  Simply put, prior to discovering the St. Paul relationship and the facts and circumstances surrounding Durkin & DeVries' dispute with St. Paul through discovery in this litigation, First Sealord had no reason to make further inquiries about an agency relationship between Durkin & DeVries and St. Paul, the existence of which First Sealord was unaware.

The facts are that Durkin & DeVries actively hid relevant facts from First Sealord. Despite the clear questions set out in the Agency Questionnaire, Durkin & DeVries failed to disclose to First Sealord the fact that Durkin & DeVries was an agent for St. Paul, that St. Paul had claimed in 2004 that Durkin & DeVries issued an unauthorized bond in excess of $77 million, that St. Paul had cancelled Durkin & DeVries, and that St. Paul had revoked Durkin &

DeVries' powers of attorney.   First Sealord was entitled to trust that Durkin & DeVries responded truthfully on the Agency Questionnaire, <u>see</u>  <u>Padalino</u>, 616 F.Supp.2d at 547, and First Sealord had no reason to inquire about the undisclosed and unknown disputes that arose during the relationship between Durkin & DeVries and St. Paul.   Accordingly, because First Sealord did not discover the facts that gave rise to its claim for negligent misrepresentation until May 2012, the two year statute of limitations did not expire.

## V.   CONCLUSION

First Sealord's First Amended Complaint alleges all of the elements of a cause of action for negligent misrepresentation, supported by well-pled facts.   Thus, First Sealord's claim for negligent misrepresentation is not subject to dismissal under Rule 12(b)(6).   Further, the record evidence supports and confirms that Durkin & DeVries misrepresented material facts on its responses to First Sealord's Agency Questionnaire, that Durkin & DeVries intended and knew that First Sealord would rely on its misrepresentations, and that Durkin & DeVries' misrepresentations were a substantial factor in causing First Sealord's injuries.   At a minimum, the record reflects substantial issues of material fact regarding First Sealord's negligent misrepresentation claim that must be resolved at trial.   Accordingly, whether the Court views Durkin & DeVries' Motion as a motion to dismiss under Rule 12(b)(6) or a motion for summary judgment under Rule 56, it must be denied.

Dated this 16th day of August, 2012.

Respectfully submitted,

/s/Robert G. Barbour
Robert G. Barbour, Esq.
Brian N. Krulick, Esq.
Kevin J. McKeon, Esq.
WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000

*Counsel for Plaintiff,*
*First Sealord Surety, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of August 2012, I caused a true and correct copy of

the foregoing Motion for Leave to file First Amended Complaint to be served upon the following

via e-mail and through the cm/ecf system:

> Marshall D. Bilder
> Christopher E. Torkelson
> Sterns & Weinroth
> 50 West State Street, Suite 1400
> Trenton, NJ 08607-1298
> *Counsel of Record for Defendant*

> /s/Robert G. Barbour
> Robert G. Barbour, Esq.
> Brian N. Krulick, Esq.
> Kevin J. McKeon, Esq.
> WATT, TIEDER, HOFFAR
> & FITZGERALD, L.L.P
> 8405 Greensboro Drive, Suite 100
> McLean, Virginia 22102
> (703) 749-1000

> *Counsel for Plaintiff,*
> *First Sealord Surety, Inc.*

41