**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FIRST SEALORD SURETY, INC.,**<br>        **Plaintiff,** | ) ) ) | |
| v. | ) ) | **No. 2:10-cv-00832-TON** |
| **DURKIN & DEVRIES INSURANCE AGENCY,**<br>**LLC,**<br>        **Defendant.** | ) ) ) ) ) | |

**SUPPLEMENTAL DECLARATION OF ROBERT G. BARBOUR
IN OPPOSITION TO DURKIN & DEVRIES INSURANCE AGENCY, LLC'S
MOTION TO DISMISS (Doc. 40)**

I, ROBERT G. BARBOUR, declare:

I am an attorney-at-law admitted *pro hac vice* to practice before this Court.  I am a Partner with the law firm of Watt, Tieder, Hoffar & Fitzgerald, L.L.P., attorneys for Plaintiff First Sealord Surety, Inc. ("First Sealord").  Unless otherwise stated, I have personal knowledge of the following facts, and if called and sworn as a witness, could and would competently testify thereto.

1.      This Supplemental Declaration is being submitted in opposition to Durkin & DeVries Insurance Agency, LLC's ("Durkin & DeVries") Motion to Dismiss (Doc. 40).

2.      On July 11, 2012, Durkin & DeVries filed its Motion to Dismiss Count One of First Sealord's First Amended Complaint (Doc. 40).

3.      Pursuant to the Court's Order Setting Briefing Schedule (Doc. 45), First Sealord filed its Opposition to Durkin & DeVries' Motion to Dismiss (Doc. 46), on August 16, 2012.

4.      Count One of First Sealord's First Amended Complaint (Doc. 34-3) asserts a claim against Durkin & DeVries for Negligent Misrepresentation for making material

misrepresentation on First Sealord's Agency Questionnaire which were relied upon in connection with Durkin & DeVries' appointment as First Sealord's agent.

5.     Durkin & DeVries' Motion to Dismiss argues that the negligent misrepresentation claim should be dismissed because First Sealord cannot show that Durkin & DeVries' misrepresentations proximately caused First Sealord's claimed damages.

6.     Durkin & DeVries filed its Motion to Dismiss, however, before it deposed First Sealord's Corporate Representative, Christopher Mucchetti regarding the facts and circumstances surrounding the negligent misrepresentation claim, which took place, by mutual agreement of the parties, on September 13, 2012.  A copy of the Second Notice of Deposition is attached as Exhibit A.

7.     Likewise, First Sealord's Opposition to the Motion to Dismiss was filed prior to Mr. Mucchetti's deposition.

8.     Attached as Exhibit B are the relevant portions of Mr. Mucchetti's deposition wherein he testified regarding the issue of proximate cause raised in Durkin & DeVries' Motion to Dismiss, specifically as it relates to how Durkin & DeVries' misrepresentations on the Agency Questionnaire were a substantial factor in the issuance of the bonds that ultimately led to losses incurred by First Sealord.

/s/ Robert G. Barbour
ROBERT G. BARBOUR

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of October, 2012, I caused a true and correct copy of

the foregoing Supplemental Declaration of Robert G. Barbour, Esq., with exhibits, to be served

upon the following via e-mail and through the cm/ecf system:

Christopher E. Torkelson
Marshall D. Bilder
Sterns & Weinroth
50 West State Street, Suite 1400
Trenton, NJ 08607-1298

*Counsel of Record for Defendant*

/s/Robert G. Barbour
Robert G. Barbour, Esq.
Brian N. Krulick, Esq.
Kevin J. McKeon, Esq.
WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P
8405 Greensboro Drive, Suite 100
McLean, Virginia 22102
(703) 749-1000

*Counsel for Plaintiff,*
*First Sealord Surety, Inc.*

# EXHIBIT A

**STERNS & WEINROTH**
A Professional Corporation
50 West State Street, Suite 1400
Trenton, NJ 08607-1298
Telephone: (609) 392-2100
Facsimile: (609) 392-7956
Attorneys for Defendant/Third Party Plaintiff, Durkin & DeVries Insurance Agency, LLC n/k/a
Durkin & Durkin Insurance Agency, LLC

---

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FIRST SEALORD SURETY, INC., | Civil Action No.: 2:10-cv-00832-TON |
| Plaintiff, | |
| v. | |
| DURKIN & DEVRIES INSURANCE AGENCY, LLC, | **SECOND NOTICE OF DEPOSITION PURSUANT TO FED.R.CIV.PROC. 30(b)(6) DIRECTED TO FIRST SEALORD SURETY, INC.** |
| Defendant/Third Party Plaintiff, | |
| v. | |
| HELLER & SMITH CORPORATION, | |
| Third Party Defendant. | |

TO:   Robert G. Barbour, Esq.
      Brian N. Krulick, Esq.
      Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
      8405 Greensboro Drive, Suite 100
      McLean, Virginia 22102
      Attorneys for Plaintiff, First Sealord Surety, Inc.

PLEASE TAKE NOTICE that Defendant/Third Party Plaintiff, Durkin & DeVries

Insurance Agency, LLC n/k/a Durkin & Durkin Insurance Agency, LLC ("Durkin"), pursuant to

Rule 30(b)(6) of the Federal Rules of Civil Procedure, will take the deposition of the following

person(s) on August 23, 2012, beginning at 10:00 a.m. and continuing from day to day thereafter

until completed:

The designated representative(s) of New First Sealord Surety, Inc. ("First Sealord") having the most knowledge regarding the matters addressed in the plaintiff's First Amended Complaint, including without limitation the following specific topics:

(i)     the factual basis for the allegations contained in First Sealord's First Amended Complaint in this matter;

(ii)    whether First Sealord was aware that Durkin had done business with St. Paul in the 5 years preceding the time when First Sealord engaged Durkin.

(iii)   the Agency Agreement between First Sealord and Durkin;

(iv)   the Agency Questionnaire completed by Durkin;

(v)    all investigation(s), analysis, and decisions undertaken or made by First Sealord regarding the appointment of Durkin as First Sealord's agent for the purpose of soliciting business for First Sealord's surety bond products;

(vi)   any and all prospective agents that First Sealord declined to appoint as agents based upon the agent's responses to the Agency Questionnaire;

(vii)  any and all agents terminated by First Sealord based upon the agent's dealings with another insurance carrier;

(viii) any and all prospective and/or agents of First Sealord who disclosed claims concerning unauthorized bonds;

(ix)   First Sealord's policies and procedures regarding the appointment of agents for the purpose of soliciting business for First Sealord's surety bond products;

(x)    First Sealord's policies and procedures regarding the termination of appointed agents;

(xi)   First Sealord's policies and procedures regarding monitoring and/or due diligence concerning appointed agents;

(xii)  First Sealord's gross revenues and profits relating to all business solicited by Durkin as agent for First Sealord;

(xiii) First Sealord's complete agency file relating to Durkin; and

(xiv) damages alleged to be suffered by First Sealord relating to its appointment of Durkin as its agent.

Said representative(s) shall also be examined and be prepared to testify about: First Sealord's initial disclosures, discovery responses and documents produced in response to the Durkin's discovery requests.

The said depositions will be taken at the offices of Stradley, Ronan, Stevens & Young, LLP,

2005 Market Street, Suite 2600, Philadelphia, Pennsylvania, or at a mutually convenient location within the Eastern District of Pennsylvania to be agreed upon by counsel, before an officer authorized by law to administer oaths.    Each deponent is requested to produce and permit inspection and copying of all documents in his or her possession, including but not limited to personal files, corporate records, documents, and correspondence, which relate to or refer to the topics identified herein, as well as all documents responsive to defendant's prior discovery requests and that have not previously been produced in discovery.    Said documents shall be produced at the offices of Sterns & Weinroth, 50 W. State Street, Suite 1400, Trenton, New Jersey 08608, five (5) business days before the date of the deposition.

**STERNS & WEINROTH**
A Professional Corporation
Attorneys for Defendant/Third Party
Plaintiff, Durkin & DeVries Insurance
Agency, LLC n/k/a Durkin & Durkin
Insurance Agency, LLC


/s/ Christopher E. Torkelson
            Christopher E. Torkelson

Dated: July 31, 2012

3

## **CERTIFICATE OF SERVICE**

I, Christopher E. Torkelson, Esq., hereby certify that the foregoing Notice of Deposition

was served on July 31, 2012, via e-mail and ordinary mail, upon:

      Robert G. Barbour, Esq.
      Brian N. Krulick, Esq.
      Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
      8405 Greensboro Drive, Suite 100
      McLean, Virginia 22102
      Attorneys for Plaintiff, First Sealord Surety, Inc.

/s/ Christopher E. Torkelson
Christopher E. Torkelson

Dated:  July 31, 2012

4

# EXHIBIT B

Case 2:10-cv-00832-TON   Document 52   Filed 10/01/12   Page 10 of 26

CHRISTOPHER MUCCHETTI                        September 13, 2012
FIRST SEALORD vs. DURKIN & DEVRIES                          1

1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF PENNSYLVANIA
2         CIVIL ACTION NO. 2:10-CV-00832-TON

3   FIRST SEALORD SURETY, INC.,

4            Plaintiff,

5        v.

6   DURKIN & DEVRIES INSURANCE
    AGENCY, LLC,
7
         Defendant/Third-Party Plaintiff,
8
    v.
9
    HELLER & SMITH CORPORATION,
10
              Third-Party Defendant.
11   _____

12

13

14      DEPOSITION UNDER ORAL EXAMINATION OF

15            CHRISTOPHER MUCCHETTI

16        DATE:   SEPTEMBER 13, 2012

17   REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR

18

19

20

21

22      ESQUIRE DEPOSITION SOLUTIONS
              33 Wood Avenue
23               Suite 445
          Iselin, New Jersey   07095
24             (800) 247-8366

25   JOB  # 370294



1   state, but licenses would have to get renewed

2   on a periodic basis.

3        Q    During the course of an agent's

4   appointment by First Sealord, for what

5   reasons would an underwriter refer back to

6   the agency file?

7        A    Off the top of my head, there's --

8   well, I mean, if they got some information,

9   you know, maybe someone wanted to be removed

10  from a power just to see what was going on,

11  but I don't think there would be a whole lot

12  of situations where that would happen.

13       Q    Would an underwriter ever refer to

14  the agency file as part of the underwriter's

15  process in considering a specific bond

16  request?

17       A    I would say no, but it would set

18  the foundation for -- after the appointment

19  process, you know, everything that has led up

20  to that appointment is part of the

21  underwriting process, so to speak.

22       Q    Once the agent has been appointed

23  though, every bond request is considered by

24  the underwriter based on the individual bond

25  request.

1        Is that right?

2            MR. KRULICK:   Object to form.

3        Q    The underwriter never goes back to

4    double check the agency answer when it gets a

5    bond request, does it?

6            MR. KRULICK:   Object to form.

7        A    Not to my knowledge.

8        Q    Although you don't have any direct

9    knowledge, are you generally aware that at

10   some point in time bonds issued to Heller &

11   Smith went into claims?

12       A    Yes.

13       Q    Okay.  You're at least aware that's

14   an allegation in the case, right?

15       A    Yes.

16       Q    Do you know why the Heller & Smith

17   bonds went into claims?

18       A    I don't.

19       Q    Do you know when the Heller & Smith

20   bonds went into claims?

21       A    I don't.

22       Q    Did Durkin's responses on the

23   agency questionnaire, how Durkin answered any

24   of the questions on the agency questionnaire,

25   did that influence, did that affect whether



```
 1   or not the bonds issued to Heller & Smith

 2   several years later went into claims?

 3                MR. KRULICK:  Object to form.

 4        A    I don't think there's a direct

 5   effect, but that's part of the process.

 6        Q    How is it part of the process?

 7        A    Well, because when we get the

 8   information back, for example, the agency

 9   history questions, we're relying on the

10   accuracy of those questions in appointing the

11   agent.

12        Q    But after that agent is appointed,

13   you just testified a few minutes ago the

14   underwriter wouldn't ever go back to the

15   agency questionnaire considering a bond

16   request.

17                MR. KRULICK:  Object to form.

18        A    I understand that, but if -- if the

19   history and -- and -- what we're being told,

20   we have looked at as an exhibit, the cover

21   letter that came in that pointed out some

22   longevity with the account, bonded since its

23   inception, so if the accuracy of the

24   information is not there, then it affects --

25        Q    Go ahead.
```



1    have wrote the bond.

2         Q    I understand that.  I'm asking you

3    a different question.  I just want to make

4    sure you understand my question, all right?

5              Did the way that Durkin answered

6    any of the questions in the questionnaire

7    cause Heller & Smith to experience financial

8    difficulties?

9              MR. KRULICK:  Object to form.

10        A    Not that I'm aware of.

11        Q    Did any of Durkin's answers in the

12   agency questionnaire cause Heller & Smith to

13   experience cash flow problems?

14             MR. KRULICK:  Object to form.

15        A    Not that I'm aware of.

16        Q    Did any of Durkin's answers in the

17   questionnaire cause the bond issued to Heller

18   & Smith on any job to result -- to cause any

19   supplier to assert a claim on a bond because

20   he hadn't been paid?

21             MR. KRULICK:  Object to form.

22        A    Not that I'm aware of.

23        Q    So aside from the fact that Durkin

24   was the agent, whether or not a specific bond

25   went into claims or not didn't actually have



1   anything to do with Durkin's answers to

2   questions on the questionnaire, did it?

3           MR. KRULICK:   Object to form.

4       A    Again, I would say that there was

5   some -- there would be an indirect

6   correlation because of --

7       Q    How is it -- I want you to tell me

8   exactly how is it that Durkin's answer to

9   question Number 17, on the agency

10  questionnaire about powers of attorney, how

11  is it that Durkin's answer to that, no matter

12  what the answer was, by the way, no matter

13  what the answer was, how did that cause the

14  Middleboro bond to go into claims?

15      A    From what I said before.  If he

16  checked off yes to having his powers revoked,

17  we wouldn't have appointed him.  That bond

18  never would have been issued.  So it never

19  would have went into claim.

20      Q    If his answer to that question was

21  no, right?  And as a matter of fact, his

22  power of attorney never had been revoked, so

23  it's a truthful answer.

24          All right.  How would his truthful

25  answer to that question of no have caused the



Case 2:10-cv-00832-TON   Document 52   Filed 10/01/12   Page 16 of 26

CHRISTOPHER MUCCHETTI                     September 13, 2012
FIRST SEALORD vs. DURKIN & DEVRIES                         255

1    deferred to Heller & Smith?

2         A    I'm not aware of them, but it

3    doesn't mean they don't exist.

4         Q    Is it your understanding that every

5    single bond that First Sealord issued to

6    principals represented by Durkin or brought

7    to the company by Durkin went into claims and

8    incurred losses?

9         A    I'm sorry?

10        Q    Is it your understanding every

11   single bond First Sealord issued to a

12   principal brought to you by Durkin, every

13   single bond went into claims and resulted in

14   losses?

15        A    No, it's not.

16        Q    Okay.  Or Durkin's responses to the

17   agency questionnaire, true or not, any other

18   responses, were they a factor in the bonds

19   that didn't result in losses being successful

20   bonds?

21        A    They are from the respect of

22   whether they're true or not.

23        Q    So it's impossible to predict,

24   based on Durkin's answers to the agency

25   questionnaire, whether or not a particular



```
1         Q      If they were cancelled by First

2    Sealord and also if -- well, now that we've

3    seen one example of why an agency might

4    affirmatively answer one of these questions

5    that are such an issue in Durkin's case, now

6    that we've seen -- well, sometimes an

7    explanation is satisfactory.

8              Are there other explanations that

9    might be satisfactory to an affirmative

10   response on an agency questionnaire?

11        A      I think it was --

12             MR. KRULICK:  Object to form.

13        A      I think it would depend on the

14   question.

15        Q      Depends on the question, depends on

16   the circumstances of the case, right?

17        A      Yes.

18        Q      Okay.  So the simple yes or no is

19   not by itself on any of these questions, it's

20   not by itself disqualifying, it depends on

21   the explanation?

22             MR. KRULICK:  Object to form.

23        A      I think it depends on the question.

24        Q      On the question?

25        A      Well, yes.  And to me, you know, a
```



1   cancellation, the unauthorized bond portion

2   or bond question to me is more concerning

3   than a cancellation for that reason.

4       Q     Because it's totally unacceptable

5   for an agent to issue a bond without

6   authorization, right?

7       A     Well, it's unacceptable from the

8   standpoint that it lays -- that it sets the

9   table for everything that comes after the

10  fact from that agent from an account

11  standpoint.  You know, there's -- I think

12  what I had said before, they are -- you know,

13  they're an appointed agent.  It's not a

14  willy-nilly, you know, throw it against the

15  wall and see who can get us business.  You

16  know, you go after agents that know the

17  business, that in some cases have

18  designations and go through the continuing

19  education.  Some of that is not related to

20  surety, so we're relying on the truthfulness.

21      Q     Question 18 asks whether the agency

22  has ever been involved in litigation or

23  claims concerning unauthorized bonds.

24          Is that right?

25      A     Yes, 18.



```
 1        Q    Okay.  So the explanation is
 2   important, correct?
 3        A    Correct.
 4        Q    And First Sealord never got an
 5   explanation.
 6             Isn't that correct?
 7        A    Correct.
 8        Q    So First Sealord was never in a
 9   position to determine whether or not what
10   Durkin & Devries' relationship with -- strike
11   that.
12             Is the truthfulness of an agent
13   important?
14        A    Important in what regard?
15        Q    Generally speaking, is the
16   truthfulness of an agent important -- an
17   important quality that a surety looks at when
18   appointing them an agent?
19        A    Yes, I think it is.
20        Q    If you know that they are
21   untruthful, would you ever appoint them?
22        A    No.
23        Q    The process by which First Sealord
24   issued bonds was such that First Sealord
25   itself did not directly issue any of the
```



```
1    bonds.
2              Is that correct?
3        A    Correct.
4              MR. TORKELSON:   Objection to the
5    form.  Go ahead.
6        A    It did not.
7        Q    Explain to me what the process was
8    for a bond to be issued.
9        A    After it was submitted, it would go
10   through an approval process.  The system
11   would generate a bond number and then the
12   field underwriter would go back to the agent
13   with the approval and would give them the
14   bond number.
15       Q    Okay.  And who would issue the
16   bond?
17       A    The agent would then in turn issue
18   the bond.
19       Q    Because the agent has the power of
20   attorney.
21            Is that correct?
22       A    Yes.
23       Q    And the power of attorney gives a
24   lot of power, doesn't it?
25       A    Yes, it gives them the ability to
```



1    issue bonds.

2        Q    If an agent can't be trusted with

3    that power of attorney or if an agent can't

4    be trusted, would you ever give them the

5    power of attorney to issue bonds?

6        A    No.

7        Q    And so each time that a bond is

8    issued, you have to be able to trust an

9    agent.

10            Is that correct?

11       A    Right.

12       Q    And part of trusting an agent is

13   trusting everything that that agent has told

14   you up until that point.

15            Is that correct?

16            MR. TORKELSON:   Objection to the

17   form.

18       A    Correct.

19       Q    At any point in time, whether or

20   not there were any losses on any bonds, if

21   First Sealord discovered that Durkin &

22   Devries misrepresented the responses on the

23   agency questionnaire, as has been alleged in

24   this complaint with respect to its

25   relationship with St. Paul, and the fact that



```
 1    its powers of attorneys were revoked, it was

 2    accused of issuing an unauthorized bond, what

 3    would First Sealord have done?

 4              MR. TORKELSON:  Objection to the

 5    form.  Go ahead.

 6         A    Issued a termination.

 7         Q    Regardless of whether or not there

 8    are any losses.

 9              Is that correct?

10         A    Yes.

11         Q    And that's because the truthfulness

12    and the ability to trust an agent's responses

13    are important on the -- just as important on

14    the last day of the relationship as they are

15    on the first day of the relationship.

16              Is that correct?

17         A    Correct.

18         Q    Okay.  And the truthfulness and the

19    ability to trust in the agent's response is a

20    factor that goes into the approval of every

21    bond that First Sealord approves for its

22    agents.

23              Is that correct?

24         A    Correct.

25         Q    Okay.  And because if it's
```



Case 2:10-cv-00832-TON   Document 52   Filed 10/01/12   Page 23 of 26

CHRISTOPHER MUCCHETTI                          September 13, 2012
FIRST SEALORD vs. DURKIN & DEVRIES                              281

1    discovered that the agent is untruthful, it's

2    immediately terminated, would you say it's a

3    substantial factor?

4              MR. TORKELSON:  Objection to the

5    form.

6        Q    Would you say that the agent's

7    truthfulness is a substantial factor in First

8    Sealord's decision to approve a bond?

9              MR. TORKELSON:  Objection to the

10   form.

11       A    Yes.

12       Q    Just to clarify here, as the

13   corporate representative that has been

14   appointed by First Sealord at this deposition

15   with respect to the facts and circumstances

16   regarding Durkin & Devries' relationship with

17   St. Paul, you've testified that the only

18   information you're aware of is that which

19   you've got from lawyers and the allegations

20   and whatever is in the first amended

21   complaint.

22             Is that correct?

23             MR. TORKELSON:  Objection to the

24   form.

25       A    Correct.



1        Q    And as the corporate representative

2    of First Sealord, you stand -- do you stand

3    by the allegations and assertions made in the

4    first amended complaint?

5              MR. TORKELSON:   Objection to the

6    form.

7        A    Yes.

8        Q    Okay.  And because of the fact that

9    Durkin & Devries never disclosed its

10   relationship to First Sealord, there's no way

11   for anybody at First Sealord to know

12   firsthand the facts, the specific facts

13   regarding Durkin & Devries' relationship with

14   St. Paul.

15             Is that correct?

16             MR. TORKELSON:   Objection.

17       A    Yes.

18       Q    So who would be the best source of

19   information for -- regarding Durkin &

20   Devries' relationship with St. Paul,

21   generally speaking?

22             If you wanted to know something

23   about the relationship between Durkin &

24   Devries and St. Paul, who would you ask?

25       A    Durkin & Devries.



Case 2:10-cv-00832-TON   Document 52   Filed 10/01/12   Page 25 of 26

CHRISTOPHER MUCCHETTI                    September 13, 2012
FIRST SEALORD vs. DURKIN & DEVRIES                    283

1          Q    Anybody else?

2          A    You could ask St. Paul.

3          Q    Okay.  First Sealord would not have

4    knowledge regarding Durkin's relationship

5    with St. Paul, correct?

6          A    Yes.

7          Q    Especially if Durkin & Devries

8    didn't tell you about it.

9               Is that correct?

10         A    Correct.

11         Q    So if there were letters written by

12   St. Paul and by Durkin & Devries regarding

13   St. Paul and Durkin & Devries' relationship,

14   who would be the best people to testify on

15   that regard?

16              MR. TORKELSON:  Objection to the

17   form.

18         A    Either Durkin or St. Paul.

19              MR. KRULICK:  Okay.

20              I don't have any further questions.

21   CONTINUED EXAMINATION BY MR. TORKELSON:

22         Q    I just have a couple.

23              Mr. Krulick asked you if Durkin &

24   Devries had put on its agency questionnaire

25   $78 million in losses in 2004, whether that



1    Q    Okay.  And would the fact that it's

2  another agent that went through the

3  appointment process and for all intents and

4  purposes was a perfectly qualified agent, no

5  problems with that agent, would that be

6  predictive of whether or not Heller & Smith

7  bonds, through that agent, would go into

8  claims or not?

9            MR. KRULICK:   Object to form.

10    A    No, but we would have been able to

11  rely on the accuracy of the information on

12  the agency questionnaire.

13    Q    But it doesn't have any impact.

14  It's not a factor at all whether the Heller &

15  Smith bond issued through that other agent,

16  succeed or fail?

17    A    It does from the standpoint of

18  trusting the information.

19    Q    I'm not talking about trusting the

20  information.  I'm talking about whether the

21  bond succeeds or fails, whether there are

22  claims made against the bond.

23            If it comes through another agent

24  who's perfectly trustworthy, does that make

25  any difference in whether those bonds succeed

