WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.
ATTORNEYS AT LAW

8405 Greensboro Drive, Suite 100
McLean, Virginia 22102

Telephone: 703-749-1000
Facsimile: 703-893-8029
www.wthf.com

Brian N. Krulick*
Bkrulick@wthf.com
*not licensed in Virginia

October 19, 2012

**VIA CM/ECF**

Honorable Thomas N. O'Neill, Jr., U.S.D.J.
4007 U.S. Courthouse
601 Market Street
Philadelphia, PA 19106

> Re:   ***First Sealord Surety, Inc. v. Durkin & DeVries Insurance Agency, LLC***
>         Civil Action No. 2:10-cv-832-TON

Dear Judge O'Neill:

Pursuant to your request at yesterday's hearing, on behalf of Plaintiff, First Sealord Surety, Inc. ("First Sealord"), we submit this letter setting forth the Pennsylvania law that unequivocally establishes that an agent, in this case Durkin & DeVries Insurance Agency, LLC ("Durkin & DeVries"), owes a fiduciary duty to its principal, First Sealord. For the Court's convenience, we have attached copies of the relevant cases.

In Pennsylvania, the three basic elements of agency are: "the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." Basile v. H & R Block, Inc., 761 A.2d 1115, 1121 (Pa. 2000) (internal citations omitted). In the case at bar, it is beyond dispute that the Agency Agreement attached to the First Amended Complaint established an agency relationship between First Sealord and Durkin & DeVries.

Hon. Thomas N. O'Neill, Jr., U.S.D.J.
October 19, 2012
Page 2

"An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." Sutliff v. Sutliff, 528 A.2d 1318, 1323 (Pa. 1987), citing Restatement (Second) of Agency § 387 (1958). "[I]n all matters, affecting the subject of his agency, [the agent] must act with the utmost good faith in furthering and advancing the interests of his principal. This requires that he give the principal all information of the subject matter that comes to his knowledge." See Sylvester v. Beck, 178 A.2d 755-57 (Pa. 1962). The Eastern District of Pennsylvania recognizes that under Pennsylvania law, the existence of a contractual agency relationship does not absolve an agent of its fiduciary duty to its principal:

> Because the terms of the agency relationship are spelled out in a written agreement, it does not mean that the agent does not also owe, as a matter of law, a duty of loyalty to the principal. In other words, the contract between the parties may serve to inform and define the agent's fiduciary duty imposed by law.

McDermott v. Party City Corp., 11 F.Supp.2d 612, 627 (E.D.Pa. 1998). Thus, it is clear under Pennsylvania law that, even where a written agreement setting forth the agency relationship exists, an agent owes its principal a fiduciary duty separate and apart from any contractual obligations. Accordingly, in this case, Durkin & DeVries, as First Sealord's appointed agent pursuant to the Agency Agreement, owed First Sealord a fiduciary duty.[1]

Finally, similar to the law regarding proximate cause and negligent misrepresentation claims cited in First Sealord's Opposition to the Motion to Dismiss (Doc. 46) where the element of causation is a question for the jury and not to be taken from the jury's consideration unless it is clear that reasonable minds could not differ on the issue, see Hamil v. Bashline, 392 A.2d

---

[1] For a discussion of the factual basis that supports First Sealord's claim that Durkin & DeVries breached its fiduciary duty, First Sealord refers the Court to First Sealord's Opposition to Durkin & DeVries' Motion for Summary Judgment (Doc. 38), Section IV(C), pages 26-28.

Hon. Thomas N. O'Neill, Jr., U.S.D.J.
October 19, 2012
Page 3

1280, 1284-85 (Pa. 1978), where the non-moving party presents record evidence that creates material issues of fact regarding allegations that a party breached its fiduciary duties, such questions are appropriate for submission to a jury. Beecham v. American Life and Casualty Ins. Co., 65 Pa. D. & C. 4th 370, 375 (Pa.Com.Pl. 2003).

In conclusion, under Pennsylvania law, Durkin & DeVries owed a fiduciary duty to First Sealord separate and apart from any contractual obligations under the Agency Agreement. See Sylvester, McDermott. Further, as set forth in First Sealord's Opposition to Durkin & DeVries' Motion for Summary Judgment (Doc. 38), record evidence supports First Sealord's claim for Breach of Fiduciary Duty. Accordingly, Durkin & DeVries' Motion for Summary Judgment must be denied.

Thank your for your consideration.

Respectfully submitted,

WATT, TIEDER, HOFFAR
& FITZGERALD, L.L.P.

Brian N. Krulick

Attachments

cc:    Robert G. Barbour, Esq.
       Christopher E. Torkelson, Esq.
       Marshall D. Bilder, Esq.

Westlaw.

761 A.2d 1115                                                                Page 1
563 Pa. 359, 761 A.2d 1115
**(Cite as: 563 Pa. 359, 761 A.2d 1115)**

▷

Supreme Court of Pennsylvania.
Sandra J. BASILE and Laura Clavin, Individually
and on behalf of others similarly situated, Ap-
pellees
v.
H & R BLOCK, INC., H & R Block Eastern Tax
Services, Inc. and Mellon Bank (DE) National As-
sociation, Appellants.
Appeal of H & R Block, Inc. and H & R Block
Eastern Tax Services, Inc.
Sandra J. Basile and Laura Clavin, Individually and
on behalf of others similarly situated
v.
H & R Block, Inc., H & R Block Eastern Tax Ser-
vices, Inc. and Mellon Bank (DE).
Appeal of H & R Block, Inc., and H & R Block Eastern
Tax Services, Inc.
Sandra J. Basile and Laura Clavin, Individually and
on behalf of others similarly situated
v.
H & R Block, Inc., H & R Block Eastern Tax Ser-
vices, Inc. and Mellon Bank (DE) National Associ-
ation.
Appeal of H & R Block, Inc., and H & R Block
Eastern Tax Services, Inc. (Two Cases).

Argued Feb. 1, 2000.
Decided Nov. 22, 2000.

Taxpayers sued tax preparer and bank for
fraud, negligent misrepresentation, breach of fidu-
ciary duty, and violation of consumer protection
statutes and usury laws arising out of tax refund an-
ticipation loan program. Preparer and bank re-
moved the case. The United States District Court
for the Eastern District of Pennsylvania, 897
F.Supp. 194, dismissed federal claims, and re-
manded action to state court. Taxpayers moved for
class certification. The Court of Common Pleas,
Philadelphia County, Civil Division, No. 3246,
April Term 1993, Bernard J. Avellino, John W.
Herron, and Stephen E. Levin, JJ., disqualified one

of the consumers as class representative, and dis-
missed action. Taxpayers appealed. The Superior
Court, Nos. 585, 586, 710 and 711 Philadelphia
1998, Johnson, J., 729 A.2d 574, affirmed in part,
reversed in part, and remanded. Allocatur was gran-
ted. The Supreme Court, Nos. 44-47 E.D. Appeal
Docket 1999,Castille, J., held that the preparer was
not an agent of taxpayers and, therefore, owed no
fiduciary duty to disclose that it shared the fee for
the loans.

Vacated and remanded.

Nigro and Saylor, JJ., dissented and filed opin-
ions.

West Headnotes

**[1] Appeal and Error 30 ☞863**

30 Appeal and Error
   30XVI Review
      30XVI(A) Scope, Standards, and Extent, in
General
         30k862 Extent of Review Dependent on
Nature of Decision Appealed from
            30k863 k. In general. Most Cited
Cases
   Review of a summary judgment is plenary.

**[2] Appeal and Error 30 ☞949**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k949 k. Allowance of remedy and mat-
ters of procedure in general. Most Cited Cases
   A summary judgment will be reversed only
where it is established that the court committed an
error of law or clearly abused its discretion.

**[3] Appeal and Error 30 ☞934(1)**

30 Appeal and Error
   30XVI Review

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

30XVI(G) Presumptions
    30k934 Judgment
        30k934(1) k. In general. Most Cited
Cases

    A court reviewing a summary judgment must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party.

**[4] Principal and Agent 308 ⛛3(1)**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k3 Agency Distinguished from Other
Relations
                308k3(1) k. In general. Most Cited
Cases

    Tax preparer was not an agent of taxpayers in securing refund anticipation loans from a bank as part of its rapid refund program and, therefore, owed no fiduciary duty to disclose that it shared the fee for the loans; the loan was only one option for a rapid refund, the taxpayers alone chose the loan option, and the preparer's mere facilitation of the its customers' desire was insufficient to establish an agency relationship.

**[5] Principal and Agent 308 ⛛1**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k1 k. Nature of the relation in general.
Most Cited Cases

    The three basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking, and the understanding of the parties that the principal is to be in control of the undertaking. Restatement (Second) of Agency § 1 comment.

**[6] Principal and Agent 308 ⛛1**

308 Principal and Agent

308I The Relation
    308I(A) Creation and Existence
        308k1 k. Nature of the relation in general.
Most Cited Cases

    Agency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary.

**[7] Principal and Agent 308 ⛛19**

308 Principal and Agent
    308I The Relation
        308I(A) Creation and Existence
            308k18 Evidence of Agency
                308k19 k. Presumptions and burden of
proof. Most Cited Cases

    The burden of establishing an agency relationship rests with the party asserting the relationship.

**[8] Principal and Agent 308 ⛛48**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k48 k. Nature of agent's obligation.
Most Cited Cases

    An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit. Restatement (Second) of Agency § 387.

**[9] Principal and Agent 308 ⛛48**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k48 k. Nature of agent's obligation.
Most Cited Cases

    In all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information.

**[10] Principal and Agent 308 ⛛48**

308 Principal and Agent

308II Mutual Rights, Duties, and Liabilities
   308II(A) Execution of Agency
      308k48 k. Nature of agent's obligation.
Most Cited Cases

The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf; rather, the action must be a matter of consequence or trust, such as the ability to actually bind the principal or alter the principal's legal relations.

**1116 *362 James C. Schwartzman, Philadelphia, N. Louise Ellingsworth, Kansas City, MO, for appellants, H & R Block and H & R Block Eastern Tax Services.

**1117 Steven E. Angstreich, Michael Coren, Carolyn C. Lindheim, Philadelphia, for appellees, Sandra J. Basile and Laura Clavin.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

### OPINION OF THE COURT

CASTILLE, Justice.

This Court granted allocatur to address questions concerning the scope and contours of agency relationships under Pennsylvania law. Specifically, we must determine whether appellees produced sufficient evidence of an agency relationship between appellants H & R Block, Inc., H & R Block Eastern Tax Services, Inc. (collectively "Block") and appellants' Rapid Refund customers so that appellees' class action complaint that Block breached a fiduciary duty to those customers may survive summary judgment.

H & R Block, Inc., provides tax preparation services nationwide through a network of retail offices operated through subsidiaries, one of which is H & R Block Eastern Tax Services. As part of its service, Block offers a program known as "Rapid Refund," which involves electronic filing of tax returns with the Internal Revenue Service (IRS), resulting in quicker refunds than a taxpayer filing a paper return would receive. Block also arranged for Mellon Bank (DE) National Association (Mellon Bank) to provide a refund anticipation loan (RAL) program to Block's qualified Rapid Refund customers. Under the RAL program, Mellon Bank advanced to the customer the amount of the customer's anticipated tax refund, less a financing charge, within days of Block's filing of the return. Appellee Sandra Basile applied for, and received, such a loan in 1993.

Basile and Laura Clavin filed this class action against Block and Mellon Bank in the Court of Common Pleas of Philadelphia County alleging that Mellon Bank, acting as a consumer *363 lender providing RALs, participated with Block in practices designed to deceive consumers as to the true nature of the loans.[FN1] Block and Mellon Bank removed the case to the United States District Court for the Eastern District of Pennsylvania based upon diversity jurisdiction.[FN2] Appellees then filed an amended class action complaint asserting claims under the Truth in Lending Act,[FN3] the Pennsylvania Unfair Trade Practices and Consumer Protection Law,[FN4] and the Delaware Legal Rate of Interest,[FN5] as well as a claim that Block breached its fiduciary duty to appellees by failing to disclose that the RAL was a loan and that Block had a financial interest in arranging the RAL program.

> FN1. The trial court ultimately found that Laura Clavin was not an adequate class representative, and the Superior Court affirmed that ruling. Therefore, notwithstanding the caption, Sandra Basile is the sole named appellee. Although also listed as a nominal appellant, Mellon Bank is not a party to this appeal.

> FN2. 28 U.S.C. § 1441.

> FN3. 15 U.S.C. § 1638.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

761 A.2d 1115                                                                                 Page 4
563 Pa. 359, 761 A.2d 1115
**(Cite as: 563 Pa. 359, 761 A.2d 1115)**

FN4. 73 P.S. § 201-2 *et seq.*

FN5. 6 Del.Code § 2301(a).

Discovery was conducted in the federal court action, after which Block and Mellon Bank filed motions for summary judgment. The district court granted the motions in part and dismissed appellees' federal claims under the Truth in Lending Act and the Delaware Legal Rate of Interest. The court also found that appellees' unfair trade practices claim was preempted by the National Bank Act.[FN6] Having dismissed the federal claims, and finding no diversity jurisdiction, the district court returned the matter to the Court of Common Pleas.

FN6. 12 U.S.C. § 1 *et seq.*

Appellees then filed a class certification motion in common pleas court, and the parties filed cross motions for summary judgment on the breach of fiduciary duty claim. The initial trial judge denied the motions for summary judgment without prejudice pending a ruling on class certification. The matter was reassigned to the **1118 Honorable John W. Herron, who conducted a class certification hearing. Judge Herron held that *364 the unfair trade practices claim was preempted and denied certification as to appellees' claims for fraud and negligent misrepresentation. The court granted certification on the breach of fiduciary duty claim and disqualified Laura Clavin as a class representative due to a conflict of interest.

The parties then filed renewed cross motions for summary judgment on the fiduciary duty claim. The trial judge, the Honorable Stephen E. Levin, granted Block's motion for summary judgment finding that Block was not appellees' agent because appellees did not exercise substantial control over Block's preparation of the tax returns and, further, that no confidential relationship otherwise existed between the parties. Appellees appealed Judge Levin's order granting summary judgment on the breach of fiduciary duty claim, as well as Judge Herron's order finding that the unfair trade practices

claim was preempted and disqualifying Clavin as a class representative.[FN7] The Superior Court reversed Judge Levin's grant of summary judgment, as well as Judge Herron's order denying class certification based on preemption of the unfair trade practices claim as to Block. The court affirmed the denial of class certification as to Mellon Bank. With respect to summary judgment, the Superior Court found "as a matter of fact" that the pleadings established a principal-agent relationship between Block and appellees giving rise to a fiduciary duty as to all matters within the scope of the agency. *Basile v. H & R Block, Inc.,* 729 A.2d 574, 582 (Pa.Super.1999). The court remanded to the trial court for "disposition of questions of fact concerning the extent to which Block's failure to disclose the nature of the Rapid Refund program and its participation in the profits generated by the RALs constituted a violation of Block's duty as an agent." *Id.* Having found that a fiduciary duty existed as a result of an agency relationship, the court did not reach appellees' alternate theory of liability-i.e., that a fiduciary duty arose as a result of a confidential relationship between Block and appellees. *365 Id.* Block sought allocatur only on the agency issue, and this Court granted allocatur to consider the propriety of the Superior Court's conclusion that an agency relationship existed between appellees and Block such that appellees may pursue a claim that Block breached its fiduciary duties to them.

> FN7. Block cross-appealed the initial trial judge's order to the extent that it created a presumption that Block had acted as appellees' agent. The Superior Court affirmed. That issue is not before this Court.

[1][2][3] This Court's scope of review of an order granting summary judgment is plenary. *O'Donoghue v. Laurel Savings Ass'n,* 556 Pa. 349, 354, 728 A.2d 914, 916 (1999). Our standard of review is clear: the trial court's order will be reversed only where it is established that the court committed an error of law or clearly abused its discretion. *Cochran v. GAF Corp.,* 542 Pa. 210, 215, 666 A.2d

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

245, 248 (1995). Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *P.J.S. v. Pennsylvania State Ethics Comm'n,* 555 Pa. 149, 153, 723 A.2d 174, 175 (1999). The reviewing court must view the record in the light most favorable to the nonmoving party, resolving all doubts as to the existence of a genuine issue of material fact against the moving party. *Id.* When the facts are so clear that reasonable minds cannot differ, a trial court may properly enter summary judgment. *Cochran,* 542 Pa. at 215, 666 A.2d at 248.

[4] The parties do not dispute the facts material to the issue of whether an agency relationship existed. In 1990, Block began offering its Rapid Refund program whereby its taxpayer customers could receive speedier refunds using one of three services: (1) electronic filing of the tax return **1119 for a fee; (2) electronic filing for a fee with direct deposit of the taxpayer's refund by the IRS to the taxpayer's bank account; or (3) electronic filing for a fee with a RAL arranged by Block with a lender such as Mellon Bank. The third option involving the RALs is the service at issue.

Block offered its RAL program through Mellon Bank to Block's Pennsylvania customers. Between 1990 and 1993, more than 600,000 Pennsylvania residents participated in the *366 RAL program. Specifically, Block customers who filed their returns electronically and met the lender's eligibility requirements were informed of the availability of loans in the amount of their anticipated refunds from Mellon Bank. If the customer was interested in the loan, Block would simultaneously transmit the taxpayer's income tax return information to the IRS and Mellon Bank. Within a few days of the transmittal, the taxpayer, if approved, would receive a check in the amount of the loan minus a bank transaction fee. The taxpayer could also elect to have Block's tax preparation and electronic filing fees withheld by the lender from the RAL check so

that the taxpayer would not have to advance any money. When the taxpayer's actual tax refund was ready, usually within a matter of weeks, the IRS would deposit the refund check into an account with Mellon Bank to repay the loan. In exchange for the RAL, the taxpayer paid to Mellon Bank a flat rate finance charge of $29.00 or $35.00, which Block employees presented to the taxpayer as a flat dollar amount rather than as a percentage interest rate on the short term loan.[FN8] Since the RAL is secured by the tax refund, and the tax refund is paid directly into a proprietary account at Mellon Bank, the lender bank takes on few risks with the program. Block did not disclose to its RAL customers that it received a payment from Mellon Bank for each loan, shared in the profits of the RALs in other ways, or that the taxpayer's endorsement on the back of the loan proceeds check constituted a signature on a loan agreement printed on the reverse of the check.

> FN8. Due to the short-term nature of these loans (approximately two weeks), the finance charges translate to interest rates as high as 151 percent, depending on the amount of the loan. Appellee Basile's actual interest rate was 77.3 percent.

The positions of the parties are easily stated. Appellees claim, and the Superior Court found, that they produced sufficient evidence to establish that an agency relationship existed between Block and the taxpayers who participated in the Rapid Refund program and secured RALs. They further claim that Block breached its fiduciary duty to those taxpayers by failing to disclose the true nature of the program as a loan program and to inform them that Block received a percentage *367 of the finance charge paid to Mellon Bank and indirectly benefited from the loans in other ways. Appellees note that Block holds itself out to the public as "America's tax team" and encourages consumer trust by utilizing slogans such as "Do what millions of Americans do, trust H & R Block" and that Block's success in the field of tax return preparation is due to the im-

761 A.2d 1115                                                              Page 6
563 Pa. 359, 761 A.2d 1115
**(Cite as: 563 Pa. 359, 761 A.2d 1115)**

age of trustworthiness Block has created. Appellees claim that Block exploited this relationship with their clients by steering them into loans with exorbitant rates of interest carrying little practical value other than a quick refund for their clients, but which further profited Block financially.

Block denies that it had an agency relationship with its customers, arguing that appellees did not exercise the requisite substantial control over Block's preparation and electronic filing of the tax returns and that Block did not have the legal authority to bind appellees to the RAL agreements. Accordingly, Block argues that it owed no fiduciary duty to its clients with respect to the RALs. Instead, referring to then-Chief Judge Cardozo's well-known formulation maxim, Block avers that it was free to conduct itself with its clients according to the "morals of the marketplace." Brief for Appellants at 28-29, quoting **1120*Northeast General Corp. v. Wellington Advertising, Inc.,* 82 N.Y.2d 158, 604 N.Y.S.2d 1, 624 N.E.2d 129, 132-33 (1993), quoting *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 547, (1938) (Cardozo, C.J.).

[5][6][7][8][9] The law is clear in Pennsylvania that the three basic elements of agency are: " 'the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.' " *Scott v. Purcell,* 490 Pa. 109, 117, 415 A.2d 56, 60 (1980), quoting Restatement (Second) of Agency § 1, Comment b (1958); *see also Reid v. Ruffin,* 503 Pa. 458, 463, 469 A.2d 1030, 1033 (1983). "[A]gency results only if there is an agreement for the creation of a fiduciary relationship with control by the beneficiary." *Smalich v. Westfall,* 440 Pa. 409, 413, 269 A.2d 476, 480 (1971). The burden of establishing an agency relationship *368 rests with the party asserting the relationship. *Scott,* 490 Pa. at 117 n. 8, 415 A.2d at 61 n. 8. "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff,* 515 Pa. 393, 404, 528 A.2d

1318, 1323 (1987), citing Restatement (Second) of Agency § 387 (1958). Thus, in all matters affecting the subject of the agency, the agent must act with the utmost good faith in furthering and advancing the principal's interests, including a duty to disclose to the principal all relevant information. *See Sylvester v. Beck,* 406 Pa. 607, 610-11, 178 A.2d 755, 757 (1962).

Other jurisdictions have considered the precise issue before this Court-whether, under the law of those jurisdictions, an agency relationship existed between Block and taxpayers participating in Block's Rapid Refund program who secured RALs-with mixed results. A single court, the Maryland Court of Appeals, has held that Block acted as its customers' agent with respect to the RALs. *See Green v. H & R Block, Inc.,* 355 Md. 488, 735 A.2d 1039 (1999). [FN9] There, the court found that Block acted as the taxpayers' agent in preparing their income tax returns, and that the agency relationship included the process of securing RALs, because the taxpayers' retained ultimate control over Block's actions in preparing and filing the tax returns and applying for the RALs. [FN10] The court based its finding of an agency relationship as to the RALs on the fact that Block "played an integral part in the customer's receipt of the bank loan, which indisputedly has legal ramifications for the H & R Block customer and the bank." *Id.* at 1053. In addition, the court emphasized that Block intended to create a scenario in which taxpayers would trust it to prepare and file their returns and obtain the most rapid *369 refund possible resulting in the taxpayers' reasonable belief that Block was acting as their agent. That scenario, the Maryland court felt, made it reasonable for Block's customers to believe that Block was acting as their agent.

FN9. *Green v. H & R Block* is the sole appellate decision existing at the time of this opinion finding that an agency relationship exists between Block and its RAL customers. Notably, the *Green* court relied upon the Superior Court's decision in this case in

761 A.2d 1115                                                                      Page 7
563 Pa. 359, 761 A.2d 1115
**(Cite as: 563 Pa. 359, 761 A.2d 1115)**

support of its decision.

FN10. Block conceded at oral argument in *Green* that it acted as the agent for the taxpayers in preparing and filing returns, but asserted that it acted as the lender's agent rather than the taxpayers' agent in securing the RALs. Block argued that the two transactions should be treated distinctly. No such concession has been made here.

The weight of authority, however, is to the contrary. In *Carnegie v. H & R Block, Inc.*, 269 A.D.2d 145, 703 N.Y.S.2d 27 (2000), *Beckett v. H & R Block, Inc.*, 306 Ill.App.3d 381, 239 Ill.Dec. 736, 714 N.E.2d 1033 (1999), and *Peterson v. H & R Block Tax Services, Inc.*, 971 F.Supp. 1204 (N.D.Ill.1997), the courts found that no agency relationship existed in connection with the RALs. In *Carnegie,* the court upheld the dismissal of the plaintiff's cause of action for breach of fiduciary duty holding that "Block was not acting as plaintiff's agent in soliciting her to enter into the **\*\*1121** RAL transaction, which plaintiff did by her own acts as principal." *Carnegie,* 703 N.Y.S.2d at 29 (citing *Beckett*). The *Beckett* court similarly held that "whether to enter into the RAL agreement was a decision the customer made by signing the loan check. Block did not have the power to enter into this agreement on the customer's behalf. Thus, Block was not the client's agent." *Beckett,* 239 Ill.Dec. 736, 714 N.E.2d at 1041. The federal district court in *Peterson,* meanwhile, granted Block's motion to dismiss the plaintiff's claim that Block was the plaintiff's agent on different grounds, *i.e.,* finding that the plaintiff's complaint was "devoid of facts demonstrating that [the plaintiff] controlled the 'manner or method' in which Block performed its services." *Peterson,* 971 F.Supp. at 1213.

We agree with the prevailing view. The pleadings here do not establish an agency relationship. With specific respect to the RALs, there is no showing that appellees intended Block to act on their behalf in securing the RALs. To the contrary, Block offered appellees the opportunity to file their

tax returns electronically with the *three* options set forth above, only one of which involved RALs. Appellees were not required to apply for an RAL in order to have their returns prepared by Block or filed electronically through Block. It was appellees alone who decided to take advantage of that particular option. Block was neither authorized to, nor did it in fact, act on its **\*370** customers' behalf in this regard. If a customer elected to apply for an RAL, Block simply facilitated the loan process by presenting appellees to Mellon Bank as viable loan candidates. Block neither applied for the loan on behalf of appellees nor determined that appellees should apply; appellees undertook that procedure themselves. The RAL program was merely another distinct and separate service offered by Block to its customers. Furthermore, it was a distinct service that Block's customers were fully aware came at a higher price, just as one would expect for an advance of money. Simply introducing appellees to a lender willing to provide a loan is not sufficient to create an agency relationship. Therefore, we hold that, as a matter of law, Block was not acting as appellees' agent in the RAL transactions, such that they were subject to a heightened, fiduciary duty.

[10] We are aware that here, as in *Green,* Block could be said to have played an "integral part" in arranging the RALs. In our view, however, "integral" or not, Block's mere facilitation of the its customers' desire to pursue the loans, as one of the multiple services offered by Block, is not sufficient to establish an agency relationship under Pennsylvania law. The special relationship arising from an agency agreement, with its concomitant heightened duty, cannot arise from any and all actions, no matter how trivial, arguably undertaken on another's behalf. Rather, the action must be a matter of consequence or trust, such as the ability to actually **bind** the principal or alter the principal's legal relations. Indeed, implicit in the long-standing Pennsylvania requirement that the principal manifest an intention that the agent act on the principal's behalf is the notion that the agent has authority to alter the principal's relationships with third parties,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

such as binding the principal to a contract. Notably, the Restatement, which we have cited with approval in this area in the past, specifically recognizes as much. *See Restatement (Second) of Agency* § 12 ("An agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself.").

**\*371** The phrase "power of an agent" denotes the ability of an agent or apparent agent to affect the legal relations of the principal in matters connected with the agency or apparent agency. The exercise of this power may result in binding the principal to a third person in contract; in divesting the principal of his interests in a thing, as where the agent sells the principal's goods; in the acquisition of new interests for the principal, as where **\*\*1122** the agent buys goods for the principal; or in subjecting the principal to a tort liability, as where a servant, while acting within the scope of his employment, injures a third person.

*Id.* at Comment a. *See also id.* at § 8A, Comment a ("The power of an agent to bind his principal is the distinctive feature of the Anglo-American agency relation").

Such power decidedly did not exist here with regard to facilitating the RALs, nor even to preparing and filing the tax returns. Block had no more authority to alter the legal relationship between its customers and the IRS than it had to bind those customers to a loan agreement with Mellon Bank. Block could not file a tax return without the customer's authorization and signature, nor could Block obligate the customer to pay any amount of income tax to the IRS without authorization and consent in the form of the customer's signature on the return. Therefore, no agency relationship existed between Block and its customers. *See Peterson, supra.*[FN11]

> FN11. Appellees argue that Block has waived its argument that appellees failed to show that Block had the right to alter appellees' relationships with third parties

and that, even if not waived, Pennsylvania law does not require that an agent possess the right to alter the principal's relationships with third parties. Block has maintained throughout this litigation that it lacked the authority to act on behalf of appellees; therefore, there is no waiver.

Our conclusion that there is no agency relationship here carries no judgment regarding Block's business practices. If Block's method of doing business is worthy of the condemnation that appellees suggest, presumably the marketplace will react to correct it. It is not our place to imbue the relationship between Block and appellees with heightened legal qualities that the parties did not agree upon.

**\*372** Before courts can infer and superimpose a duty of the finest loyalty, the contract and the relationship of the parties must be plumbed. We recognize that "[m]any forms of conduct permissible in a workaday word for those acting at arm's length, are forbidden to those bound by fiduciary ties." ( *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545).... If the parties find themselves or place themselves in the milieu of the "workaday" mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to a higher realm of relationship and fashion the stricter duty for them.

*Northeast General Corp. v. Wellington Advertising, Inc.,* 82 N.Y.2d 158, 604 N.Y.S.2d 1, 624 N.E.2d 129, 131 (1993).

Here, the parties created no higher realm of relationship. Nor is the transaction at issue here even unusual in the workaday marketplace. Many providers of goods and services also make referrals to banks or agencies that will finance the purchase at issue. In all of these transactions, the purchaser is generally well aware that there are costs attendant to the financing. Nothing prevented appellees from questioning Block employees regarding the basis for the costs of the RALs and whether Block be-

nefited from the financing service. If Block's response did not satisfy appellees, they were free to take their business elsewhere. That is the essence of our market economy.

Our conclusion that an agency relationship did not exist, as a matter of law, does not end the matter. In the lower courts, appellees alternatively argued that, even if a principal-agent relationship did not exist, Block owed appellees a fiduciary duty as a result of a confidential relationship. The Superior Court did not reach this question because it concluded that an agency relationship existed. We cannot resolve this issue presently. Block requested, and was granted, review of the agency issue alone, and that is the only issue that was briefed and argued to this Court. Since we do not have the benefit of briefing or a lower court determination to review on the matter, the better course is to remand to the Superior Court *373 for consideration of the **1123 confidential relationship issue in the first instance.

Accordingly, the order of the Superior Court is vacated, and the matter is remanded to that court for proceedings not inconsistent with this opinion.

Justice NIGRO and Justice SAYLOR file dissenting opinions.

NIGRO, Justice, dissenting.

I respectfully dissent, as I believe that an agency relationship existed between H & R Block and Appellees.

"This Court has defined agency as 'the relationship which results from (1) the manifestation of consent of one person to another that (2) the other shall act on his behalf and subject to his control, and (3) consent by the other so to act.' " *Reid v. Ruffin*, 503 Pa. 458, 462-63, 469 A.2d 1030, 1033 (1983), citing *Smalich v. Westfall*, 440 Pa. 409, 413-14, 269 A.2d 476, 480 (1970) and RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958). "Those rendering service but retaining control over the manner of doing it ... may be agents, agreeing

only to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal." *Smalich,* 440 Pa. at 414, 269 A.2d at 481. Furthermore, Comment b of the Restatement (Second) of Agency § 1 provides in relevant part:

> To constitute the relation, there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relation between them to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow.

RESTATEMENT (SECOND) OF AGENCY § 1, cmt. b. Therefore, direct evidence of specific authority is unnecessary. Rather, the relationship can be inferred from the circumstances of the case by looking at factors such as the relation of the parties *374 and their conduct. *See Scott v. Purcell,* 490 Pa. 109, 117 n. 8, 415 A.2d 56, 60 n. 8 (1980) (internal citations omitted).

I believe that Appellees met their burden of establishing that an agency relationship existed. Here, the Superior Court found that Appellees "established that they visited the [H & R] Block offices in response to media promotions of the Rapid Refund Program to engage [H & R] Block to achieve two results: 1) to complete and file their tax returns, and 2) to obtain a refund of any overpayment of taxes they had made to the Internal Revenue Service ["IRS"]." *Basile v. H & R Block, Inc.,* 729 A.2d 574, 581 (Pa.Super.1999) (citing Deposition of Laura Calvin, 11/18/93, at 103-04; Deposition of Sandra Basile, 11/17/93, at 33-35). Appellees remained at the office while H & R Block employees completed the tax forms. After completion, the H & R Block employees requested that Appellees sign the tax returns before H & R Block sent the returns to the IRS and the state Department of Revenue. Calvin Deposition, *supra,* at 104-05; Basile Deposition, *supra,* at 39-40. These facts indicate that: (1) Appellees manifested that H & R

Block, through its employees, compute their taxes and complete and send their tax forms, thereby "rendering service but retaining control of the manner of doing it;" (2) H & R Block, through its employees, accepted the undertaking of completing and sending Appellees' tax forms; and (3) Appellees remained in control, that is, they had to sign their own forms and the H & R Block employees completed the forms pursuant to information given to them by Appellees. *See Reid,* 503 Pa. at 462-63, 469 A.2d at 1033. For these reasons, I believe that an agency relationship existed between Appellees and H & R Block with respect to the computation of their taxes and the completion and submission of their tax returns to the taxing authority. What remains is to determine whether agency extended to the Rapid Refund portion of the transaction. I believe it does.

Evidence in this case establishes that when the H & R Block tax preparer determined that a particular taxpayer was eligible for a refund, the preparer offered the **1124 taxpayer one of three options. The taxpayer could choose between (1) an electronic filing of the tax return for a fee; (2) an electronic *375 filing of the tax return for a fee with an electronic direct deposit by the IRS of the tax return to the taxpayer's bank account; or 3) an electronic tax return filing for a fee with a refund anticipation loan arranged by H & R Block with a lending institution such as Mellon Bank, called a "Rapid Refund." The Rapid Refund enabled the taxpayer to receive her "refund" within a few days, instead of the typical four-to six weeks it would take for the taxing authority's refund check to arrive. Customers who chose the H & R Block Rapid Refund option were given an application which they completed and submitted to Mellon Bank. Once the bank approved the application, it issued a check to the taxpayer in an amount equal to the taxpayer's anticipated refund less transaction fees. The taxpayer would then sign over the entire amount of the check from the taxing authority which would arrive a few weeks later.

H & R Block essentially contends that its relationship with the taxpayer is concluded once the tax return is filed, and that once the tax preparer offers her the application for the Rapid Refund, the taxpayer's relationship is a creditor/debtor one with Mellon Bank. I disagree as I believe that H & R Block's role in facilitating the Rapid Refund for the taxpayer is as the taxpayer's agent as all three elements of agency exist. Here, (1) the taxpayer manifested her consent to the tax preparer that she wished to participate or take advantage of H & R Block's Rapid Refund program when it was offered; (2) the preparer facilitated the process of obtaining a Rapid Refund by offering an application; and (3) the preparer consented to act on the taxpayer's need by matching the taxpayer to a source for the early refund, here, Mellon Bank. *See Reid,* 503 Pa. at 462-63, 469 A.2d at 1033. Accordingly, I also believe an agency relationship existed between Appellees and H & R Block for purposes of the Rapid Refund Program.

"An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit." *Sutliff v. Sutliff,* 515 Pa. 393, 404, 528 A.2d 1318, 1323 (1987) (citing RESTATEMENT (SECOND) OF AGENCY § 387 (1958) ("[A]n agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected *376 with his agency.")). Furthermore, the Restatement (Second) of Agency § 389 states that: "Unless otherwise agreed, an agent is subject to a duty not to deal with his principal as an adverse party in a transaction connected with his agency without the principal's knowledge." RESTATEMENT (SECOND) OF AGENCY YYYYYYY § 389 (1958). Finally, the fiduciary duty an agent owes his principal also includes a duty of disclosure, that is, the agent must disclose all relevant information pertaining to the parties' performances within the scope of the agency relationship. *Matter of Estate of Evasew,* 526 Pa. 98, 104-05, 584 A.2d 910, 912-13 (1990). In *Evasew,* we stated:

[A] fiduciary seeking to profit by a transaction with the one who confided in him has the burden of showing that he communicated to the other, not only the fact of his interest in the transaction, but all information he had which it was important for the other to know in order to enable him to judge the value of his property.

*Evasew*, 526 Pa. at 104, 584 A.2d at 912.

As H & R Block was the agent through which the Rapid Refund was facilitated, it had a duty to disclose the nature of its relationship with Mellon Bank in respect to the Rapid Refund Program. As the majority noted, "Block did not disclose to its [refund application loan] customers that it received a payment from Mellon Bank for each loan, shared in the profits of the [refund application loans] in other ways, or that the taxpayer's endorsement on the back of the loan proceeds check constituted a signature on a loan agreement printed on the reverse of the check." Maj. Op. 563 Pa. at ----, 761 A.2d at 1119. I believe **1125 that this is a gross violation of H & R Block's fiduciary duty to Appellees. Since I believe that the evidence creates the inference that an agency relationship existed between H & R Block and Appellees for the entire tax return "package" offered and further, that H & R Block violated the fiduciary duty it owed to Appellees, I respectfully dissent.

SAYLOR, Justice, dissenting.

I agree with the majority that, to the extent that refund anticipated loans ("RALs") are viewed as discrete transactions, *377 no agency relationship between Block and its customers would be discernible. Like the majority, I would not be inclined to conclude, extrinsic of an existing, underlying agency relationship, that a separate agency role is necessarily undertaken by one who merely facilitates a lending transaction. Nevertheless, I join that portion of Mr. Justice Nigro's analysis which concludes, as did the Superior Court, that an agency relationship existed between Block and Appellees for the purposes of preparing Appellees' tax returns, filing them with the IRS, and obtaining refunds. In-

deed, I note that H & R Block conceded as much, at least for purposes of Maryland law, in *Green v. H & R Block, Inc.*, 355 Md. 488, 735 A.2d 1039, 1049 (1999). I also believe that the fiduciary duties associated with such relationship may be viewed as sufficiently broad to compel disclosure of aspects of self-interest in a related loan transaction. Thus, I would affirm the order of the Superior Court remanding "for disposition of questions of fact concerning the extent to which Block's failure to disclose the nature of the Rapid Refund program and its participation in the profits generated by the RALs constituted a violation of Block's duty as an agent." *Basile v. H & R Block, Inc.*, 729 A.2d 574, 582 (Pa.Super.1999).

Pa.,2000.
Basile v. H & R Block, Inc.
563 Pa. 359, 761 A.2d 1115

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

528 A.2d 1318
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099
**(Cite as: 515 Pa. 393, 528 A.2d 1318)**

Page 1

▷

Supreme Court of Pennsylvania.
Carlene S. SUTLIFF, Appellant,
v.
Gregory L. SUTLIFF and Fred K. Collins, Appellees.
Carlene S. SUTLIFF, Appellee,
v.
Gregory L. SUTLIFF and Fred K. Collins, Appellants.
COMMONWEALTH ex rel. Carlene S. SUTLIFF, Appellee,
v.
Gregory L. SUTLIFF, Appellant. (Two Cases)

77 M.D. 1985
78 M.D. 1985
79 M.D. 1985
80 M.D. 1985
Argued May 16, 1986.
Decided July 9, 1987.
Reargument Denied Oct. 7, 1987.

In related actions, the Court of Common Pleas, Cumberland County, Orphans' Court, No. 107 Orphans' 1982 and No. 859 Support 1981, Sheely, J., denied wife's request to remove husband and business associate as custodians of children's funds under Uniform Gifts to Minors Act and denied custodians request for attorney fees and awarded support and entered modified order relating to one daughter's college fees and expenses. On appeal from both actions, the Superior Court, Nos. 2423, 2495, 3117, 3168, and 3208, Philadelphia, 1982, 339 Pa.Super. 523, 489 A.2d 764, affirmed the order in No. 107, reversed and remanded the order in No. 859, and vacated the order in No. 859 modifying support. On appeal, the Supreme Court, No. 77–80 Middle District Appeal Docket, 1985, Hutchinson, J., held that: (1) parent's obligation to support minor children is independent of minor's assets, so that if he or she can reasonably do so, parent is obligated to provide support for minor

children regardless of Uniform Gifts to Minors Act property, and (2) court may more freely consider Uniform Gifts to Minors Act assets when apportioning financial responsibility for child's education than when establishing parent's support obligation.

Affirmed in part, remanded in part.

McDermott, J., concurred in the result and filed an opinion.

Nix, C.J., concurred and dissented and filed an opinion.

Larsen, J., dissented and filed an opinion in which Flaherty, J., joined.

West Headnotes

**[1] Infants 211 ☜1175**

211 Infants
   211IV Property and Estate
      211IV(C) Gifts and Trusts
         211k1175 k. Control, management, and use of property. Most Cited Cases
    (Formerly 211k28)
   Custodian may, as fiduciary, exercise his statutory discretion in certain circumstances to distribute custodial funds for minor's support in addition to those due from parent.

**[2] Infants 211 ☜1282**

211 Infants
   211VII Actions
      211VII(B) Course of Proceedings
         211k1277 Right of Action; Standing
            211k1282 k. Gifts and trusts. Most Cited Cases
    (Formerly 211k28)
   Court of common pleas lacked jurisdiction over question relating to expenditure of Uniform Gifts to Minors Act funds for support of children, as both questions were pending above. 20 Pa.C.S.A. §§

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

528 A.2d 1318                                                                 Page 2
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099
**(Cite as: 515 Pa. 393, 528 A.2d 1318)**

5301 – 5310;   Rules   App.Proc.,   Rule   1701,   42
Pa.C.S.A.

**[3] Child Support 76E ⟜7**

76E Child Support
    76EI In General
        76Ek7 k. Purpose of child support. Most
Cited Cases
    (Formerly 285k3.1(5), 285k3.1(1))

**Child Support 76E ⟜21**

76E Child Support
    76EII Duty to Support in General
        76Ek21 k. Welfare of child. Most Cited
Cases
    (Formerly 285k3.1(1))

**Child Support 76E ⟜23**

76E Child Support
    76EII Duty to Support in General
        76Ek22 Obligation of Parents
            76Ek23 k. In general. Most Cited Cases
    (Formerly 285k3.1(1))
    Purpose of child support is to promote best in-
terest of child; associated legal obligation of par-
ents is to provide for reasonable expenses of raising
child.

**[4] Child Support 76E ⟜23**

76E Child Support
    76EII Duty to Support in General
        76Ek22 Obligation of Parents
            76Ek23 k. In general. Most Cited Cases
    (Formerly 285k3.1(5))
    Parents have duty to support their minor chil-
dren even if it causes parents some hardship.

**[5] Child Support 76E ⟜100**

76E Child Support
    76EIII Factors Considered
        76EIII(C) Factors Relating to Child
            76Ek100 k. In general. Most Cited Cases

    (Formerly 285k3.1(10))
    Cost of raising children, for purpose of deter-
ining parents' monetary obligation of support, is
function of several factors including custom, chil-
dren's needs and parents' financial status, and it is
intended to provide for more than bare necessities.

**[6] Child Support 76E ⟜105**

76E Child Support
    76EIII Factors Considered
        76EIII(C) Factors Relating to Child
            76Ek105 k. Income. Most Cited Cases
    (Formerly 285k3.1(9))

**Child Support 76E ⟜108**

76E Child Support
    76EIII Factors Considered
        76EIII(C) Factors Relating to Child
            76Ek108 k. Child's estate or trust. Most
Cited Cases
    (Formerly 285k3.1(9))
    Earnings of older, college age children may be
considered in certain circumstances as may funds
placed in trust for benefit of child or for support or
education, for purpose of determining parents' sup-
port obligation.

**[7] Infants 211 ⟜1161**

211 Infants
    211IV Property and Estate
        211IV(C) Gifts and Trusts
            211k1161 k. In general. Most Cited Cases
    (Formerly 211k28)
    Purpose of Uniform Gifts to Minors Act is to
provide inexpensive easy mechanism for giving
property to minors. 20 Pa.C.S.A. §§ 5301–5310.

**[8] Infants 211 ⟜1174**

211 Infants
    211IV Property and Estate
        211IV(C) Gifts and Trusts
            211k1169 Custodian or Trustee
                211k1174 k. Duties, responsibilities,

528 A.2d 1318

515 Pa. 393, 528 A.2d 1318, 56 USLW 2099

**(Cite as: 515 Pa. 393, 528 A.2d 1318)**

and breach. Most Cited Cases

(Formerly 211k28)

Minor-custodian relationship under Uniform Gifts to Minors Act involves at minimum the fiduciary obligation of an agent; custodian is expected to use the property for the minor's benefit and act in the minor's interest. 20 Pa.C.S.A. §§ 5301–5310.

**[9] Principal and Agent 308 ⚖➜48**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
            308k48 k. Nature of agent's obligation. Most Cited Cases

Agency relationship is fiduciary one, and agent is subject to duty of loyalty to act only for principal's benefit.

**[10] Infants 211 ⚖➜1174**

211 Infants
    211IV Property and Estate
        211IV(C) Gifts and Trusts
            211k1169 Custodian or Trustee
                211k1174 k. Duties, responsibilities, and breach. Most Cited Cases

(Formerly 211k28)

Custodian under Uniform Gifts to Minors Act should be held to no less rigorous standard than is agent; indeed, custodian's duties may be more properly analogous to those of trustees of broadest possible discretionary powers. 20 Pa.C.S.A. §§ 5301–5310.

**[11] Child Support 76E ⚖➜107**

76E Child Support
    76EIII Factors Considered
        76EIII(C) Factors Relating to Child
            76Ek107 k. Wealth. Most Cited Cases

(Formerly 285k3.1(9))

Parent's obligation to support minor children is independent of minor's assets, so that he or she can "reasonably" do so, parent is obligated to provide support for minor children regardless of Uniform Gifts to Minors Act property. (Per Hutchinson, J., with two Justices concurring, the Chief Justice concurring in part and one Justice concurring in the result.) 20 Pa.C.S.A. §§ 5301–5310.

**[12] Infants 211 ⚖➜1175**

211 Infants
    211IV Property and Estate
        211IV(C) Gifts and Trusts
            211k1175 k. Control, management, and use of property. Most Cited Cases

(Formerly 211k28)

To extent that expenditure of children's Uniform Gifts to Minors Act assets relieved father from his "reasonable" support obligation, it was a breach of duty of loyalty by the father who, together with a business associate, exercised powers as custodian of children's Act property, and brought into question father's good faith in exercising his custodial discretion. (Per Hutchinson, J., with two Justices concurring, the Chief Justice concurring in part and one Justice concurring in the result.) 20 Pa.C.S.A. §§ 5301–5310.

**[13] Infants 211 ⚖➜1172**

211 Infants
    211IV Property and Estate
        211IV(C) Gifts and Trusts
            211k1169 Custodian or Trustee
                211k1172 k. Resignation, removal, and successorship. Most Cited Cases

(Formerly 211k28)

In cases involving conflict of interest, court may consider removal of custodian of Uniform Gifts to Minors Act property. 20 Pa.C.S.A. §§ 5301–5310.

**[14] Child Support 76E ⚖➜119**

76E Child Support
    76EIII Factors Considered
        76EIII(C) Factors Relating to Child
         76Ek115 Education
            76Ek119 k. Post-secondary education.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

528 A.2d 1318                                                                                          Page 4
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099
(Cite as: 515 Pa. 393, 528 A.2d 1318)

Most Cited Cases
(Formerly 285k3.1(12))

Although parent has absolute duty to support his or her minor children, support obligation does not always extend to financing college education, and absent agreement, limited duty to provide college education arises only if child shows willingness in aptitude to undertake studies and parent can provide necessary funds without hardship to himself.

**[15] Child Support 76E ⬤⟶107**

76E Child Support
    76EIII Factors Considered
        76EIII(C) Factors Relating to Child
            76Ek107 k. Wealth. Most Cited Cases
    (Formerly 285k3.1(9))

Court may more freely consider Uniform Gifts to Minors Act assets when apportioning financial responsibility for child's education than when establishing parent's support obligation. (Per Hutchinson, J., with two Justices concurring, the Chief Justice concurring in part and one Justice concurring in the result.) 20 Pa.C.S.A. §§ 5301–5310.

**[16] Infants 211 ⬤⟶1172**

211 Infants
    211IV Property and Estate
        211IV(C) Gifts and Trusts
            211k1169 Custodian or Trustee
                211k1172 k. Resignation, removal, and successorship. Most Cited Cases
    (Formerly 211k28)

Automatic removal as custodian of Uniform Gifts to Minors Act property and surcharge for father's past use of Act property to fulfill his support obligation was inappropriate, even though such past acts violated father's fiduciary duty of loyalty, because propriety of such use had not previously been considered in context of Uniform Gifts to Minors Act. (Per Hutchinson, J., with two Justices concurring, the Chief Justice concurring in part and one Justice concurring in the result.) 20 Pa.C.S.A. §§ 5301–5310.

**[17] Infants 211 ⬤⟶1175**

211 Infants
    211IV Property and Estate
        211IV(C) Gifts and Trusts
            211k1175 k. Control, management, and use of property. Most Cited Cases
    (Formerly 211k28)

Any custodian who uses Uniform Gifts to Minors Act funds to satisfy parent's support obligation is subject to surcharge and removal of his acts in bad faith. (Per Hutchinson, J., with two Justices concurring, the Chief Justice concurring in part and one Justice concurring in the result.) 20 Pa.C.S.A. §§ 5301–5310.

**\*\*1320 \*397** Bonnie D. Menaker, Harrisburg, for Gregory Sutliff and Fred collins.

Ronald M. Katzman, Arthur L. Goldberg, Harrisburg, for Carlene Sutliff.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

OPINION ANNOUNCING THE JUDGMENT OF THE COURT
HUTCHINSON, Justice.[FN*]

FN* This case was reassigned to the writer.

These consolidated appeals by allowance arise out of a support action for minors begun in Cumberland County Common Pleas and a subsequent action to remove and surcharge the custodians of the minors' funds after the custodians had applied the minors' funds to discharge the support obligation of one of the custodians.

[1] The issues presented for our review concern the use of property given under the Pennsylvania Uniform Gifts to Minors Act (UGMA), 20 Pa.C.S. §§ 5301 –10, specifically, whether such funds

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

528 A.2d 1318                                                                                                                  Page 5
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099
**(Cite as: 515 Pa. 393, 528 A.2d 1318)**

should be considered by the court in fashioning a support order and whether they may be used to fulfill a parent's support obligation. A threshold issue here is whether Common Pleas had jurisdiction to modify support orders which were on appeal to allow credit for the custodial distributions. Since the modification involved the *398 issue on appeal, we hold it did not.[FN1] On the merits,[FN2] we hold that a parent's obligation to support minor children is independent of the minor's assets. UGMA funds may not be used to fulfill the parent's support obligation where the parent has sufficient means to discharge it himself. Upon determining that the parent has sufficient funds to reasonably support the minor without seriously depriving himself or other persons to whom he has a similar obligation, the court should not thereafter consider the minor's funds in setting the support obligation. This is not to say that a custodian cannot, as a fiduciary, exercise his statutory discretion in certain circumstances to distribute custodial funds for a minor's support in addition to those due from the parent. However, where the parent is also custodian, his dual obligation comes into conflict. In such case, he may not credit his custodial distribution against his support obligation. In the event of a dispute over the extent of his parental obligation, the parent custodian is removable at Common Pleas' discretion on petition by or on behalf of the child.

> FN1. Common Pleas did have jurisdiction to consider a modification of the order based on changed circumstances, here the enrollment of one child in college and consequent removal from the mother's household. On the merits of this issue *see* op. at 1322, *infra*.

> FN2. Carlene Sutliff has filed an application to quash the cross-appeals we granted Gregory Sutliff from the trial court's modified order at 79 and 80 M.D. Appeal Docket, 1985. The application is based on an agreement the parties made while these cases were pending in Superior Court and

was the subject of a similar motion which that court denied. Because Common Pleas' treatment of the support issue and the availability of custodial funds to meet it has become inextricably intertwined, we believe Superior Court acted properly in refusing the application to quash. We have entered a separate order denying the application made in this Court.

Gregory L. Sutliff (father) and Carlene S. Sutliff (mother) were married in 1960; they had four children. At the time of the couple's separation in 1981 only the three youngest, Kimberly, Julia and Laura, were minors. The father owns and operates a successful car dealership in the Harrisburg area. His net worth is approximately $3,000,000 and he earns in excess of $130,000 per year. The mother is an *399 emergency room physician. She works part time and earns $26,000 per year. She claims that she cannot work full time because that would prevent her from properly raising the children.

The father and his parents gave substantial assets to the children under the UGMA. The children's aggregate accounts contained cash, stocks and bonds worth over $466,000. These assets were divided equally among the children. Father is the custodian**1321 of those assets given by his parents; Fred K. Collins, the father's business associate, is custodian of those assets given by the father.

In November, 1981 the mother filed a petition for support for herself and the three minor children. An interim support order providing $400.00 per week exclusively for the support of the minor children was entered against the father. Collins and he used the UGMA funds to fulfill up to 75% of the support obligation.

The mother then filed a suit alleging misuse of the children's custodial funds by the father and Collins. She sought a full accounting and their removal as custodians. She also sought to surcharge the custodians for any UGMA funds spent to dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

528 A.2d 1318                                                                                                          Page 6
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099
**(Cite as: 515 Pa. 393, 528 A.2d 1318)**

charge the father's support obligation.

Cumberland County Common Pleas, Orphans' Court Division, held that the custodians could use the children's UGMA funds to fulfill the father's support obligation to the children. The court relied on statutory language which gives the custodian broad discretion in expending UGMA funds.

§ 5305. Duties and powers of custodian

(b) The custodian shall pay over to the minor for expenditure by him or expend for the minor's benefit so much of or all the custodial property as the custodian deems advisable for the support, maintenance, education and benefit of the minor, in the manner, at the time or times, and to the extent that the custodian, in his discretion, deems suitable and proper, with or without court **\*400** order, with or without regard to the duty of himself or of any other person to support the minor, or his ability to do so, and with or without regard to any other income or property of the minor, which may be applicable or available for any such purpose.

20 Pa.C.S. § 5305(b). The court did not limit the amount of custodial funds that the father and Collins could use to discharge the father's support obligation. Mother appealed this order.

Subsequently, Common Pleas entered a final support order which required the father to pay $600.00 per week for support of the minor children. [FN3] In reaching its decision on support, the court considered, among other factors, the assets and income of the father and the mother, housing expense and prior standard of living. The court stated that it had previously resolved the issue of the availability of the children's UGMA assets to fulfill the father's child support obligation. It stated that "[t]here is no doubt that [father] can reasonably pay this support order," but did not restrict or limit the father's use of UGMA funds to fulfill his support obligation.

FN3. The order also required the father to

pay $300.00 per week for the support of mother.

Both parties appealed the final support order to Superior Court. The mother claimed that Common Pleas improperly permitted father to satisfy his support obligations from custodial funds. In addition, she argued that the father and Collins, his business associate, should be removed as custodians and surcharged for their improper use of the UGMA funds. The father appealed the support order, claiming that he should not be required to support children who have substantial assets of their own.

While the appeal was pending, the father filed a petition to modify the support order with respect to his eldest daughter, Kimberly, who had recently entered college. Common Pleas modified the order to allow him to pay her college expenses from UGMA funds. Child support payable to the mother was also reduced by $200.00 per week during **\*401** the school year to account for the girl's absence from home. The mother appealed this modification to Superior Court as well. She claimed that Common Pleas lacked jurisdiction to conduct any additional proceedings concerning the order because it had been appealed. All appeals were consolidated.

Superior Court held that a court generally may not consider the UGMA assets of a minor child when fashioning a support order, and a custodian may not use these assets to fulfill a parent's support obligation.**\*\*1322** The court, however, distinguished between children under eighteen years of age and those over eighteen.[FN4] It held that a court may consider the UGMA funds of college age children when apportioning college expenses. The court refused to remove the custodians, order an accounting or surcharge the father and Collins because the law establishing custodians' duties and responsibilities was not defined prior to this case. Superior Court, relying on Pa.R.A.P. 1701, also held that Common Pleas lacked jurisdiction to entertain a petition to modify the final support order while the case was on appeal to Superior Court.

FN4. Superior Court, relying on Pa.R.C.P. 76, incorrectly defined the age of majority as eighteen. The age of majority for substantive purposes in civil matters remains twenty-one. 1 Pa.C.S. § 1991; *In re Pincus Estate*, 378 Pa. 102, 105 A.2d 82 (1954). However, 23 Pa.C.S. § 4321, enacted in October, 1985, distinguishes between children eighteen years of age and younger and children older than eighteen for purposes of support. We do not believe that 23 Pa.C.S. § 4321 is a departure from the established law of the Commonwealth discussed *infra*. Since the statute was passed after these proceedings began, we will not discuss it further.

[2] We will address the jurisdictional question first. Rule 1701 states in relevant part:

Rule 1701. Effect of Appeal Generally

(a) General rule. Except as otherwise prescribed by these rules, after an appeal is taken ..., the trial court ... may no longer proceed further in the matter.

....

(c) Limited to matters in dispute. Where only a particular item, claim or assessment adjudged in the matter is *402 involved in an appeal, ... the appeal ... shall operate to prevent the trial court ... from proceeding further with only such item, claim or assessment, unless otherwise ordered by the trial court ... or by the appellate court or a judge thereof as necessary to preserve the rights of the appellant.

The appeal included the issues of whether UGMA funds should be considered by the court when fashioning a support order, and whether the husband may fulfill his support obligation with them. The modification also dealt with the expenditure of UGMA funds for the support of the children. It was on this issue that Common Pleas

entered its modification. This was improper; the court lacked jurisdiction because those questions were pending above. Had the modification dealt merely with a change in support because of changed circumstances arising out of one child's attendance at college and not been related to the expenditure of UGMA funds, Rule 1701 would not have divested the court of jurisdiction. Therefore, we affirm Superior Court on this point and proceed to a consideration of the merits.

[3][4][5][6] The purpose of child support is to promote the best interest of the child; the associated legal obligation of parents is to provide for the reasonable expenses of raising the child. *Melzer v. Witsberger*, 505 Pa. 462, 480 A.2d 991 (1984). Indeed, parents have a duty to support their minor children even if it causes them some hardship. *Conway v. Dana*, 456 Pa. 536, 318 A.2d 324 (1974). The cost of raising children is a function of several factors including custom, the children's needs and the parents' financial status. *Melzer v. Witsberger*, 505 Pa. at 471, 480 A.2d at 995. It is intended to provide for more than bare necessities. *Id.* at 471, 480 A.2d 996. Superior Court has consistently held that a parent's support duty is not affected by a minor child's own means or earning potential. *Commonwealth ex rel. Byrne v. Byrne*, 212 Pa.Superior Ct. 566, 243 A.2d 196 (1968); *Commonwealth v. Trimble*, 197 Pa.Superior Ct. 644, 180 A.2d 92 (1962); *Commonwealth ex rel. Firestone v. Firestone*, 158 Pa.Superior Ct. 579, 45 A.2d 923 (1946). *403 However, the earnings of older, college age children may be considered in certain circumstances. *Commonwealth ex rel. Platt v. Platt*, 227 Pa.Superior Ct. 423, 323 A.2d 29 (1974). *See also Commonwealth ex rel. Cann v. Cann*, 274 Pa.Superior Ct. 274, 418 A.2d 403 (1980). Funds placed in trust for the benefit of a child or for support or education may also be considered when calculating support in certain circumstances. **1323 *Commonwealth ex rel. Goichman v. Goichman*, 226 Pa.Superior Ct. 311, 316 A.2d 653 (1973); *Doelp v. Doelp*, 219 Pa.Superior Ct. 420, 281 A.2d 721 (1971).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

528 A.2d 1318

515 Pa. 393, 528 A.2d 1318, 56 USLW 2099

**(Cite as: 515 Pa. 393, 528 A.2d 1318)**

Page 8

The father cites *Doelp* to support his view that funds given to the children under the Pennsylvania Uniform Gifts to Minors Act may be used to fulfill his support obligations and that he and his business associate have properly performed their statutory duty as custodians of the UGMA assets. This analysis overlooks critical distinctions between *Doelp* and the instant case. In *Doelp,* the father's ability to fulfill his financial obligation was in doubt and the lower court did not allow into the record any evidence about the trust. In addition, the order was contested only as to one child, an eighteen year old college student. Out of cases following *Doelp,* Superior Court has evolved a rule that a court calculating child support may take a child's trust assets and income into account if the father's ability to pay is in doubt or the trust was specifically established for the support or education of the beneficiary-children. *Commonwealth ex rel. Schlesinger v. Schlesinger,* 231 Pa.Superior Ct. 284, 331 A.2d 694 (1974); *Doelp v. Doelp, supra.*

[7] The purpose of the UGMA is to provide an inexpensive, easy mechanism for giving property to minors. Before passage of the UGMA, a trust or guardianship was required. These methods were unwieldy, raised federal tax problems and were often prohibitively expensive for all but large gifts. The UGMA seeks to solve the problem of administrative expense and complexity while preserving certain federal tax benefits for the donor. Uniform Gifts to Minors Act, Prefatory Note, 8A U.L.A. 318 (1983). Property**404** transferred under UGMA is owned by the donee-minor; the minor is vested with full and indefeasible title. 20 Pa.C.S. § 5304. A custodian holds, manages, invests and dispenses the property during the child's minority, 20 Pa.C.S. § 5305(a), but must deliver the property and proceeds, plus accumulated interest and profit, to the minor when he reaches the age of twenty-one.[FN5] 20 Pa.C.S. § 5305(d). Unlike a trust for support or education, the proceeds of which must be used for the stated purpose, the UGMA property and proceeds may generally be used by custodians for the child's support. It is, however, the custodian's duty

to use the property for the child's benefit. 20 Pa.C.S. § 5305(b). We have stated that a custodian may not use UGMA property to benefit himself, *Schwartz Estate,* 449 Pa. 112, 117, 295 A.2d 600, 603 (1972) (Opinion Announcing the Judgment of the Court), and suggested that a custodian may not use it to fulfill an existing support obligation. *Id.* at 115 n. 2, 295 A.2d at 603 n. 2.

> FN5. This also distinguishes a minor given assets under UGMA from a trust beneficiary. Though a beneficiary of a trust enjoys the fruits of the corpus, he may or may not eventually own it; a beneficiary does not have title to the corpus. The minor actually owns the property.

[8][9][10] The minor-custodian relationship under UGMA involves at a minimum the fiduciary obligation of an agent. The custodian is expected to use the property for the minor's benefit and act in the minor's interest. 20 Pa.C.S. § 5304. An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit. Restatement (Second) of Agency § 387 (1958); *Sylvester v. Beck,* 406 Pa. 607, 178 A.2d 755 (1962). A custodian under UGMA should be held to a no less rigorous standard. Indeed, a custodian's duties may be more properly analogous to those of a trustee with the broadest possible discretionary powers. A trustee owes a fiduciary duty to the beneficiary. Restatement (Second) of Trusts § 170 (1959); *Holmes Trust,* 392 Pa. 17, 139 A.2d 548 (1958). He violates that duty when he has a personal interest in trust dealings that might affect his judgment. Restatement (Second) of Trusts § 170 , comments b, c (1959); **405** *Banes Estate,* 452 Pa. 388, 305 A.2d 723 (1973), *appeal after remand,* 461 Pa. 203, 336 A.2d 248 (1975).

[11] Were we to permit unrestrained credit against child support for these custodians' distributions, the father's action as custodian would be self-serving and Collins's would benefit the father, not the children.**1324** When he can "reasonably" do so, the father is obliged to provide support for his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

528 A.2d 1318
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099
**(Cite as: 515 Pa. 393, 528 A.2d 1318)**

minor children regardless of the UGMA property. *Conway, supra.* Whether it is reasonable to require a father to supply all or part of the support his children require without regard to their own means is a threshold question. It involves balancing the parent's income, assets, earning power and needs against the children's needs. If the court determines that the parent can reasonably provide for their needs at an appropriate level, that obligation is paramount and the children's means should not be considered. The inquiry should thereafter deal only with the children's reasonable requirements, with a possible exception for children seeking higher education. *See* op. at 1324–1325, *infra.* If, however, the parent's assets are not adequate, the court should state, on the record, both the children's total needs and the parent's reasonable contribution. Common Pleas' failure to separate the issue of father's reasonable obligation from the children's needs has led to much of the confusion in this case.

[12] On this record, it is plain that father and his business associate exercised their powers as custodians of the children's UGMA property to fulfill some part of the father's support obligation out of the children's assets. To the extent that this expenditure of the children's assets relieved the father from his "reasonable" support obligation, it is, we believe, a breach of duty of loyalty by the father, discussed *supra,* and brings into question Collins's good faith in exercising his custodial discretion. We also believe that these facts present a conflict of interest which would require the custodians' removal. A support order must state the amount for which the father is personally responsible and must pay from his own funds. The order *406 Common Pleas entered here does not and, on its face, permits the custodians to satisfy it wholly from the children's assets until they are exhausted. This is wrong.

[13] Even if a parent lacks the resources to fully provide for his children's needs, no court should grant him or her the unbridled right to pay as much of the children's support from UGMA funds as he or she sees fit. This would be akin to re-

moving the parent's support obligation to the extent the children have assets and is contrary to law. *See* op. at 1322, *supra,* and cases cited therein. Child support is a parent's personal obligation and must be paid by him. If the parties cannot agree, the court must determine the amount which the parent should pay from his own assets. Any additional sums required for support in excess of the support order can be paid by the UGMA custodian. Where the parent lacks the means to fully meet his children's needs, the court may specify the excess sum needed and order the custodian to pay it as a minimum. Otherwise, additional payment should be left to the custodian's good faith discretion. If the court fails to do so, an uncertain custodian may ask the court to specify a minimum sum to be paid from custodial assets. In cases involving a conflict of interest, the court may consider removal of the custodian. *See* op. at 1320, 1324.

Under this analysis, UGMA property, like other assets, can be used for the children's needs if the father could not or would not fulfill his support obligation. The parent's obligation remains paramount.

As discussed earlier, Superior Court has held in similar contexts that a judge fashioning a support order may consider a child's assets and income if the parent's resources are lacking. UGMA funds should also be considered in those circumstances. Such an expenditure would save the child from need or destitution and clearly would be in the child's interest. However, that is not the case here. There is no evidence on this record that the father cannot fulfill the support order from his own resources. To the contrary, Common Pleas states that he can. There is also *407 no indication that he would permit his children to suffer serious deprivation pending judicial resolution of the support question. If a parent did refuse to fulfill his support obligation, a custodian acting in good faith could make interim expenditures for the children's necessary support. Thereafter, **1325 he could seek to recover any distributions he made on behalf of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

children from the responsible parent and in doing so should be protected against any other personal responsibility.

[14][15] Although a parent has an absolute duty to support his or her minor children, this support obligation does not always extend to financing a college education. *Emrick v. Emrick*, 445 Pa. 428, 284 A.2d 682 (1971); *DeVergilius v. DeVergilius*, 329 Pa.Superior Ct. 434, 478 A.2d 866 (1984). Absent an agreement, a limited duty to provide college education arises only if the child shows a willingness and aptitude to undertake the studies and the parent can provide the necessary funds without hardship to himself. *Emrick v. Emrick, supra; Commonwealth ex rel. Hanerkam v. Hanerkam,* 221 Pa.Superior Ct. 182, 289 A.2d 742 (1972). In this context, courts have held that children's education may be financed from sources other than the parent. *DeVergilius v. DeVergilius, supra* (college student's income, property and trust fund may be considered by the court); *Commonwealth ex rel. Schlesinger v. Schlesinger, supra* (college student daughter's trust fund may be considered by court); *Commonwealth ex rel. Platt v. Platt, supra* (college student daughter's earnings considered by court); *Doelp v. Doelp, supra* (college student son's earnings and trust fund to be considered by the court). There is no reason why this rule should not apply to UGMA funds. It is fair and consistent with the policies underlying both child support and the UGMA. Therefore, a court may more freely consider UGMA assets when apportioning financial responsibility for a child's education. However, there was no finding here that husband's assets are lacking or that provision of a college education would *408 impose any hardship on him. Indeed, the present record belies any such problem.

[16][17] A parent-custodian who uses custodial funds to satisfy his own support obligation violates his duty of loyalty and hereafter is subject to surcharge and removal for such violation. It seems to us, however, that automatic removal and surcharge for past acts of the custodians which violate this fi-

duciary duty of loyalty are inappropriate because it has not heretofore been considered in the context of UGMA. Any custodian, however, who uses UGMA funds to satisfy a parent's support obligation is subject to surcharge and removal if his acts were in bad faith.

In this case, the question of bad faith was not considered by the lower courts. For that reason, the record is inadequate for a decision on that issue.

Accordingly, the record is remanded to the Court of Common Pleas of Cumberland County for such further proceedings as may be necessary to determine the custodians' good faith as well as the question of whether this father has sufficient means to meet his children's needs without using their own property. Otherwise, the order of Superior Court is affirmed.

McDERMOTT, J., concurs in the result and files a Concurring Opinion.
NIX, C.J., files a Concurring and Dissenting Opinion.
LARSEN, J., files a Dissenting Opinion in which FLAHERTY, J., joins.
NIX, Chief Justice, concurring and dissenting.
   I agree with the result reached by the majority insofar as it relates to the assets gifted by the children's paternal grandparents. I disagree with respect to the funds which came from the children's father; those funds, in my view, should be applicable to the father's support obligation. Those funds, after all, came from the very person who has the support obligation here in issue.

*409 LARSEN, Justice, dissenting.
   I dissent; where the parents are separated and there is an order of support for their children and the children have *sufficient* assets for their support or partial **1326 support, the children's assets should be utilized first.

FLAHERTY, J., joins in this dissenting opinion.
McDERMOTT, Justice, concurring.
   To the extent that the plurality holds that it was

528 A.2d 1318
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099
(Cite as: 515 Pa. 393, 528 A.2d 1318)

improper for the custodians to use the children's UGMA funds to offset the father's support obligation, I agree.[FN1] However, because the plurality answers more than asked, I must disagree with other aspects of the opinion.

> FN1. I am also in agreement with the plurality's jurisdictional analysis.

The opinion begins its analysis with the announcement of a simple and well defined rule: "we hold that a parent's obligation to support minor children is independent of the minor's assets." P. 1320. Unfortunately, the plurality proceeds to obfuscate this simple rule by seeking to explain the instances in which a court can take into its consideration the minor's assets in setting a support order.

The primary source of support for children is their parents. *Conway v. Dana,* 456 Pa. 536, 318 A.2d 324 (1974). Either or both parents must support their offspring until they reach majority. *Costello v. LeNoir,* 462 Pa. 36, 40, 337 A.2d 866, 868 (1975). The obligation of support is independent of the assets of the children. Their assets are only relevant when the parents are unable to meet their responsibility of support, and in those instances where a minor's assets are utilized to offset the failure of the parent to meet his or her obligation, the parents' debt is not extinguished. Here, the parents are able, and no more need be said. Each case for support differs as there are different faces. A recitation that purports to cover all possibilities creates more problems than answers.

The issue here is not whether the father is able to support his children; he is. The issue is rather can a father take *410 back a gift he gave. The answer must be no, unless a father's gift is never a gift. *See generally Semasek v. Semasek,* 509 Pa. 282, 292, 502 A.2d 109, 113 (1985) (McDermott, J., concurring). If one chooses to make a gift to his children, he cannot later take it back by deducting from that patrimony what he owes in support payments.

Pa.,1987.

Sutliff v. Sutliff
515 Pa. 393, 528 A.2d 1318, 56 USLW 2099

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

178 A.2d 755                                              Page 1
406 Pa. 607, 178 A.2d 755
**(Cite as: 406 Pa. 607, 178 A.2d 755)**

**C**

Supreme Court of Pennsylvania.
Julius J. SYLVESTER and Olga R. Sylvester, his
wife, Appellants,
v.
George E. BECK.

March 13, 1962.

Principals brought an action against a real estate broker for damages because of the fact that 27 days after the broker contracted to purchase the realty personally from the principals he entered into a contract to resell the realty to a third party at a large profit. The Court of Common Pleas of Montgomery County as of April Term, 1959, No. 551, James F. Henninger, J., Specially Presiding, entered a judgment for the broker notwithstanding the verdict for the principals, and the principals appealed. The Supreme Court, Eagen, J., at No. 71, January Term, 1962, held that the principals were not entitled to recover damages in absence of proof that the broker failed to disclose fully to them all facts within his knowledge at the time they contracted to sell the realty to him.

Judgment affirmed.

Cohen, J., dissented.

West Headnotes

**[1] Principal and Agent 308 ⟨⟩48**

308 Principal and Agent
  308II Mutual Rights, Duties, and Liabilities
    308II(A) Execution of Agency
      308k48 k. Nature of Agent's Obligation.
Most Cited Cases
  Agent owes duty of loyalty to principal, and in all matters affecting subject of agency agent must act with utmost good faith in furtherance of principal's interests and must give principal all information of subject matter that comes to agent's knowledge.

**[2] Principal and Agent 308 ⟨⟩69(2)**

308 Principal and Agent
  308II Mutual Rights, Duties, and Liabilities
    308II(A) Execution of Agency
      308k69 Individual Interest of Agent
        308k69(2) k. Duty of Agent to Account for Profits of Agency. Most Cited Cases
  Agent, who makes profit in connection with transactions conducted by him on behalf of principal, is under duty to give such profit to principal.

**[3] Principal and Agent 308 ⟨⟩69(4)**

308 Principal and Agent
  308II Mutual Rights, Duties, and Liabilities
    308II(A) Execution of Agency
      308k69 Individual Interest of Agent
        308k69(4) k. Agent to Sell, Selling to Himself. Most Cited Cases
  Agent may lawfully purchase from principal, if before transaction there is full disclosure of all pertinent facts by agent to principal.

**[4] Principal and Agent 308 ⟨⟩69(8)**

308 Principal and Agent
  308II Mutual Rights, Duties, and Liabilities
    308II(A) Execution of Agency
      308k69 Individual Interest of Agent
        308k69(8) k. Transactions After Termination of Agency. Most Cited Cases
  Former agency does not preclude profit, when, with full disclosure to principal, former agent assumed relationship of purchaser.

**[5] Brokers 65 ⟨⟩31**

65 Brokers
  65IV Duties and Liability to Principal
    65k31 k. Individual Interest of Broker. Most Cited Cases
  Fact that real estate broker, who contracted to purchase realty from his principals for himself, entered into contract to resell realty to third party

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

178 A.2d 755                                                              Page 2
406 Pa. 607, 178 A.2d 755
(Cite as: 406 Pa. 607, 178 A.2d 755)

for large profit 27 days after broker contracted to purchase realty and did not disclose such fact to principals until after final settlement did not, in itself, entitle principals to damages from broker, since agency ended when principals agreed to sell.

[6] Brokers 65 ⚬⟶31

65 Brokers
    65IV Duties and Liability to Principal
        65k31 k. Individual Interest of Broker. Most Cited Cases
    Principals, who contracted to sell realty to real estate broker personally, were not entitled to recover damages from broker when broker 27 days after contracting to purchase realty from principals contracted to resell realty to third party at large profit, where principals failed to prove that broker failed to disclose to them all facts within his knowledge at time he contracted to purchase realty from them.

*608 **755 William C. Cahall III, Norristown, for appellants.

Harry M. Sablosky, Maxwell Strawbridge, Norristown, for appellee.

*607 **756 Before BELL, C. J., and MUSMANNO, JONES, COHEN, EAGEN, and O'BRIEN, JJ.

EAGEN, Justice.
    Plaintiffs, husband and wife, sued defendant, a real estate broker, for damages alleging a breach of trust in the purchase and resale of real estate. Plaintiffs won a jury verdict in the amount of $9000. The lower court entered judgment for the defendant notwithstanding the verdict. Plaintiffs appeal.

    The record read in the light most favorable to the plaintiffs' cause discloses the following: The plaintiffs were the owners of an unimproved piece of land near King of Prussia in Upper Merion Township, Montgomery County. In the winter of 1958, the defendant approached the plaintiffs and asked if they were willing to sell, stating that an oil

company was interested in the property and that the company would either buy, rent, or lease it. The plaintiffs told the defendant that they were interested only in selling. The defendant was then authorized to sell the property for $15,000 and he displayed his broker's 'for sale' sign thereon.

    Several weeks later, the defendant phoned one of the plaintiffs and offered to purchase the property for himself for the sum of $11,000. This offer was refused. Subsequent offers to purchase for $12,000 and $13,000 were submitted by the defendant, which were refused. Finally, the plaintiffs agreed to sell the property to the defendant for the sum of $14,000, and a written contract of sale was entered into by the parties on March 12, 1958. During these negotiations, one of the plaintiffs*609 asked the defendant, 'What happened to the oil company?' He responded, 'They are not interested, you want too much money for it.'

    The contract of sale provided for the payment of $100 down; the balance to be paid within three months.

    On April 8, 1958, the defendant negotiated a resale of the property from himself to one David Epstein for the sum of $25,000. The contract provided for the payment of $2500 down and the balance to be paid on or before June 30, 1958. The existence of this agreement was not disclosed to the plaintiffs.

    On June 12, 1958, the plaintiffs and the defendant met for the purpose of final settlement. The necessary deed of conveyance to the defendant was executed and delivered and the balance of the purchase price paid. Later on the same day, the defendant sold and conveyed title to Epstein in accordance with their agreement. Subsequently, when the plaintiffs learned that the defendant had realized a huge profit in a quick resale of the property, this suit followed.

    The above facts constituted plaintiffs' sole proof.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

In answer, the defendant testified that in his conversations with the plaintiffs he made it clear that an oil company was interested in the property, but only in leasing, not buying, and only if the plaintiffs would construct a gas station thereon; that the plaintiffs informed him that they were having marital difficulties and were only interested in selling in order to effectuate a property settlement; that after he was authorized by the plaintiffs to sell the property that he contacted several oil companies in an effort to sell the land without success; that a representative of the American Oil Company manifested interest in leasing the property if plaintiffs would agree to erect a gas station thereon; that this information was communicated to one of the plaintiffs, who stated that they were only *610 interested in selling and suggested to the defendant that if such a deal appeared profitable that the defendant should buy the property himself; that this the defendant finally agreed to do after some negotiations as to price.

The defendant further testified that he agreed to buy the property with the intention of having his corporation construct a **757 gas station on the site; that, with this thought in mind, he arranged to have a quantity of fill dirt placed on the ground; that subsequently, a representative of the American Oil Company, Mr. Dolan, took Epstein to meet the defendant informing him that Epstein was agreeable to purchase the property, construct a gas station thereon with his own funds and, in turn, to lease it to the American Oil Company. As a result, the contract of sale to Epstein was negotiated and consummated, without Epstein even seeing the property. The agreement included a provision that Beck was required to secure all necessary licenses to permit the construction of a gas station on the site. The defendant's testimony was corroborated in material part by Dolan of the American Oil Company.

The plaintiffs' own proof was insufficient to make out a case for the jury and the proof on the defendant's side fails to supply the vital deficiencies in plaintiffs' case. On the contrary, the defendant's

evidence was completely exculpatory.

[1][2][3][4]   There can be no doubt that an agent owes a duty of loyalty to his principal and in all matters, affecting the subject of his agency, he must act with the utmost good faith in the furtherance and advancement of the interests of his principal. This requires that he give the principal all information of the subject matter that comes to his knowledge:   Shannon v. Baltz, 398 Pa. 431, 158 A.2d 558 (1960); Kribbs v. Jackson, 387 Pa. 611, 129 A.2d 490 (1956). An agent, who makes a profit in connection with transactions conducted by him on *611 behalf of his principal is under a duty to give such profit to the principal:   Johnson to Use of McCarter v. Nippert (No. 1), 294 Pa. 464, 144 A. 404 (1928); RESTATEMENT (Second), Agency § 388 (1958).   However, an agent may lawfully purchases from his principal, if before the transaction there is a full disclosure of all pertinent facts by the agent to the principal:   Fisher's Appeal, 34 Pa. 29 (1859); Shepard & Co. v. Kaufman, 88 Pa.Super. 57 (1926); Kramer v. Winslow, 154 Pa. 637, 25 A. 766 (1893). Nor does a former agency preclude a profit, when, will full disclosure to the principal, the former agent assumed the relationship of a purchaser: Delvitto v. Schiavo, 370 Pa. 299, 87 A.2d 913 (1952).

Herein, there was a substantial variance in the allegata and probata. At trial, the plaintiffs' sole proof of the defendant's alleged breach of trust was that he sold the property at a large profit, twenty-seven days after he had entered into a contract to purchase it for himself, and that he failed to disclose this fact to the plaintiffs until subsequent to the final settlement. In the complaint, plaintiffs' cause of action was bottomed upon the theory that the defendant failed to fully disclose material facts at the time he induced the plaintiffs to sell. If plaintiffs had succeeded in proving this allegation, a case for the jury would be present. The proof failed in important respects. For instance, the plaintiffs alleged, but failed to prove, that before the defendant entered into the agreement to pur-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

178 A.2d 755
406 Pa. 607, 178 A.2d 755
(Cite as: 406 Pa. 607, 178 A.2d 755)

Page 4

chase the property that he knew that the American Oil Company was interested in buying at the sum of $25,000 and failed to disclose this information to his principals. This was not sustained by the plaintiffs and the contrary was established by the testimony of the witness, Dunn, the representative of that company. The plaintiffs also alleged that the defendant during his agency failed to disclose that an oil company was interested in the site for use as a gas station. The testimony of *612 the plaintiff, Olga R. Sylvester, herself established that such information was given to the plaintiffs.

[5] The fact that the defendant entered into a contract to resell the property twenty-seven days after he had contracted to purchase it and did not disclose this particular fact to the plaintiffs until after final settlement does not, in itself, entitle the plaintiffs to damages. The agency having ended when the plaintiffs agreed to sell, the agent was under no obligation to furnish his former principal with the details of events that took place subsequent to **758 the termination of their relationship of principal and agent.

Nor is plaintiffs' case made whole by reason of the fact that the defendant realized profit from the transaction. Certainly, the parties contemplated that the defendant intended to do just that if it were within the realm of possibility. There was no attempt to conceal the fact that the defendant himself was the purchaser. In fact, the plaintiffs consented to it.

[6] This case must be judged upon the facts known to the defendant as of the time he agreed to purchase and the plaintiffs agreed to sell. In order to sustain the cause of action asserted, plaintiffs were obliged to prove that *as of that time* the defendant failed to disclose fully all facts within his knowledge. The proof does not sustain such a finding. Hence, the allegation of concealment and unfair dealing is not made out.

Judgment affirmed.

COHEN, J., dissents.

Pa. 1962
Sylvester v. Beck
406 Pa. 607, 178 A.2d 755

END OF DOCUMENT

Westlaw.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

C

United States District Court,
E.D. Pennsylvania.

Jeffrey McDERMOTT, Donna McDermott, and
McDermott Group, Inc., Plaintiffs,
v.
PARTY CITY CORP. and Philip Nasuti, Defendants.

Civil Action No. 95-3683.
June 30, 1998.

Store owners brought action against store manager for breach of stock purchase agreement and breach of fiduciary duty under Pennsylvania law. Following jury verdict in favor of owners, manager moved for judgment as a matter of law, new trial, or remittitur. Owners moved to amend judgment to add prejudgment interest. The District Court, Eduardo C. Robreno, J., held that: (1) evidence supported finding that condition of stock purchase agreement requiring bank approval was satisfied; (2) manager was not liable for losses on owners' sale of mutual funds to pay bank debt after business was liquidated; (3) evidence supported finding that manager breached his fiduciary duty to owners; (4) consequential damages for breach of fiduciary duty would be reduced to $42,538; and (5) award of punitive damages in amount of $375,000 was not excessive.

Defendant's motion for judgment as a matter of law granted in part and denied in part; defendant's motion for new trial or remittitur denied; plaintiff's motion for prejudgment interest granted.

West Headnotes

**[1] Federal Civil Procedure 170A ☞2608.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(E) Notwithstanding Verdict

170Ak2608 Evidence
    170Ak2608.1 k. In general. Most Cited Cases
    Jury verdict can be displaced by judgment as a matter of law only if the record is critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ☞2333.1**

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(B) Grounds
            170Ak2333 Trial Errors
                170Ak2333.1 k. In general. Most Cited Cases
    Where the proffered basis for a new trial is trial error, the court's inquiry is twofold: it must first determine whether an error was made in the course of the trial, and then must determine whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice. Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A ☞2336**

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(B) Grounds
            170Ak2333 Trial Errors
                170Ak2336 k. Instructions. Most Cited Cases
    To warrant a new trial, an error in jury instructions must be so substantial that, viewed in light of the evidence in the case and the charge as a whole, the instruction was capable of confusing and thereby misleading the jury. Fed.Rules Civ.Proc.Rule 59, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A ☞2377**

170A Federal Civil Procedure
    170AXVI New Trial
        170AXVI(C) Proceedings

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

170Ak2377 k. Remittitur. Most Cited Cases

Remittitur is appropriate if the court finds that a decision of the jury is clearly unsupported and/or excessive.

**[5] Federal Civil Procedure 170A ⟐⟐2377**

170A Federal Civil Procedure
   170AXVI New Trial
      170AXVI(C) Proceedings
         170Ak2377 k. Remittitur. Most Cited Cases

If remittitur is granted, the party against whom it is entered can accept it or can proceed to a new trial on the issue of damages.

**[6] Contracts 95 ⟐⟐318**

95 Contracts
   95V Performance or Breach
      95k318 k. Discharge of contract by breach. Most Cited Cases

Under Pennsylvania law, in a bilateral contract, if a condition precedent is not satisfied, the obligations of the non-performing party are discharged.

**[7] Contracts 95 ⟐⟐322(1)**

95 Contracts
   95V Performance or Breach
      95k322 Evidence
         95k322(1) k. Presumptions and burden of proof. Most Cited Cases

Under Pennsylvania law, the party alleging the breach of contract bears the burden of proof that the condition precedent was satisfied.

**[8] Corporations and Business Organizations 101 ⟐⟐2764**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganizations
      101X(D) Sale or Transfer of All or Controlling Interest of Stock
         101k2756 Actions

101k2764 k. Evidence. Most Cited Cases
   (Formerly 101k121(5))

Under Pennsylvania law, evidence supported finding that condition of stock purchase agreement requiring consent of lending bank had been satisfied; seller testified that he received oral approval of transaction without conditions from bank officer, and sellers' attorney testified that based upon his dealing his dealings with bank it was his understanding that bank had approved transaction.

**[9] Corporations and Business Organizations 101 ⟐⟐2764**

101 Corporations and Business Organizations
   101X Mergers, Acquisitions, and Reorganizations
      101X(D) Sale or Transfer of All or Controlling Interest of Stock
         101k2756 Actions
            101k2764 k. Evidence. Most Cited Cases
   (Formerly 101k121(5))

Under Pennsylvania law, evidence supported finding that purchaser impeded satisfaction of condition of franchisee stock purchase agreement requiring that personal guarantee of purchaser's wife be obtained; wife testified that she had signed all the personal guarantees her husband had asked her to sign in the past, that she had guaranteed debts for other franchises owned by her husband, and that just recently she had guaranteed lease payments for a shopping center.

**[10] Contracts 95 ⟐⟐303(4)**

95 Contracts
   95V Performance or Breach
      95k303 Excuses for Nonperformance or Defects
         95k303(4) k. Performance prevented by other party or third person. Most Cited Cases

Under Pennsylvania law, if a party acts to hinder the satisfaction of a condition of a contract, the condition is excused; in other words, where a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

party claiming the condition has not been satisfied is the cause of the non-occurrence, he or she may not claim the non-occurrence to his or her advantage. Restatement (Second) of Contracts § 225 comment.

**[11] Corporations and Business Organizations 101 ☞2764**

101 Corporations and Business Organizations
  101X Mergers, Acquisitions, and Reorganizations
    101X(D) Sale or Transfer of All or Controlling Interest of Stock
      101k2756 Actions
        101k2764 k. Evidence. Most Cited Cases
    (Formerly 101k121(5))
  Under Pennsylvania law, evidence supported finding that purchaser accepted part performance under stock purchase agreement, thus excusing any condition precedent to agreement; sellers produced evidence that purchaser accepted benefits of management provision of agreement in form of his monthly management fee.

**[12] Contracts 95 ☞227**

95 Contracts
  95II Construction and Operation
    95II(E) Conditions
      95k227 k. Waiver. Most Cited Cases
  Under Pennsylvania law, contractual provisions can be waived, expressly or impliedly.

**[13] Contracts 95 ☞227**

95 Contracts
  95II Construction and Operation
    95II(E) Conditions
      95k227 k. Waiver. Most Cited Cases
  Under Pennsylvania law, contractual provisions may be waived by a party's conduct as long as the intent to waive may be reasonably inferred.

**[14] Corporations and Business Organizations 101 ☞2764**

101 Corporations and Business Organizations
  101X Mergers, Acquisitions, and Reorganizations
    101X(D) Sale or Transfer of All or Controlling Interest of Stock
      101k2756 Actions
        101k2764 k. Evidence. Most Cited Cases
    (Formerly 101k121(5))
  Under Pennsylvania law, evidence supported finding that purchaser waived stock purchase agreement's condition of bank approval; purchaser affirmatively undertook his management obligations under agreement immediately upon signing agreement, prior to bank formally consenting to transfer of stock.

**[15] Federal Civil Procedure 170A ☞2602**

170A Federal Civil Procedure
  170AXVII Judgment
    170AXVII(E) Notwithstanding Verdict
      170Ak2602 k. Necessity for motion for directed verdict. Most Cited Cases
  Postverdict motion for judgment as a matter of law cannot assert a ground that was not included in the earlier motion at the close of presentation of evidence. Fed.Rules Civ.Proc.Rule 50(b), 28 U.S.C.A.

**[16] Federal Civil Procedure 170A ☞2336**

170A Federal Civil Procedure
  170AXVI New Trial
    170AXVI(B) Grounds
      170Ak2333 Trial Errors
        170Ak2336 k. Instructions. Most Cited Cases
  By failing to submit jury instruction or objecting to absence of one, stock purchaser waived for post-trial consideration his argument that stock purchase agreement's condition of bank approval was material and thus could not be waived under Pennsylvania law. Fed.Rules Civ.Proc.Rule 51, 28 U.S.C.A.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

**[17] Damages 115 ☞22**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k21 Natural and Probable Consequences of Breaches of Contract
                    115k22 k. In general. Most Cited Cases
Under Pennsylvania law, generally, a breaching party is liable for damages that would naturally result from the breach.

**[18] Damages 115 ☞23**

115 Damages
    115III Grounds and Subjects of Compensatory Damages
        115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
            115III(A)1 In General
                115k21 Natural and Probable Consequences of Breaches of Contract
                    115k23 k. Under circumstances within contemplation of parties. Most Cited Cases
Under Pennsylvania law, to recover consequential damages for a breach of contract, plaintiff must show specifically that defendant had reason to know of the special circumstances causing the loss and that the injury was foreseeable; foreseeability is to be determined from the point in time when the contract was formed.

**[19] Corporations and Business Organizations 101 ☞2767**

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(D) Sale or Transfer of All or Controlling Interest of Stock
            101k2756 Actions
                101k2767 k. Damages or amount of recovery. Most Cited Cases
    (Formerly 101k121(7))
Under Pennsylvania law, balance owed to vendors, to landlord, and to lending bank following liquidation of store were recoverable as consequential damages by stock sellers in their action against purchaser for breach of stock purchase agreement; plain language of agreement stated that purchaser agreed to be responsible for 51% of debts owed by sellers.

**[20] Corporations and Business Organizations 101 ☞2767**

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(D) Sale or Transfer of All or Controlling Interest of Stock
            101k2756 Actions
                101k2767 k. Damages or amount of recovery. Most Cited Cases
    (Formerly 101k121(7))
Under Pennsylvania law, in franchisee stock sellers' action for breach of stock purchase agreement, sellers were entitled to recover from purchaser for loss on lease, loan, and vendor debt, even though franchisor had directly paid landlord, bank, and vendors for outstanding debts; franchisor's direct payment of sellers' debts did not affect purchaser's duties to sellers.

**[21] Corporations and Business Organizations 101 ☞2767**

101 Corporations and Business Organizations
    101X Mergers, Acquisitions, and Reorganizations
        101X(D) Sale or Transfer of All or Controlling Interest of Stock
         101k2756 Actions
            101k2767 k. Damages or amount of recovery. Most Cited Cases
    (Formerly 101k121(7))
Under Pennsylvania law, in stock sellers' action against purchaser for breach of stock purchase

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

agreement, sellers were not entitled to recover, as consequential damages, losses on liquidated mutual funds that had been pledged as security by sellers to secure loan and which had to be liquidated after breach; sale of mutual funds did not flow directly from breach of agreement, but rather was the result of sellers' precarious financial situation at time loan was called.

**[22] Fraud 184 ⟜7**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k5 Elements of Constructive Fraud
           184k7 k. Fiduciary or confidential relations. Most Cited Cases
    Under Pennsylvania law, the elements the plaintiff must prove in a claim of breach of fiduciary duty are: (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit was a real factor in bringing about plaintiff's injuries.

**[23] Conversion and Civil Theft 97C ⟜100**

97C Conversion and Civil Theft
    97CI Acts Constituting and Liability Therefor
        97Ck100 k. In general; nature and elements. Most Cited Cases
    (Formerly 389k1 Trover and Conversion)
    Under Pennsylvania law, the elements of conversion are: (1) the deprivation of another's right of property in, or use or possession of, a chattel; (2) without the owner's consent; and (3) without lawful justification.

**[24] Fraud 184 ⟜7**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k5 Elements of Constructive Fraud

           184k7 k. Fiduciary or confidential relations. Most Cited Cases
    Under Pennsylvania law, a "fiduciary relationship" exists where one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side, or weakness, dependence, or justifiable trust on the other.

**[25] Fraud 184 ⟜7**

184 Fraud
    184I Deception Constituting Fraud, and Liability Therefor
        184k5 Elements of Constructive Fraud
           184k7 k. Fiduciary or confidential relations. Most Cited Cases
    Under Pennsylvania law, a business association may be the basis of a confidential relationship, and may thus form the basis of a fiduciary relationship, only if one party surrenders substantial control over some portion of his or her affairs to the other.

**[26] Principal and Agent 308 ⟜48**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
           308k48 k. Nature of agent's obligation. Most Cited Cases
    Under Pennsylvania law, when a person authorizes another to act as his or her agent, the relationship between the two may be characterized as a "fiduciary relationship."

**[27] Principal and Agent 308 ⟜48**

308 Principal and Agent
    308II Mutual Rights, Duties, and Liabilities
        308II(A) Execution of Agency
           308k48 k. Nature of agent's obligation. Most Cited Cases

**Principal and Agent 308 ⟜69(1)**

308 Principal and Agent

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

308II Mutual Rights, Duties, and Liabilities
   308II(A) Execution of Agency
      308k69 Individual Interest of Agent
         308k69(1) k. In general. Most Cited Cases

Under Pennsylvania law, the duty of an agent to his principal is one of loyalty in all matters affecting the subject of his agency, and the agent must act with the utmost good faith in the furtherance and advancement of the interests of his principal.

**[28] Principal and Agent 308 &#8986;48**

308 Principal and Agent
   308II Mutual Rights, Duties, and Liabilities
      308II(A) Execution of Agency
         308k48 k. Nature of agent's obligation. Most Cited Cases

Under Pennsylvania law, the fact that the terms of the agency relationship are spelled out in a written agreement does not mean that the agent does not also owe, as a matter of law, a duty of loyalty to the principal.

**[29] Fraud 184 &#8986;7**

184 Fraud
   184I Deception Constituting Fraud, and Liability Therefor
      184k5 Elements of Constructive Fraud
         184k7 k. Fiduciary or confidential relations. Most Cited Cases

Under Pennsylvania law, evidence supported finding that store manager, as a fiduciary, owed owners the utmost duties of loyalty and good faith and that he breached those duties through self-dealing; manager made almost all of the business decisions for store, manager wrote checks to himself and to his personal attorney from store's account, manager transferred inventory from store to other stores that manager owned, and manager suggested that owners move store at same time he was planning to open his own store approximately three miles away.

**[30] Damages 115 &#8986;20**

115 Damages
   115III Grounds and Subjects of Compensatory Damages
      115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
         115III(A)1 In General
            115k20 k. Natural and probable consequences of torts. Most Cited Cases

Under Pennsylvania law, generally in tort claims, a tort-feasor is liable for all the damages which ordinarily and in the natural course of things have resulted from the commission of the tort.

**[31] Damages 115 &#8986;184**

115 Damages
   115IX Evidence
      115k183 Weight and Sufficiency
         115k184 k. In general. Most Cited Cases

Under Pennsylvania law, damages must be proven with reasonable certainty.

**[32] Damages 115 &#8986;184**

115 Damages
   115IX Evidence
      115k183 Weight and Sufficiency
         115k184 k. In general. Most Cited Cases

Under Pennsylvania law, although mathematical certainty is not required in the computation of damages, the plaintiff must introduce sufficient facts upon which the jury can determine the amount of damages without conjecture.

**[33] Fraud 184 &#8986;62**

184 Fraud
   184II Actions
      184II(E) Damages
         184k62 k. Amount awarded. Most Cited Cases

Under Pennsylvania law, in store owners' action against manager for breach of fiduciary duty, evidence supported portion of damage award in amount of $42,538; owners presented evidence that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

manager wrote checks to himself drawn on store's accounts, that manager assigned another store employee to stores owned by manager, and that manager transferred inventory from owners' store to stores owned by manager.

**[34] Fraud 184 ☞62**

184 Fraud
   184II Actions
      184II(E) Damages
         184k62 k. Amount awarded. Most Cited
Cases
   Under Pennsylvania law, in store owners' action against manager for breach of fiduciary duty, evidence did not support portion of damage award totaling $94,462; it was impossible to make a fair estimate of amount of inventory lost with no record, and no proof of lost profits was presented.

**[35] Damages 115 ☞208(8)**

115 Damages
   115X Proceedings for Assessment
      115k208 Questions for Jury
         115k208(8) k. Exemplary damages. Most
Cited Cases
   Under Pennsylvania law, the decision of whether to award punitive damages and the scope of the damages are within the discretion of the finder of fact.

**[36] Damages 115 ☞189.5**

115 Damages
   115IX Evidence
      115k183 Weight and Sufficiency
         115k189.5 k. Punitive damages. Most
Cited Cases
   (Formerly 115k184)
   Standard of proof for punitive damages under Pennsylvania law is by a preponderance of the evidence.

**[37] Damages 115 ☞87(2)**

115 Damages

115V Exemplary Damages
      115k87 Nature and Theory of Damages Additional to Compensation
         115k87(2) k. Necessity of actual damage.
Most Cited Cases

**Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In general. Most Cited
Cases
   (Formerly 115k91(1))
   Under Pennsylvania law, punitive damages are appropriate when the act committed, in addition to causing actual damages, constitutes outrageous conduct, either through reckless indifference or bad motive; "outrageous conduct" is defined as an act which, in addition to creating actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights.

**[38] Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In general. Most Cited
Cases
   (Formerly 115k91(1))
   Under Pennsylvania law, to determine whether punitive damages are appropriate the following factors may be considered: (1) the character of the act; (2) the nature and extent of the harm caused; and (3) the wealth of the defendant.

**[39] Damages 115 ☞91.5(1)**

115 Damages
   115V Exemplary Damages
      115k91.5 Grounds for Exemplary Damages
         115k91.5(1) k. In general. Most Cited
Cases
   (Formerly 115k91(1))

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

Under Pennsylvania law, in making the determination regarding an award of punitive damages, one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties.

**[40] Damages 115 ⬅91.5(1)**

115 Damages
    115V Exemplary Damages
        115k91.5 Grounds for Exemplary Damages
            115k91.5(1) k. In general. Most Cited
Cases
    (Formerly 115k91(1))
Under Pennsylvania law, in determining whether punitive damages are warranted, the state of mind of the actor is vital; the act, or the failure to act, must be intentional, reckless, or malicious.

**[41] Damages 115 ⬅91.5(1)**

115 Damages
    115V Exemplary Damages
        115k91.5 Grounds for Exemplary Damages
            115k91.5(1) k. In general. Most Cited
Cases
    (Formerly 115k91(1))
Under Pennsylvania law, to award punitive damages, there must be conduct beyond that which supported the compensatory damages award.

**[42] New Trial 275 ⬅76(1)**

275 New Trial
    275II Grounds
        275II(F) Verdict or Findings Contrary to Law
or Evidence
            275k76 Excessive Damages
                275k76(1) k. In general. Most Cited
Cases
Under Pennsylvania law, a judge may not vacate a jury's punitive damages award because he or she might have awarded less.

**[43] Fraud 184 ⬅61**

184 Fraud

184II Actions
    184II(E) Damages
        184k61 k. Exemplary. Most Cited Cases
Under Pennsylvania law, evidence supported jury's award of punitive damages to store owners in their action against store manager for breach of fiduciary duty; jury found that manager acted in his own interest, paying himself and his attorney from store funds, taking inventory from store for use in his own stores, and assigning a store employee to work in manager's own store and paying employee from store owners' funds, and manager made quick exit once he decided to quit, leaving owners "high and dry."

**[44] New Trial 275 ⬅162(1)**

275 New Trial
    275III Proceedings to Procure New Trial
        275k162 Remission or Reduction of Excess
of Recovery
            275k162(1) k. In general. Most Cited
Cases
Under Pennsylvania law, before it may remit the damages, the court must find that the jury's award shocks the court's sense of justice.

**[45] Fraud 184 ⬅62**

184 Fraud
    184II Actions
        184II(E) Damages
            184k62 k. Amount awarded. Most Cited
Cases
Under Pennsylvania law, award of $375,000 in punitive damages was not excessive when compared to award of $137,000 in compensatory damages for store manager's breach of fiduciary duty to store owners.

**[46] Damages 115 ⬅94.6**

115 Damages
    115V Exemplary Damages
        115k94 Measure and Amount of Exemplary
Damages

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

115k94.6 k. Actual damage or compensatory damages; relationship and ratio. Most Cited Cases
(Formerly 115k94)

Under Pennsylvania law, although mathematical certainty is not required in awarding punitive damages, a reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages.

**[47] Damages 115 ☞94.3**

115 Damages
115V Exemplary Damages
115k94 Measure and Amount of Exemplary Damages
115k94.3 k. Wealth of defendant. Most Cited Cases
(Formerly 115k94)

Under Pennsylvania law, the wealth of the defendant is an appropriate factor for the finder of fact to consider in awarding punitive damages.

**[48] Constitutional Law 92 ☞4427**

92 Constitutional Law
92XXVII Due Process
92XXVII(G) Particular Issues and Applications
92XXVII(G)19 Tort or Financial Liabilities
92k4427 k. Punitive damages. Most Cited Cases
(Formerly 92k303)

**Fraud 184 ☞62**

184 Fraud
184II Actions
184II(E) Damages
184k62 k. Amount awarded. Most Cited Cases

Due Process Clause was not violated by award of punitive damages in amount of $375,000 against store manager in store owners' action under

Pennsylvania law for breach of fiduciary duty, even though amount of compensatory damages was $137,000; owners retained manager because of his recognized knowledge and expertise in the industry, manager proceeded to operate for his own benefit without regard for owners' interests, manager then abandoned business under thinly veiled pretext, and manager's conduct could be considered criminal under Pennsylvania law. U.S.C.A. Const.Amend. 5; 18 Pa.C.S.A. §§ 3922, 4101 et seq.

**[49] Interest 219 ☞39(2.35)**

219 Interest
219III Time and Computation
219k39 Time from Which Interest Runs in General
219k39(2.5) Prejudgment Interest in General
219k39(2.35) k. Insurance matters. Most Cited Cases

Under Pennsylvania law, prejudgment interest is a matter of right in breach of contract cases.

**[50] Interest 219 ☞39(2.6)**

219 Interest
219III Time and Computation
219k39 Time from Which Interest Runs in General
219k39(2.5) Prejudgment Interest in General
219k39(2.6) k. In general. Most Cited Cases

Under Pennsylvania law, the right to prejudgment interest begins at the time payment is withheld after it has been the duty of the debtor to make such payment.

**[51] Interest 219 ☞39(2.30)**

219 Interest
219III Time and Computation
219k39 Time from Which Interest Runs in General
219k39(2.5) Prejudgment Interest in Gen-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

eral
                219k39(2.30) k. Contract and sales matters. Most Cited Cases

Under Pennsylvania law, in sellers' action against purchaser for breach of stock purchase agreement, sellers were entitled to prejudgment interest from date that contract was breached until date that judgment was entered.

**[52] Interest 219 ☜39(2.15)**

219 Interest
    219III Time and Computation
        219k39 Time from Which Interest Runs in General
            219k39(2.5) Prejudgment Interest in General
                219k39(2.15) k. Liquidated or unliquidated claims in general. Most Cited Cases

Under Pennsylvania law, generally, it is within the discretion of the court to award prejudgment interest with regard to unliquidated sums, such as that for breach of fiduciary duty.

**[53] Interest 219 ☜39(2.20)**

219 Interest
    219III Time and Computation
        219k39 Time from Which Interest Runs in General
            219k39(2.5) Prejudgment Interest in General
                219k39(2.20) k. Particular cases and issues. Most Cited Cases

Under Pennsylvania law, prejudgment interest is available for awards for breach of fiduciary duty.

**[54] Interest 219 ☜39(2.20)**

219 Interest
    219III Time and Computation
        219k39 Time from Which Interest Runs in General
            219k39(2.5) Prejudgment Interest in General
                219k39(2.20) k. Particular cases and

issues. Most Cited Cases

Under Pennsylvania law, in store owners' action against manager for breach of fiduciary duty, owners were entitled to prejudgment interest from date that duty was breached until date that judgment was entered.

**\*617** Kevin F. Berry, Ledgewood Law Firm, Philadelphia, PA, for Plaintiffs.

James A. Keller, Paul Hummer, Saul, Ewing, Remick & Saul, Philadelphia, PA, Edwin N. Popkin, Langhorne, PA, Frederic J. Schragger, Lawrenceville, NJ, for Defendants.

MEMORANDUM
EDUARDO C. ROBRENO, District Judge.

Donna and Jeffrey McDermott, individually and on behalf of the McDermott Group, Inc., (collectively "plaintiffs"), initiated this lawsuit against defendant Philip Nasuti ("Nasuti"),[FN1] asserting both contract and tort claims. Plaintiffs alleged that Nasuti breached a stock purchase agreement, under which Nasuti was to purchase stock in, and perform management services for, the McDermott Group, Inc. ("the McDermott Group"), a Pennsylvania corporation formed by the McDermotts for the sole purpose of operating a Party City franchise store in King of Prussia, Pennsylvania ("the store").[FN2] Plaintiffs also contend that Nasuti owed a fiduciary duty to the McDermott Group, arising from Nasuti's position as manager of the McDermott Group store and as an agent of the McDermotts. Plaintiffs claimed that Nasuti breached this fiduciary duty by permitting the store to fail, abandoning it, and usurping business opportunities to benefit Nasuti's own ventures; and converted McDermott Group property and McDermott Group employees' time for his own benefit. Plaintiffs sought damages from Nasuti related to the liquidation of the store as a result of Nasuti's alleged breach of contract and tortious conduct, and also claimed punitive damages. Nasuti, in turn, filed a counterclaim against the McDermott Group for an accounting.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

FN1. At the time the complaint was filed, Party City Corporation ("Party City Corp.") was also a defendant, however, plaintiffs reached a settlement with Party City Corp., and, on May 3, 1996, Party City Corp. was dismissed from the lawsuit.

FN2. Party City stores sell party goods such as plates and napkins. (Tr. 8/21/97 at 28.)

The case was tried before a jury, which rendered a verdict in plaintiffs' favor on the contract claim for $376,489.49 [FN3] on the breach of fiduciary duty claim for $137,000, and assessed punitive damages against Nasuti in the amount of $375,000, for a total of $888,489.49. The jury, however, found that plaintiffs had not proved that Nasuti converted the McDermott Group's property. Finally, the jury found for the plaintiffs on Nasuti's counterclaim.

FN3. Specifically the jury found that Nasuti owed plaintiffs $118,980 attributed to the lease of the store, $71,400 attributable to the loan by Royal Bank, $112,200 attributable to vendor debt, $56,409.49 attributable to Nasuti's failure to pay cash for his share of the McDermott Group, $17,500 resulting from the McDermott's sale of mutual funds resulting from Nasuti's breach, and zero dollars attributable to lost future profits.

Before the Court are Nasuti's post-trial motions claiming various points of legal and trial error, and requesting judgment as a matter of law, a new trial, or in the alternative, remittitur, and plaintiff's motion to amend judgment to add prejudgment interest. For the reasons stated herein, the Court will grant in part Nasuti's motion for judgment as a matter of law and deny it part, and will grant plaintiff's motion to amend the judgment to add prejudgment interest. The Court will, therefore, reduce the amount of compensatory damages by $111,962.39, add prejudgment interest of $65,387.01, and will

enter an amended judgment in plaintiffs' favor in the amount of $841,914.11. Nasuti's motions for a new trial, or in the alternative remittitur, will be denied.

**I. FACTS**

Donna and Jeffery McDermott decided to open a franchise operation as a family business in 1992. After engaging in extensive research they settled on a store that would sell party goods. For the purposes of owning and operating the store, the McDermotts formed the McDermott Group, of which they owned 100 percent of the stock. On November 23, 1993, the McDermott Group, entered **\*618** into a franchise agreement with Party City Corporation ("Party City Corp.") to operate a Party City franchise store in King of Prussia, Pennsylvania.[FN4]

FN4. Prior to signing the franchise agreement, on October 18, 1993, the McDermotts had entered into a lease for the store at a shopping center in King of Prussia.

On February 4, 1994, the McDermott Group obtained a loan ("the loan agreement") from Royal Bank for the amount of $200,000 to finance the Party City franchise venture. The McDermotts individually guaranteed the loan. The loan agreement required, inter alia, that the McDermott Group obtain Royal Bank's written consent prior to any change in the McDermott Group's ownership or control.

The McDermott Group store opened on March 19, 1994. In May 1994, Jeffery McDermott learned that he had been transferred by his employer from the Philadelphia area to Arlington, Virginia. Donna McDermott then discussed with Party City Corp. selling all or part of the McDermott Group's assets to Party City Corp. The negotiations did not prove fruitful. In early July 1994, the McDermotts began discussions with Nasuti, who at the time was an owner of five other Party City franchises, and his stepson, Michael Brand,[FN5] to sell all or part of the store to Nasuti. On August 30, 1994, Nasuti entered into a contract to purchase 51 percent of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

McDermott Group stock ("the stock purchase agreement") for $56,409.49. As part of the transaction,[FN6] Nasuti also agreed to undertake the management of the store. Under the stock purchase agreement, Nasuti was to receive $5,000 per month as a management fee for running the store and $700 per month for office expenses. On August 31, 1994, immediately following the signing of the stock purchase agreement, the McDermotts moved to Virginia and Nasuti took over the management of the store.

> FN5. Brand also serves as general manager of the Philip David Company which at the time of trial owned and managed several Party City franchises.

> FN6. The management and management fee provision of the agreement is contained in Exhibit B to the stock purchase agreement, entitled "Shareholder Agreement." (Ex. P-2.)

Under Nasuti's management, the store did not perform as well as projected during the Halloween season, the most important business season of the year. At the time, the McDermotts and Nasuti concluded that the poor business performance was due to a "cannibalization effect" caused by the presence of another Party City store nearby in East Norriton, Pennsylvania.[FN7] As a result, in November 1994, Donna McDermott, Nasuti, and officials from Party City Corp. began to discuss moving the store to a new location in the hopes of improving its performance.

> FN7. The opening of the East Norriton store by Party City Corp., however, technically conformed to a 3.0 mile limit imposed by the franchise agreement between Party City Corp. and the McDermott Group. The franchise agreement provides:

> The area granted pursuant to the terms of the franchise agreement shall be a minimum of a three-mile radius from the

location indicated by attaching a map showing the location and the radius to Exhibit A of the franchise agreement.

Ex. P-1 at para. 12.6.

In December 1994, at Nasuti's request, the McDermotts inspected a site at the Northeast Shopping Center, located at Roosevelt Boulevard and Welsh Road in Philadelphia, as a possible new location for the store. Thereafter, the McDermotts agreed to move the store to that location, and Party City Corp. approved the new site. At the same time, however, and unbeknownst to the McDermotts, Nasuti had been negotiating with Party City Corp. for several sites for his own new franchises, including a site located at the intersection of Cottman and Bustleton Boulevards, which was approximately three miles from the Northeast Shopping Center.[FN8]

> FN8. The parties dispute the actual distance between the two locations. Nasuti claims that according to his calculation, the distance between the stores exceeds three miles.

In January 1995, Nasuti requested permission from the McDermotts to open a Party City store under his own name at the Cottman and Bustleton location.[FN9] The McDermotts*619 refused permission to Nasuti to open a store at the Cottman and Bustleton Boulevards location because they feared that its close proximity to the Northeast Shopping Center would damage the McDermott Group store's business. In fact, it was the proximity of another Party City store which the parties suspected had eroded the business of the store in King of Prussia.[FN10]

> FN9. The parties dispute whether Party City demanded that Nasuti ask the McDermott's permission, or Nasuti contacted the McDermott's upon counsel's suggestion and "as a courtesy."

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

FN10. In September 1995, following Nasuti's termination of the stock purchase agreement, he and Brand established a Party City franchise at the Cottman and Bustleton location.

On February 9, 1995 a loan committee at Royal Bank considered both the approval of the stock purchase agreement of August 30, 1994 and the relocation of the store to the Northeast Shopping Center. The committee approved the stock purchase and the relocation with additional conditions, including that Nasuti and his wife, Helene Nasuti, personally guarantee Royal Banks's loan to the McDermott Group FN11 and that Nasuti's management fee be reduced to $4,000 per month.

FN11. According to the testimony of Daniel Gallagher, an officer of Royal Bank, the Small Business Administration requires that anyone who owns more that 20 percent of a business personally guarantee the loan. (Tr. 8/25/97 at 34.)

In March 1995, and without prior notice to the McDermotts, Nasuti instructed his attorney to "cancel the contract", because, in Nasuti's opinion, the McDermott's had breached their agreement by not investing adequate cash into the operation of the store. On March 13, 1995, Nasuti's attorney sent a letter to plaintiffs to that effect. The McDermotts contend that because Nasuti abandoned the store and at the same time also "impeded" the move of the store by planning to open his own store within three miles of the new location, they were faced with the choice of operating the store in King of Prussia or liquidating it.

In light of these circumstances, the McDermotts decided that the best option would be to liquidate the King of Prussia store. To carry out the liquidation, the McDermotts hired Stephen Cucinotti, an experienced liquidator. The store closed in April 1995, upon completion of the liquidation process. Shortly thereafter, Nasuti proceeded to open two other Party City stores-one at the North-

east Shopping Center site and another at the Cottman and Bustleton Avenues site.

II. LEGAL STANDARD FN12

FN12. The parties agree that Pennsylvania law controls in this diversity case.

A. *Judgement as a Matter of Law*

[1] In ruling on a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), the evidence in the case must be viewed in the light most favorable to the successful party, and every reasonable inference therefrom must be drawn in that party's favor. *See Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 190 (3d Cir.1992); *Fireman's Fund Ins. Co. v. Videfreeze Corp.,* 540 F.2d 1171, 1178 (3d Cir.1976) ("The trial judge, in his review of the evidence, ... must expose the evidence to the strongest light favorable to the party against whom the motion is made and give him the advantage of every fair and reasonable inference"). It is impermissible to question the credibility of witnesses, or to weigh conflicting evidence as would a fact-finder. *See Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993). Applying these precepts, a jury verdict can be displaced by judgment as a matter of law only if "the record is 'critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.' " *Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir.1980) (quoting *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir.1969)), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981).

B. *New Trial*

[2][3] Similar concerns restrict the Court's discretion in ordering a new trial pursuant to Federal Rule of Civil Procedure 59. "Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts." *\*620Lind v. Schenley Indus., Inc.,* 278 F.2d 79, 90 (3d Cir.1960) (en banc). A new trial on the basis that the verdict is against the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

weight of the evidence can be granted "only where a miscarriage of justice would result if the verdict were to stand." *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir.1993). Where the proffered basis is trial error, "[t]he court's inquiry ... is twofold. It must first determine whether an error was made in the course of the trial, and then must determine whether that error was so prejudicial that refusal to grant a new trial would be inconsistent with substantial justice." *Farra v. Stanley-Bostitch, Inc.*, 838 F.Supp. 1021, 1026 (E.D.Pa.1993) (internal quotations omitted), *aff'd without op.*, 31 F.3d 1171 (3d Cir.1994); *see* Fed.R.Civ.P. 61. An error in jury instructions must be so substantial that, viewed in light of the evidence in the case and the charge as a whole, " 'the instruction was capable of confusing and thereby misleading the jury.' " *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 922 (3d Cir.1986) (quoting *United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1195 (3d Cir.1984)).

*C. Remittitur*

[4][5] Defendant argues, in the alternative, that the Court should grant a remittitur in this case due to the excessiveness of the damages awarded. Remittitur is appropriate if the Court "finds that a decision of the jury is clearly unsupported and/or excessive." *Spence v. Board of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir.1986); *see* 11 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2815 (1973). If remittitur is granted, the party against whom it is entered can accept it or can proceed to a new trial on the issue of damages.

III. DISCUSSION

*A. Contract*

1. Liability

Nasuti contends that he is entitled to judgment as a matter of law on the issue of contract liability because the evidence at trial did not support a finding that a condition precedent to the contract was satisfied. Specifically, Nasuti points to section

2.4(a) of the stock purchase agreement which provides:

> 2.4 *Conditions to Purchaser's Obligations.* The Purchaser's obligation to purchase two hundred four shares shall be subject to the following conditions at or before closing hereunder:
>
> (a) Royal Bank and the Small Business Administration shall have consented to the transactions described herein;

Ex. P-9 sec. 2.4. Nasuti argues that Royal Bank and the Small Business Administration ("SBA") did not actually approve the stock purchase agreement, and that this approval was required as a condition precedent to the his obligation to perform under the contract. Nasuti points to Royal Bank loan committee's minutes of February 9, 1995 which addressed the McDermott Group's "Request for Approval for the sale of 51% of the company and the relocation of the store." (Ex. P-13.) According to the minutes, "[t]he Committee approved the request with the following added conditions." Nasuti claims that the stock purchase agreement was not valid until the conditions listed, one of which was to "[t]ry to obtain Mrs. Nasuti's guaranty," were satisfied. Nasuti then argues that because his wife Helene Nasuti's guarantee was not obtained, the stock purchase agreement was never fully approved.[FN13]

> FN13. The validity of the argument that Nasuti could defend against the enforcement of the stock purchase agreement on the basis that a condition precedent was not fulfilled is doubtful because, in this case, the condition ran to the benefit of Royal Bank, and not to Nasuti.

Plaintiffs respond that the purchase of the stock was not conditioned upon such approvals being obtained, and that even if satisfaction of the condition was a predicate to performance, the condition was satisfied, excused or waived.

a. The condition was satisfied

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

11 F.Supp.2d 612
(Cite as: 11 F.Supp.2d 612)

[6][7][8] In a bilateral contract, if a condition precedent is not satisfied, the obligations of the non-performing party are discharged. *Francis Gerard Janson P.C. v. Frost,* 422 Pa.Super. 36, 618 A.2d 1003, 1006 (1993). The party alleging the breach of contract bears the burden of proof that the condition *621 was satisfied. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001, 1007-1008 (3d Cir.1980) (applying Pennsylvania law). Jeffrey McDermott testified at trial that in August 1994 he received oral approval of the transaction without conditions from Daniel Gallagher, an officer of Royal Bank. (Tr. 8/26/97 at 47).[FN14] Further, the McDermotts' attorney who had negotiated the transaction, Jack Weiner, Esquire, testified at trial that based on his dealings with Royal Bank in this case it was his understanding that Royal Bank had approved the transaction. (Tr. 8/22/97 at 194-95.)[FN15] Based upon the evidence presented, the Court concludes that there was sufficient evidence on the record for a reasonable jury to find that the condition of prior approval by Royal Bank was satisfied.

FN14. Plaintiffs also argue that the nowhere in the contract was there any requirement that the approval be in writing.

FN15. The court recognizes that there was evidence that the approval was subject to conditions. Plaintiffs also offered the testimony of Daniel Gallagher, an officer of Royal Bank, who explained that at the loan committee meeting, the transaction was approved with added conditions, (Tr. 8/25/97 at 11-12), a letter from Gallagher to Weiner addressing the approval of the transaction by Royal Bank, (Ex. P-32), and the minutes of the Royal Bank loan committee's February 9, 1995 meeting, (Exs. P-13 and P-14), to confirm that the Royal Bank loan committee "approved the request with the following added conditions" (Tr. 8/25/97 at 11-12). It is not, of course, the job of the Court to weigh conflicting evidence, *see Parkway Garage,* 5 F.3d at 691, but only to determine whether the verdict is supported by at least "that minimum quantum of evidence," *see Dawson v. Chrysler Corp.,* 630 F.2d 950, 959 (3d Cir.1980).

### b. The condition was excused
#### i. Nasuti's misconduct impeded the satisfaction of the condition

[9] Nasuti argues that the minutes of the loan committee's February 9, 1995 meeting imposed additional conditions precedent to the agreement. Nasuti specifically points to the alleged requirement that Nasuti's wife's personal guarantee be obtained. First, plaintiffs argue that Mrs. Nasuti's personal guarantee was not really a mandatory condition because the minutes stated only that Royal Bank would "*try* to obtain Mrs. Nasuti's guarantee." (Ex. P-13 (emphasis added).) Second, plaintiffs claim that even if Helene Nasuti's personal guarantee was a condition precedent which had not been satisfied, the reason it was not satisfied was because defendant himself refused to cooperate by not obtaining his wife's personal guarantee in "bad faith." Plaintiffs contend that Nasuti's argument that this "condition" was not satisfied is a mere pretext, and that the testimony showed that Helene Nasuti routinely gave her personal guarantee in other business transactions. Because, according to plaintiffs, her failure to provide her personal guarantee in this instance was due to Nasuti's bad faith, the condition was excused.

[10] If a party acts to hinder the satisfaction of a condition, the condition is excused. *Restatement (Second) of Contracts* § 225 cmt. b (1979). In other words, where a party claiming the condition has not been satisfied is the cause of the non-occurrence, he or she may not claim the non-occurrence to his or her advantage. *Commonwealth of Pennsylvania Dept. of Transp. v. W.P. Dickerson & Son, Inc.,* 42 Pa.Cmwlth. 359, 400 A.2d 930, 932 (1979); *Craig Coal Mining Co. v. Romani,* 355 Pa.Super. 296, 513 A.2d 437, 440 (1986) (A party "may not, in fact,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

take advantage of an insurmountable obstacle placed by himself in the path of another party's adherence to the agreement."). *See, e.g., In re Stroud Ford, Inc.,* 190 B.R. 785, 787 (Bankr.M.D.Pa.1995).

Helene Nasuti testified that, in fact, in the past she had signed all the personal guarantees her husband asked her to sign, (Tr. 8/26/97 at 90), that she had guaranteed debts for other Party City franchises owned by her husband, (Tr. 8/26/97 at 95), and that just recently she had guaranteed lease payments of $1.5 million for the Northeast Shopping Center (Ex. P-20). This evidence was sufficient to support a reasonable jury's finding that the condition was excused by Nasuti's hindrance of the satisfaction of the condition.

### ii. Nasuti accepted performance

[11] Plaintiffs also argue that because Nasuti accepted part performance under the *622 Shareholder Agreement, any condition precedent was excused. *See Restatement (Second) of Contracts* § 247 (acceptance of part performance excuses the subsequent nonoccurrence of a condition) (1979). Plaintiffs produced evidence that Nasuti accepted the benefits of the management provision of the Shareholder Agreement in the form of his monthly management fee of $5,700. (Tr. 8/21/97 at 58, 73-82.). Therefore, the jury was entitled to find that the conditions were excused by Nasuti's acceptance of part performance.

### c. The condition was waived

[12][13][14] Further, plaintiffs explain that the condition was waived by Nasuti's performance under the contract. "Contractual provisions can be waived, expressly or impliedly." *Black Top Paving Co. v. Commonwealth of Pa. Dep't of Transp.,* 466 A.2d 774, 776 (1983). These provisions may be waived by a party's conduct "as long as the intent to waive may be reasonably inferred." *In re Imaging Equipment Services,* 143 B.R. 355, 359 (Bkrtcy.W.D.Pa.1992) (applying Pennsylvania law). Plaintiffs offered evidence that Nasuti affirmatively undertook his management obligations un-

der the stock purchase agreement immediately upon signing the agreement and, as pointed out above, accepted payments for his services from the McDermott Group. Plaintiffs also offered testimony that they relinquished management of the store to Nasuti and that Nasuti began to manage the store immediately following the execution of the agreement. Once in charge of the store, Nasuti controlled inventory, budget, and purchasing decisions; adjusted payroll and assuming hiring and firing responsibilities; implemented his operating procedures in the store; taught employees how to buy inventory; transferred inventory between the store and other Party City stores owned by Nasuti; visited the store regularly; prepared receipts for spring inventory; attended meetings with Party City Corp.; attended buying meetings on behalf of the McDermott Group; and opened bank accounts in the name of "Party City King of Prussia" at the address of Nasuti's management company. (Tr. 8/21/97 at 73-82; 8/22/97 at 32-36, 39, 40-47.) This evidence supports a finding that because Nasuti undertook full and complete management of the store after the signing of the stock purchase agreement, and prior to Royal Bank formally consenting to the transfer of the stock, Nasuti waived the condition of bank approval.

### d. The condition was material

[15] Nasuti, now armed with new post-trial counsel, raises for the first time the argument that the condition of bank approval was material and, therefore, it could not be waived. Nasuti's current counsel argues that "since this is a legal issue on which the jury would not pass in any event, that it is preserved by Mr. Shragger's motion, which was an oral motion." (Tr. 4/17/98 at 8.) Assuming that this was an issue for the Court to decide, Nasuti, however, concedes that trial counsel did not raise this particular argument in his Rule 50 motions made either at the close of plaintiffs' case or at the close of all the evidence. *See* Tr. 8/26/97 at 75-78; 211-215. "Since [a Rule 50(b) ] motion is nothing more than a renewal of the earlier motion made at the close of the presentation of evidence, it cannot

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

assert a ground that was not included in the earlier motion." 9A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2537, at 345 (2d ed.1994); *Chemical Leaman Tank Lines, Inc. v. Aetna Casualty and Sur. Co.,* 89 F.3d 976, 993 (3d Cir.1996), *cert. denied,* 519 U.S. 994, 117 S.Ct. 485, 136 L.Ed.2d 379 (1996). *See also Williams v. Runyon,* 130 F.3d 568, 571 (3d Cir.1997) ( "Under normal circumstances, a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion."). Because Nasuti failed to raise the issue of the materiality of the condition in his Rule 50(a) and 50(b) motions, the issue was waived.

[16] Assuming that the materiality of the condition was an issue for the jury, plaintiffs argue that Nasuti waived this argument when he failed to submit a jury instruction or object to the absence of one on such grounds. *See* Def.'s Request for Charge (doc. no. 96); Tr. 8/27/97 at 16-25. The Court agrees that because Nasuti neither timely and appropriately raised the issue at trial, nor objected to the jury instructions, the issue of materiality *623 of the conditions was waived and may not be considered now on post trial motions. Fed.R.Civ.P. 51. FN16

> FN16. Federal Rule of Civil Procedure 51 provides:
>
> No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds for the objection.
>
> Fed.R.Civ.P. 51. The Third Circuit has interpreted this rule strictly. *Ryder v. Westinghouse Elec. Corp.,* 128 F.3d 128, 135 (3d Cir.1997), *cert. denied,* 522 U.S. 1116, 118 S.Ct. 1052, 140 L.Ed.2d 115 (1998).

The Court concludes that neither the jury lacked "adequate guidance on a fundamental question," nor would the "failure to consider the error ... result in a fundamental miscarriage of justice." *Failla v. City of Passaic,* 146 F.3d 149, 156 (3d Cir. 1998) (citing *United States v. 564.54 Acres of Land,* 576 F.2d 983, 987 (3d Cir.1978), *rev'd on other grounds,* 441 U.S. 506, 99 S.Ct. 1854, 60 L.Ed.2d 435 (1979)). In the cases collected by the Third Circuit in *564.54 Acres of Land* to support this apparent exception to Rule 51, the trial courts either gave the jury the equivalent of no instruction on the law, or gave them a legally incorrect instruction. *See Ratay v. Lincoln Nat'l Life Ins. Co.,* 378 F.2d 209 (3d Cir.1967) (concluding that trial court instruction was clearly erroneous because it incorrectly stated the burden of proof in a fraud case); *Wilson v. American Chain and Cable Co.,* 364 F.2d 558 (3d Cir.1966) (concluding that trial court committed a fundamental error when it failed to define superseding cause and distinguish it from concurrent cause in a negligence case where causation was a pivotal issue); *Pritchard v. Liggett & Myers Tobacco Co.,* 350 F.2d 479, 486 (3d Cir.1965)(concluding that trial court in failed to correlate the law to the facts when its instructions did not distinguish between the two variations of the assumption of the risk defense, contributory negligence and misuse of product, in a case alleging breach of an express warranty); *McNello v. John B. Kelly, Inc.,* 283 F.2d 96, 102 (3d Cir.1960) (concluding that a fundamental error had been committed where the trial court failed to instruct the jury on the law applied to the facts "the question of liability ... was submitted to the jury with what was tantamount to no instructions

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

at all"); *Mazer v. Lipschutz,* 327 F.2d 42, 52 (3d Cir.1963) (concluding the failure to review a legally incorrect jury instruction would result in a miscarriage of justice). *But see Trent v. Atlantic City Elec. Co.,* 334 F.2d 847, 859 (3d Cir.1964) (concluding that the court need not consider the contested instruction because "the evidence was more than sufficient to justify findings of negligence on [the jury's] part even under a more properly detailed charge."). In this case, Nasuti does not contend either that the Court failed to give the jury adequate guidance or that the Court gave an legally incorrect instruction, but rather, the Court, did not include an instruction that Nasuti failed to propose. Thus, the Court concludes that the exception to Rule 51 enunciated by the Third Circuit in *Failla* and *564.54 Acres* is not applicable in this case.

In summary, on the contract claim, the Court agrees that, in viewing the evidence in the light most favorable to the prevailing party, and given the advantage of every fair and reasonable inference to the prevailing party, plaintiffs showed that the condition of bank approval was either satisfied, excused, or waived.

2. Damages

Based on its finding that Nasuti breached a contract between Nasuti and plaintiffs, the jury awarded plaintiffs $376,489.49. Nasuti complains generally, that the jury award on the contract claim exceeded plaintiff's expectation interest in the contract, i.e. that the award is excessive in relation to what plaintiffs would have received had the contract been performed.

a. Nasuti's failure to pay cash for his share of the McDermott Group

[17] Nasuti argues the because the jury's finding that he was liable on the contract claim was improper, plaintiffs are not entitled to collect the

$56,409.49 awarded for Nasuti's failure to pay cash for 51 percent of stock in the McDermott Group as required by the stock purchase agreement. "Generally, a breaching party is liable for damages that would naturally result from the breach...." *Fort Washington Resources v. Tannen,* 901 F.Supp. 932, 943 (E.D.Pa.1995)(citing *Ebasco Servs., Inc. v. Pennsylvania Power & Light Co.,* 460 F.Supp. 163, 213 n. 62 (E.D.Pa.1978)). In this case, it is conceded by Nasuti that this amount flows directly from the breach of the contract. Because the jury concluded that Nasuti breached the agreement, it was proper for the jury to conclude that an award of damages flowing from the breach in the amount of $56,409.49 should be awarded to plaintiffs.

b. Consequential damages

Further, Nasuti contends that the contract damage award is excessive so as to constitute *624 a windfall to plaintiffs that "shocks the conscience" and which must be reduced. Specifically, Nasuti argues that the jury's award for particular items, the store lease, the balance on the loan by Royal Bank, and the vendor debt, were improper in light of the well-settled rule that consequential damages must have been reasonably foreseeable to be compensable. Nasuti contends that the damages awarded flowed not directly from the breach of the stock purchase agreement, but from the McDermott's decision to liquidate the store prematurely and that the decision to liquidate could not have been foreseen by Nasuti at the time he entered into the contract with plaintiffs.

Plaintiffs respond that Nasuti should have known that the McDermotts would have to liquidate the store and accelerate debt payments when he breached the agreement. They explain that when Nasuti breached the contract, they were faced with two options: "(1) continue to operate the store at [the King of Prussia] location at which it was losing money ... or (2) close the store and curtail the losses they were sustaining." Pls.' Mem. at 27. Plaintiffs essentially argue that they used their best business judgment in deciding to liquidate the store. They

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

contend that, "Nasuti cannot be permitted to breach his contract and second guess how the McDermotts tried to mitigate their damages afterward." *Id.* Plaintiffs also contend that the particular consequential damages they seek were also foreseeable, and point to the stock purchase agreement under which Nasuti agreed to indemnify plaintiffs for 51 percent of the debt to the landlord, to Royal Bank, and to the vendors, and the fact that Nasuti has made none of these payments.

[18] The Court agrees with plaintiffs' arguments. First, Pennsylvania law distinguishes "between general damages-those ordinary damages that flow directly from the breach; and special or consequential damages-those collateral losses, such as expenses incurred or gains prevented which result from the breach." *Tannen,* 901 F.Supp. at 943 (citing *Ebasco,* 460 F.Supp. at 213 n. 62 (E.D.Pa.1978)). It is well-settled that to recover consequential damages, plaintiff must show specifically that defendant had reason to know of the special circumstances causing the loss and that the injury was foreseeable. *Id.; Hadley v. Baxendale,* 9 Exch. 341 (1854). Foreseeability is to be determined from the point in time when the contract was formed. *Tannen,* 901 F.Supp. at 943; *Hazleton Area School District v. Bosak,* 671 A.2d 277, 282 (1996).

[19] In this case, the Shareholder Agreement unambiguously states:

Nasuti further agrees to indemnify, defend and hold [the McDermotts] harmless from and against any loss or liability exceeding, as to each such separate liability equal to the McDermott Share. In the event any of such guarantees are called upon by the respective creditors of the [the McDermott Group], upon funding of their share by [the McDermotts], Nasuti shall immediately fund his share of the required payment.

Ex. P-11 at para. 6. It is clear from the plain language of the Shareholder Agreement that Nasuti agreed as part and parcel of his obligation under the agreement to be responsible for 51 percent of the

debts owed by the McDermott Group. The balance owed to the vendors, to the landlord, and to Royal Bank are, therefore, recoverable because they were foreseeable.

[20] Nasuti next argues that plaintiffs have already recovered for the loss on the lease, the loan, and the vendor debt through plaintiffs' settlement with Party City Corp. in which Party City Corp. directly paid the landlord, Royal Bank, and the vendors for outstanding debts. Therefore, Nasuti argues, to allow these claims in this case would constitute double recovery. In essence, Nasuti contends that "a plaintiff may obtain judgment against several [defendants] for the same harm, [however] he or she is only entitled to one satisfaction of that harm." *Brandt v. Eagle,* 412 Pa.Super. 171, 602 A.2d 1364, 1367 (1992) (en banc), *app. denied,* 532 Pa. 653, 615 A.2d 1310.

Plaintiffs reply that they are not seeking "double recovery" from Party City Corp. and Nasuti, but that Party City Corp. merely agreed to pay the amount of the settlement directly to the creditors rather than to them, in satisfaction of the debts owed by the *625 McDermotts and Nasuti collectively as part of the McDermott Group. (Ex. P-38.)

The direct payment by Party City Corp. of the debts of the McDermott Group did not affect Nasuti's duties to the McDermotts. The two are completely unrelated. The McDermotts and Party City Corp. structured the settlement inter se in a manner that Party City Corp. was to pay the amounts owing directly to the creditors, rather than having Party City Corp. pay the McDermotts who would, in turn, pay the creditors. This undoubtedly was done to accommodate Party City Corp.'s concern that it not be subjected to potential liability by third parties in the event that the McDermotts did not pay the creditors with the monies received from the Party City Corp. settlement. In any event, the McDermotts, albeit through payment by Party City Corp. rather than directly, extinguished 100 percent of the debts owed by the McDermott Group to creditors. Because under the Shareholder Agreement, Nasuti

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

must pay 51 percent of the McDermott Group debt, the Court will uphold this portion of the jury award.

### c. Unforeseeable damages-the sale of the mutual funds

[21] Nasuti also contends that the jury's award of $17,500 for the tax and opportunity losses associated with the early liquidation of the McDermotts' mutual funds to secure the repayment of the loan to Royal Bank was improper. Plaintiffs disagree, arguing that because Nasuti was provided all of the Royal Bank loan documents, including those indicating that the McDermotts had pledged the mutual funds as security, Nasuti could have reasonably foreseen that the mutual funds would have to be liquidated if he breached the stock purchase agreement.

The Court disagrees with plaintiffs' theory of foreseeability. As discussed above, foreseeability is to be determined at the point in time when the contract was formed and not at the time the contract was breached, i.e. were the consequences reasonably contemplated by the parties at the time the agreement was made, not when it was broken. Plaintiffs claim that Nasuti knew that the mutual funds were pledged as security and, thus, that fact was within the contemplation of the parties at the time the agreement was entered. Mere knowledge of one of the parties of a special situation, however, is not sufficient:

'Parties, when they enter into contracts, may well be presumed to contemplate the ordinary and natural incidences and consequences of performance or non-performance; but they are not supposed to know the condition of each other's affairs, nor to take into consideration any existing or contemplated transactions not communicated or known, with other persons. Few persons would enter into contracts of any considerable extent as to subject matter or time if they should thereby incidentally assume responsibility of carrying out, or be legally held affected by other arrangement over which they have no control.'

*Ebasco,* 460 F.Supp. at 217 (quoting *Macchia v. Megow,* 355 Pa. 565, 50 A.2d 314, 316 (1947) (quoting Sutherland on Damages § 47(4th ed.))).

The claim for tax and opportunity losses is thus not compensable. As Jeffery McDermott testified at trial, the mutual funds were not liquidated by Royal Bank, but rather they were sold by the McDermotts to raise cash to pay the Royal Bank debt because they had no other liquid assets to draw from. (Tr. 8/25/97 at 227.) Therefore, the sale of the mutual funds did not flow directly from the breach of the contract, but rather was the result of the McDermotts' precarious financial situation at the time that the loan was called.[FN17]

> FN17. Nasuti is no more responsible for the tax and lost opportunity costs associated with the voluntary sale of the mutual funds than he would be for future appreciation of the McDermott's two homes, which were also pledged as security for the transaction, if the McDermotts had chosen to sell these houses rather than the mutual funds to raise cash to pay the debt.

Therefore, the Court will affirm the jury's award of contract damages in all respects except to reduce by $17,500 for the liquidation of the mutual funds, resulting in a reduced recovery under the contract claim of $358,989.49.

**\*626 B. Tort**

#### 1. Liability

[22][23] Plaintiffs allege that through self-dealing, including writing checks to himself from a McDermott Group account, transferring store inventory and personnel to his own Party City stores, usurping corporate opportunities, and then abandoning the store without adequate notice, Nasuti converted McDermott Group property and breached a fiduciary duty he owed the McDermott Group. Nasuti challenges the jury's verdict for plaintiffs on the breach of fiduciary duty claim, ar-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

guing that he did not owe them a duty as a fiduciary, and that even if did, he never breached that duty. In disputing the contention that there existed a fiduciary relationship between him and plaintiffs, Nasuti argues that the relationship between the parties was defined by a written contract, negotiated at arms-length between sophisticated parties, and that therefore no fiduciary duty was established. Moreover, even if there were a duty, there was insufficient evidence to support a finding that there was a breach of any duty owed to plaintiffs by Nasuti.[FN18]

> FN18. Nasuti contends that the evidence presented to the jury to prove plaintiffs' claim for conversion must be disregarded in evaluating plaintiffs claim for breach of fiduciary duty, because the jury did not find for plaintiffs on the conversion claim. The Court disagrees. Claims for breach of fiduciary duty and conversion are distinct and have separate and discrete elements. The elements the plaintiff must prove in claim of breach of fiduciary duty are: "(1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring about plaintiff's injuries," Pa. S.S.J.I. § 4.16 (1991). The elements of conversion are: (1) the deprivation of another's right of property in, or use or possession of, a chattel; (2) without the owner's consent; and (3) without lawful justification. *See Bernhardt v. Needleman,* 705 A.2d 875, 878 (1997). *See also Universal Premium Acceptance Corp. v. York Bank and Trust Co.,* 69 F.3d 695, 704 (3d Cir.1995) (citing *Cenna v. United States,* 402 F.2d 168, 170 (3d Cir.1968)).

While a plaintiff may not recover twice

based on the same evidence on alternative theories, *Trackers Raceway, Inc. v. Comstock Agency, Inc.,* 400 Pa.Super. 432, 583 A.2d 1193, 1196 (1990), it does not follow that plaintiffs who proceeds on alternative theories based on the same type of evidence, cannot recover on one theory, i.e., breach of fiduciary duty, because the jury did not find for plaintiffs on the alternative theory, i.e., conversion.

Plaintiffs respond, to the contrary, that the evidence overwhelmingly supports the conclusion that plaintiffs placed their trust in the skill and experience of Nasuti and Brand, who had many years experience in the retail goods business and who owned and managed several apparently successful Party City stores. Further, plaintiffs contend that the Shareholder Agreement, which delegates management responsibilities to Nasuti, expressly designated Nasuti as their agent. Therefore, they argue, Nasuti, as the McDermott Group's agent, owed it "the utmost duties of loyalty and good faith toward the McDermotts with respect to the operation of the franchise." Pls.' Mem. at 22.

[24][25][26][27][28] Under Pennsylvania law, "[a fiduciary] relationship exists where one person has reposed a special confidence in another to the extent that the parties do not deal with each other on equal terms, either because of an overmastering dominance on one side or weakness, dependence or justifiable trust, on the other." *Commonwealth Dept. of Transp. v. E-Z Parks,* Inc. 153 Pa.Cmwlth. 258, 620 A.2d 712, 717 (1993). "A business association may be the basis of a confidential relationship 'only if one party surrenders substantial control over some portion of his [or her] affairs to the other.' " *Id.* (quoting *In re Scott's Estate,* 455 Pa. 429, 316 A.2d 883, 886 (1974)). Further, when a person authorizes another to act as his or her agent, the relationship between the two may be characterized as a fiduciary relationship. *Sutliff v. Sutliff,* 515 Pa. 393, 528 A.2d 1318, 1323 (1987) (citing *Restate-*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*ment (Second) of Agency* § 387 (1958)[FN19];
*Sylvester v. Beck*, 406 Pa. 607, 178 A.2d 755
(1962)); *Garbish v. Malvern Fed. Sav. & Loan
Ass'n*, 358 Pa.Super. 282, 517 A.2d 547, 553-54
(1986). *See also In re Shahan*, 429 Pa.Super. 91,
631 A.2d 1298, 1303 (1993). "Under Pennsylvania
**\*627** law, the duty of an agent to his principal is
one of loyalty in all matters affecting the subject of
his agency and 'the agent must act with the utmost
good faith in the furtherance and advancement of
the interests of his principal.' " *Garbish*, 517 A.2d
at 553-54 (quoting *Sylvester v. Beck*, 406 Pa. 607,
178 A.2d 755 (1962)). Because the terms of the
agency relationship are spelled out in a written
agreement, it does not mean that the agent does not
also owe, as a matter of law, a duty of loyalty to the
principal. In other words, the contract between the
parties may serve to inform and define the agent's
fiduciary duty imposed by law. Thus, for example,
an agent who embezzles from his principal may be
in breach of both the contract between the parties
which spelled out his authority and functions, as
well as the agent's duty imposed by operation of
law.

> FN19. The Restatement provides that
> "[u]nless otherwise agreed, an agent is
> subject to a duty to his principal to act
> solely for the benefit of the principal in all
> matters connected with his agency." *Re-
> statement (Second) of Agency* § 387 (1958)
> .

[29] As explained above, the evidence presen-
ted at trial was sufficient to support a finding that
Nasuti assumed management and control of the
store on behalf of the McDermott Group. After
Donna and Jeffrey McDermott moved to Virginia,
they entrusted Nasuti, whom they had selected by
virtue of his management expertise, to manage the
day-to-day operation of the McDermott Group busi-
ness. The evidence showed that Nasuti acted as the
McDermott Group's agent, making almost all the
business decisions, and exercising full discretion on
behalf of the McDermott Group for purchasing, in-

ventory, payroll, personnel management, and nego-
tiations with Party City Corp. and outside vendors.

Further, plaintiffs offered evidence that Nasuti
opened a checking account in New Jersey, the loca-
tion of Nasuti's management company, in the name
of "Party City King of Prussia." (Tr. 8/21/97 at
79-81). Nasuti wrote checks to himself drawn on
this account, which held funds from the McDermott
Group store. The McDermotts, who had no signa-
ture authority on the account, *id.,* did not learn of
its existence until after Nasuti repudiated the agree-
ment and abandoned his management duties at the
McDermott Group store, (*id.;* Tr. 8/25/97 at 63-64).
Specifically, Nasuti wrote a check to his personal
attorney on October 11, 1994 for $2,900. (Ex. P-
27.) On March 6, 1995, Nasuti wrote a check to
himself for $10,000, one week before he "canceled
the contract" purportedly because the McDermotts
failed to put more cash into the business. (Ex. P-
22.) Even after Nasuti's repudiation of the contract,
he wrote several checks payable to himself on this
account, including, one on March 23, 1995 for
$2,000, (Ex. P-23), one on March 27, 1995, for
$1,000, (Ex. P-24), and one on March 30, 1995 for
$3,000, (Ex. P-21).

Nasuti also transferred the McDermott Group's
store manager, Tom Volpini, to other Party City
stores owned by Nasuti and his affiliates. Plaintiffs
paid Volpini's salary, which Brand reduced from
$48,000 per year to $32,000 per year, (Tr. 8/22/97
at 40), from the McDermott Group account while
Volpini was working for Nasuti at his other stores
for approximately three months. (Tr. 8/25/97 at
164, 171-72.)

Plaintiffs also offered evidence, in the form of
Party City "Inter Store Transfer" sheets, that
showed that Nasuti transferred $15,747.61 worth of
inventory from the store to other stores, including
stores he owned, without reimbursing the McDer-
mott Group. (Ex. P-66; Tr. 8/25/97 at 77).

Further, plaintiffs offered evidence that Nasuti
acted in his own interest when he suggested to the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

McDermotts that they relocate the McDermott Group store to the Northeast Shopping Center location, while in the meantime, unbeknownst to plaintiffs, Nasuti was planning to open his own Party City store approximately three miles away at the Cottman and Bustleton Avenues location.[FN20]

> FN20. Plaintiffs further argue that Nasuti would benefit if he alone had both the Cottman and Bustleton and Northeast Shopping Center stores, regardless of their proximity, because he would, inter alia, be able to transfer inventory and employees and cross-refer customers, and thus a synergy between the stores would develop.

Lastly, plaintiffs offered evidence that Nasuti "cancel[ed] the contract" without notice and abruptly left the store. Based upon the evidence that Nasuti failed to provide sufficient notice to allow the McDermott Group to make alternative arrangements, and not making any efforts to keep the business viable*628 during the transition following his departure, the jury could have reasonably concluded that Nasuti put his interests ahead of the interests of the McDermotts.

In summary, the jury had sufficient evidence to reasonably conclude that Nasuti, as a fiduciary, owed plaintiffs the utmost duties of loyalty and good faith. Further, plaintiffs offered sufficient evidence for a reasonable jury to find, that through self-dealing, Nasuti breached these duties.

2. Damages
     a. Compensatory damages
Nasuti argues that even assuming there was a breach of fiduciary duty, there was no evidence to support an award of damages. Plaintiffs respond that the $137,000 that the jury awarded them was adequately based upon evidence that: (1) Nasuti had paid himself from McDermott Group accounts in the amount of $18,790; (2) Nasuti had transferred inventory to his other stores for which he paid with McDermott Group funds in the amount of $15,747.61; (3) Nasuti took other inventory for

which there was no records of inter-store transfers; (4) Nasuti transferred McDermott Group Store Manager Tom Volpini to Nasuti's other Party City stores while Volpini was being paid wages by the McDermott Group ($8,000, representing three months at a salary of $32,000 per year); and (5) plaintiffs were deprived profits when Nasuti impeded the relocation of the store from King of Prussia to the Northeast Shopping Center location through his self dealing.

Nasuti also contends, that because the jury did not find for plaintiffs on the conversion claim, it would be inconsistent, and thus impermissible to award plaintiffs damages on the breach of fiduciary duty claim, and that because the jury did not award plaintiffs damages for lost profits under contract theory, they could not do so under this tort claim.

[30][31][32] Generally in tort claims, "a tortfeasor is liable for all the damages which ordinarily and in the natural course of things have resulted from the commission of the tort." *Frank v. Volkswagenwerk, A.G. of West Germany,* 522 F.2d 321, 323 (3d Cir.1975)(citing *Hillsdale Coal & Coke Co. v. Pennsylvania R.R. Co.,* 229 Pa. 61, 78 A. 28 (1910)). Damages must be proven with reasonable certainty. *Delahanty v. First Pennsylvania Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1257 (1983)(internal citations omitted). While mathematical certainty is not required, the plaintiff must introduce sufficient facts upon which the jury can determine the amount of damages without conjecture. *Id.*

[33] As described above, plaintiffs presented evidence that Nasuti wrote checks to himself drawn on McDermott Group accounts, three of which he wrote even after he purportedly had repudiated the agreement. Testimony was offered that Nasuti assigned Tom Volpini, whose salary was reduced from $48,000 per year to $32,000 per year, to stores owned by Nasuti for three months and that Volpini was paid from McDermott Group funds. There was also evidence in the form of a list of inter-store transfers, including the invoice number, the invent-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

ory's origin, its destination, and the value of the transfer, that Nasuti transferred McDermott Group inventory to his own stores.[FN21] (Ex. P-66; Tr. 8/25/97 at 77). The jury, therefore, had sufficient evidence upon which to award plaintiffs $42,537.61 for the losses of these items.

> FN21. For the reasons explained above, there is no reason why plaintiff should be barred from recovering for the damages suffered from the loss of injury because the jury did not find for plaintiffs on the conversion claim. "Relief in the alternative or of several different types may be demanded." Fed.R.Civ.P. (8)(a). Therefore, when a plaintiff proceeds on alternative theories, a plaintiff is not precluded from recovering on one theory because the jury did not find for him or her on both.

[34] The $94,462.39 constituting the balance of the award, however, is not supported by the evidence. Plaintiffs argue that the jury may have awarded this amount to compensate them for the inventory that was missing upon physical inspection of the stock for which there was no transfer sheets, and/or, the profits lost by being prevented from continuing to operate the store at the Northeast Shopping Center.

**\*629** Plaintiffs offer the testimony of Stephen Cucinotti, an experienced liquidator, who had been hired by the McDermotts to liquidate the store. Cucinotti testified at trial that when he compared the computer-generated inventory sheets to the store's physical inventory, he found "significant discrepancies," i.e. where there should have been ten items according to the inventory sheets, upon physical inspection, only one or two were found. (Tr. 8/22/97 at 65.) Neither Cucinotti's testimony, nor the computer generated "Inventory Valuation Summary Report" (Ex. D-145) he referred to in his testimony, were specific enough to justify the jury's award. Further, Cucinotti did not testify that he calculated the amount of the inventory missing. The inventory valuation summary report only lists total values for

the inventory that was supposed to have existed in each store department. The Court concludes that because it would be impossible to reach a fair estimate of the amount of inventory lost based on Cucinotti's testimony and the supporting document, the evidence was not sufficient to support the jury's award without conjecture. The Court therefore will not uphold that aspect of the jury's award on this basis.

Alternatively, plaintiffs further that they were entitled to the profits the McDermott store could have made if plaintiffs were not forced to liquidated the franchise by Nasuti's breach. Lost profits for a new business, however, are generally not recoverable because "such damages are by nature speculative and elude a reasonable certain estimation." *Tannen,* 901 F.Supp. 932. In other words, because a new business, by definition, has not track record of earnings, projecting future profits is a hazardous undertaking. Plaintiffs did not adduce proofs which would allow the award on this basis. Because, damages on this theory, are speculative, at best, and because no proof of lost profits was presented no reasonable jury could award damages for lost profits in this case.

For these reasons, the Court must reduce the jury's award on the breach of fiduciary duty claim by $94,462.39, from $137,000 to $42,537.61.

b. Punitive damages

Nasuti argues that the jury's punitive damage award was not supported by the evidence, and that because it was nearly three times the amount of compensatory damages awarded, is excessive, and thus must be reduced. Nasuti further argues that the loss to plaintiffs was purely economic, and Nasuti's actions were not outrageous or reprehensible so as to justify the punitive damage award.

Plaintiffs respond that the size of the award was appropriate because a lesser amount would not deter someone of Nasuti's wealth from taking similar actions, and thus would defeat one of the purposes for punitive damages, to punish the wrongdo-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

er for committing the improper act and to deter others for committing such an act in the future. *Restatement (Second) of Torts* § 908 (1977); *In re TMI,* 67 F.3d 1119 (3d Cir.1995); *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800, 803 (1989).

i. Nasuti's actions were sufficiently outrageous to
support an award of punitive damages.

[35][36][37][38][39][40][41][42]        Under Pennsylvania law, the decision of whether to award punitive damages and the scope of the damages are within the discretion of the finder of fact.<sup>FN22</sup> *Donaldson v. Bernstein,* 104 F.3d 547, 556-57 (3d Cir.1997) (applying Pennsylvania law). "Punitive damages are appropriate when the act committed, in addition to causing actual damages, constitutes 'outrageous conduct,' either through reckless indifference or bad motive." *Id.* (citing *McClellan v. Health Maintenance Organization of Pennsylvania,* 413 Pa.Super. 128, 604 A.2d 1053, 1061 (1992) and *Feld v. Merriam,* 485 A.2d 742, 747-48 (1984) (adopting *Restatement (Second) of Torts* § 908(2)in Pennsylvania)). Outrageous conduct "is defined as an act which, in addition to creating 'actual damages, also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights.' " *630Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 235 (3d Cir.1997) (quoting *Delahanty,* 464 A.2d at 1263). To determine whether punitive damages are appropriate the following factors may be considered: (1) the character of the act; (2) the nature and extent of the harm caused; and (3) the wealth of the defendant. *Kirkbride,* 555 A.2d at 803 (citing *Restatement (Second) of Torts* § 908(2) (1978)). Further, in making the determination, "one must look to the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties.... The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Feld v. Merriam,* 506 Pa. 383, 485 A.2d 742, 747-48 (1984), *quoted by UGI Corp. v. Piccione,* No. 88-1125, 1997 WL 698011, *8 (E.D.Pa. Nov. 5, 1997). Moreover, un-

der Pennsylvania law, to award punitive damages there must be conduct beyond that which supported the compensatory damages award. *Donaldson,* 104 F.3d at 557 (citing *Smith v. Renaut,* 387 Pa.Super. 299, 564 A.2d 188, 193-94 (1989)). In other words, because the award of punitive damages is intended to satisfy a public policy purpose beyond compensation to the injured party, simply because the conduct of the tortfeasor is actionable and has caused damages, the injured party is not entitled to punitive damages. Further, a judge may not vacate a jury's punitive damages award because he or she might have awarded less. *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890, 925 (1995).

> FN22. The standard of proof for punitive damages under Pennsylvania law is by a preponderance of the evidence. *Sprague v. Walter,* 441 Pa.Super. 1, 656 A.2d 890, 923 (1995) (citing *DiSalle v. P.G. Pub. Co.,* 375 Pa.Super. 510, 544 A.2d 1345, 1372 (1988)).

[43] The jury's finding that plaintiffs had proven that Nasuti acted in an outrageous manner, that is he acted with intentional, reckless, or malicious disregard for plaintiffs' interests was supported by the evidence. Plaintiffs produced evidence that after Nasuti gained the McDermott's trust and confidence, he acted in his own interest, paying himself and his attorney from McDermott Group funds, taking inventory from the McDermott Group for use in his own stores, and assigning a McDermott Group employee to work in his store and paying him from McDermott Group funds. Even after Nasuti let the McDermotts know the Northeast Shopping Center location was available, he made the choice problematic by choosing to open his own store approximately three miles away. Once he decided to quit, Nasuti executed a quick exit, without prior notice, on the pretext that there was no contract between the parties. Thus, plaintiffs offered evidence that Nasuti left them "high and dry" to his own benefit. The jury, therefore, was within its discretion to find the conduct to have been intentional,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

reckless, or malicious.

[44] Before it may remit the damages, the Court must find that the jury's award "shocks the court's sense of justice." *Kirkbride,* 555 A.2d at 802-803. Considering the character of Nasuti's actions, the nature and extent of the harm caused by him, and in light of his wealth, there is nothing to indicate that the jury's award "shocks the conscience." Therefore, the Court has no basis to overturn the jury's award of punitive damages.

ii. The award was not unconstitutionally excessive.

Nasuti contends that the jury's award of $375,000 is impermissibly excessive when compared to the $137,000 the jury awarded in compensatory damages. Nasuti relies on the recent United States Supreme Court case of *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), for the proposition that a punitive damage award that is "grossly excessive" violates the constitutional right to due process, and is, therefore, impermissible. In response, plaintiffs argue that Nasuti's reliance on *BMW* is inappropriate in this particular case, because in *BMW,* the punitive damages awarded were 500 times the amount of compensatory damages awarded, while in this case the ratio is only 3 to 1.

[45][46][47] The Court must decide whether the award was excessive under either or both Pennsylvania or federal law. First, the Pennsylvania Supreme Court has held that under Pennsylvania law there is no proportionality required between the amount of consequential damages and the amount of punitive damages awarded. *Kirkbride v. Lisbon Contractors, Inc.,* 521 Pa. 97, 555 A.2d 800 (Pa.1989). The Pennsylvania Superior*631 Court explained the rationale of the *Kirkbride* decision thus:

Under Pennsylvania law, punitive damages need bear no proportional relationship to the compensatory damages awarded in a particular case. Rather, a reasonable relationship must exist between the amount of the punitive damage

award and the twin goals of punishment and deterrence, the character of the tortious act, the nature and extent of the harm suffered by the plaintiff, and the wealth of the defendant. Our Supreme Court has ruled that a mathematical proportionality requirement between punitive and compensatory damages would actually defeat the purpose of punitive damages, which is to punish tortfeasors for outrageous conduct and deter them and others from similar conduct.

*Sprague,* 656 A.2d at 925 (citing *Kirkbride,* 555 A.2d at 803-804). While "mathematical certainty" is not required, *Delahanty,* 464 A.2d at 1257, "a reasonable relationship must still exist between the nature of the cause of action underlying the compensatory award and the decision to grant punitive damages." *Sprague,* 656 A.2d at 925. Further, the wealth of the defendant is an appropriate factor for the finder of fact to consider. *Sprague,* 656 A.2d at 925 (citing *Kirkbride,* 555 A.2d at 803).

Finding no defect in the jury's award under Pennsylvania law, the Court must turn to the question of whether the punitive damage award was so excessive as to violate due process under federal law. The United States Supreme Court, in *BMW,* explained that "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice nor only of the conduct that will subject him to punishment but also of the severity of the penalty a state may impose," *BMW,* 116 S.Ct. at 1598. The Supreme Court set forth three "guideposts" to aid in the determination whether a particular punitive damage award is "grossly excessive," and therefore violates due process. *Id.* These guideposts are: (1) the degree of reprehensibility of defendant's conduct, (2) the ratio of the punitive damage award to the actual harm inflicted on the plaintiff, and (3) a comparison of civil and criminal sanctions for comparable conduct. *Id.* at 1599-1603.

[48] Nasuti argues that the evidence did not support the jury's finding that his actions were suf-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

ficiently reprehensible to justify an award of punitive damages. According to the Supreme Court, this factor is "the most important indicium of the reasonableness of a punitive damages award ....", and trickery or deceit are considered indicative of reprehensible conduct. *Id.,* at 1599.

In this case, jury found that Nasuti breached the fiduciary duty he owed the McDermotts. While the McDermotts were sophisticated in terms of their knowledge and experience in business generally, they retained Nasuti precisely because of his recognized knowledge and expertise in the party goods industry. Having thus obtained the confidence of the McDermotts, Nasuti proceeded to operate for his own benefit without regard to the McDermott's interests. Once detection of Nasuti's perfidy became inevitable because of the poor performance of the store, Nasuti fabricated a pretext that there had never been any contract. Therefore, the jury was entitled to conclude that, having been anointed by the McDermotts as "captain of their [business] ship," Nasuti abandoned it, without notice and in the middle of a financial storm, under the thinly veiled pretext that there had never been a contract at all.

Nasuti further argues that the amount of punitive damages awarded was out of proportion to the actual loss caused by the breach. However, in *BMW,* the Supreme Court rejected the notion that there exists "a mathematical bright line between constitutionally acceptable and constitutionally unacceptable that would fit every case." *Id.* at 1602 (quoting *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) and *Pacific Mutual Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). Rather, the Supreme Court held that "[a] general concern of reasonableness ... properly enter[s] into the constitutional calculus." *Id.* Nor is Nasuti's argument that the punitive damage award be mathematically proportional to the compensatory damages **\*632** awarded consistent with Pennsylvania law.[FN23] *Kirkbride,* 555 A.2d at 803. In this case, the amount of the punitive

award, $375,000, is less than nine times the reduced amount of compensatory damages under the tort claim, $42,537.61.

FN23. In *Kirkbride,* the Pennsylvania Supreme Court held that:

If the purpose of punitive damages is to punish a tortfeasor for outrageous conduct and to deter him or others from similar conduct, then a requirement of proportionality defeats that purpose. It is for this reason that the wealth of the tortfeasor is relevant. In making its determination, the jury has the function of weighing the conduct of the tortfeasor against the amount of damages which would deter such future conduct. In performing this duty, the jury must weigh the intended harm against the tortfeasor's wealth. If we were to adopt [a theory of proportionality], outrageous conduct, which only by luck results in nominal damages, would not be deterred and the sole purpose of a punitive damage award would be frustrated. If the resulting punishment is relatively small when compared to the potential reward of his actions, it might then be feasible for a tortfeasor to attempt the same outrageous conduct a second time. If the amount of punitive damages must bear a reasonable relationship to the injury suffered, then those damages probably would not serve as a deterrent. It becomes clear that requiring punitive damages to be reasonably related to compensatory damages would not only usurp the jury's function of weighing the factors set forth in Section 908 of the Restatement (Second) of Torts, but would also prohibit victims of malicious conduct, who fortuitously were not harmed, from deterring future attacks.

*Kirkbride,* 555 A.2d at 803 (quoted by

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

*G.J.D. and D.K. by G.J.D. v. Johnson,*
447 Pa.Super. 340, 669 A.2d 378, 382
(1995)).

In *BMW,* the Supreme Court commented that
"[i]n most cases, the ratio will be well within a con-
stitutionally acceptable range, and remittitur will
not be justified on this bases. When the ratio is a
breathtaking 500 to 1, however, the award must
surely 'raise a judicial eyebrow.' " *BMW,* 116 S.Ct.
at 1603 (quoting *TXO,* 509 U.S. at 482, 113 S.Ct.
2711 (O'Connor, J., dissenting)). In *Haslip,* the
Court concluded that a ratio of four to one did not "
'cross the line into the area of constitutional impro-
priety.' " *BMW,* 116 S.Ct. at 1602 (quoting *Haslip,*
499 U.S. at 23-24, 111 S.Ct. 1032); and in *TXO*
the Court suggested that even if a punitive damage
award was as high as 10 times compensatory dam-
age award, the due process clause would not be vi-
olated, *id.* Because the ratio in this case, 8 to 1,
does not approach the ratios other courts have
found to "raise a judicial eyebrow," or " 'jar one's
constitutional sensibilities,' " *TXO,* 509 U.S. at 462,
113 S.Ct. 2711 (quoting *Haslip,* 499 U.S. at 18, 111
S.Ct. 1032), 482, the Court concludes that the ratio
in this case is not constitutionally impermissible.

Lastly, the Court must "compar[e] the punitive
damages award and the civil or criminal penalties
that could be imposed for comparable misconduct
..." *BMW,* 116 S.Ct. at 1603. The Court concludes
that this last test is satisfied because Nasuti's con-
duct could be considered criminal under
Pennsylvania law, *see* Forgery and Fraudulent Prac-
tices, 18 Pa. Cons.Stat. ch. 41, and Theft by Decep-
tion, 18 Pa. Cons.Stat. § 3922, and could subject
him to a term of incarceration and fines up to twice
the amount he gained by his conduct. Further, un-
der Pennsylvania law, fraudulent business practices
are subject to civil penalties up to three times the
actual damages sustained plus additional relief a
court may deem proper and costs and fees. *See* 73
Pa. Stat. § 201-1 *et seq.*

Upon consideration of the *BMW* guideposts,
the Court concludes that the punitive damage award

in this case is not "grossly excessive" and will per-
mit the jury's award to stand.

C. *Prejudgment Interest*

1. Breach of contract

[49][50][51] Prejudgment interest is a matter of
right in breach of contract cases. *Spang & Co. v.
USX Corp.,* 410 Pa.Super. 254, 599 A.2d 978, 983
(1991) (citing *Fernandez v. Levin,* 519 Pa. 375, 548
A.2d 1191, 1193 (1988)). "That right to interest be-
gins at the time payment is withheld after it has
been the duty of the debtor to make such payment."
*Fernandez,* 548 A.2d at 1193. Under Pennsylvania
law, unless otherwise specified by the parties, the
rate of prejudgment interest is calculated as simple
interest at a rate of six percent per year. Pa. Stat.
Ann. tit. 41, § 202 (1991); *Spang,* 599 A.2d at 984.
***633** In this case, the Court has concluded that the
jury's award of should be reduced to $358,989.49.
Of this amount, $56,409.49 was awarded as the
purchase price of the stock and $302,580.00 was
awarded for Nasuti's share (51 percent) of the land-
lord debt, the vendor debt, and the debt to Royal
Bank. Thus, as to the landlord debt, the vendor
debt, and the Royal Bank debt, plaintiffs are en-
titled to $44,660.81, representing six percent in-
terest on $302,580.00 from the time the contract
was breached, March 13, 1995, until the time
judgement was entered, August 28, 1997 (2.46
years). As to the amount owed plaintiffs for the
purchase price of the stock, the applicable rate of
interest is governed by the terms of the Promissory
Note. (Ex. P-10.) According to the Promissory
Note, interest shall accrue at the prime rate. (Ex. P-
10.) Plaintiffs, therefore, are entitled to $14,447.65
in prejudgment interest, representing interest at
prime rate on $56,409.49 from August 30, 1994, the
date the Promissory Note was executed, to August
28, 1997, the date of judgment. *See* Pls.' Mem. to
Add Prejudgment Interest, Ex. B.

2. Breach of fiduciary duty

[52][53][54] Generally, it is within the discre-
tion of the Court to award prejudgment interest

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

11 F.Supp.2d 612
**(Cite as: 11 F.Supp.2d 612)**

with regard to unliquidated sums, such as that for breach of fiduciary duty. *See Ambromovage v. United Mine Workers of Am.,* 726 F.2d 972, 981 (3d Cir.1984); *Sack v. Feinman,* 489 Pa. 152, 413 A.2d 1059, 1063-65 (1980). Under Pennsylvania law, prejudgment interest is available for awards for breach of fiduciary duty. *Sack,* 413 A.2d at 1065 ("Whenever the defendant holds money or property that belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment, interest upon the funds or property so held may be necessary to force complete restitution.") As discussed above, *see supra* at pp. 625-628, Nasuti breached the fiduciary duty he owed plaintiffs. Further, the Court calculated the damages awarded to plaintiffs by evaluating the evidence supporting specific amounts Nasuti improperly took from plaintiff. Therefore plaintiffs are entitled to $6,278.55, representing six percent simple interest per year on $42,537.61 from the time the duty was breached until the date of judgement.

In this case, the jury found that Nasuti breached a contract with, and fiduciary duty owed to, plaintiffs. Further, Nasuti has failed to provide any specific reason why it would be inequitable to award prejudgment interest on plaintiffs' award. The Court, therefore, will add $65,387.01 in prejudgment interest to the total amount awarded plaintiffs.

## IV. CONCLUSION

For the reasons stated above, the Court will vacate the jury award for the breach of contract and enter an amended judgment in favor of plaintiffs for $841,914.11, representing $776,527.10 in the principal award and $65,387.01 in prejudgment interest.

An appropriate order follows.

### ORDER

**AND NOW,** this 30th day of **June, 1998,** upon consideration of defendant's motion for judgment as a matter of law, or in the alternative for a new trial (doc. no. 136), plaintiffs' responses (doc. nos. 137,

139), and defendant's reply (doc. no. 138), plaintiffs' motion to amend judgment to add prejudgment interest (doc. no. 114), defendant's response (doc. no. 117), after oral argument, and for the reasons stated in the Memorandum accompanying this Order, it is hereby **ORDERED** as follows:

1. As to docket no. 116-1, defendant's motion for judgment as a matter of law is **GRANTED IN PART and DENIED IN PART;**

2. As to docket no. 116-3, defendant's motion for a new trial is **DENIED;**

3. As to docket no. 116-2, defendant's motion for remittitur is **DENIED;**

4. As to docket no. 114, plaintiff's motion for prejudgment interest is **GRANTED;** and

5. An **AMENDED JUDGMENT** shall be **ENTERED** in favor of plaintiffs and against defendant in the amount of $841,914.11.

**AND IT IS SO ORDERED.**

E.D.Pa.,1998.
McDermott v. Party City Corp.
11 F.Supp.2d 612

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

2003 WL 23580348, 65 Pa. D. & C.4th 370
**(Cite as: 2003 WL 23580348 (Pa.Com.Pl.), 65 Pa. D. & C.4th 370)**

**H**

Court of Common Pleas of Pennsylvania, Lack-
awanna County.
Beecham
v.
American Life and Casualty Insurance Co.

No. 98 CV 3147.
December 19, 2003

*371 *Kimberly D. Borland*, for plaintiffs.

*Mark H. Scoblionko*, for defendant.

NEALON, *J.*

Defendant has filed a motion for partial **sum-
mary judgment** with respect to plaintiffs' claims
based upon unintentional conduct and submits that
an earlier **summary judgment** ruling found the
plaintiffs to be contributorily negligent as *372 a
matter of law. Defendant has also presented another
motion for **summary judgment** seeking to reopen
an economic loss doctrine issue which was previ-
ously rejected by two other judges of this court.
Since the prior **summary judgment** ruling never
adjudged the plaintiffs to be contributorily negli-
gent, nor has the defendant identified an interven-
ing change in the controlling law warranting the re-
versal of the law of the case on the economic loss
doctrine, both motions will be denied.

I. FACTUAL BACKGROUND

Plaintiffs William D. Beecham and Dorothy V.
Beecham have commenced this action against de-
fendant American Life and Casualty Insurance Co.
seeking to recover damages as a result of their loss
of an annuity policy investment. On November 11,
1994, the Beechams purchased an annuity contract
with American Life through its agent Patrick Idaspe
for $176,243. American Life reportedly discovered
that Idaspe had engaged in misconduct with another
company, Beneficial Standard, involving his cre-
ation and use of fraudulent company letterhead.

Therefore, by letter dated June 12, 1995, American
Life notified Idaspe that his agency contract would
be terminated on June 27, 1995. Additionally, an
insurance wholesaler who acted as Idaspe's super-
visor, Jack D. Aiken, forwarded a letter to Americ-
an Life in which he recommended that Idaspe's an-
nuity contract transactions be placed on "a watch
list" by American Life.

However, American Life never informed the
Beechams of its investigation and termination of
Idaspe based upon his fraudulent conduct. Follow-
ing his termination by American Life, Idaspe con-
vinced the Beechams to *373 cancel their annuity
contract with American Life and transfer their
funds to another company. The Beechams followed
Idaspe's advice, and although they originally re-
ceived periodic statements from an entity identified
as Equity Service Company, those statements later
ceased thereby prompting the Beechams to contact
Idaspe. Regrettably, the Beechams discovered that
Idaspe had committed suicide and that the proceeds
from the annuity policy had been lost.

The Beechams maintain that despite American
Life's knowledge of Idaspe's fraudulent activity, it
failed to notify its policyholders such as the
Beechams regarding Idaspe's termination. The
Beechams further contend that American Life neg-
lected to heed Jack D. Aiken's recommendation that
Idaspe's business be placed on "a watch list." Ac-
cording to the Beechams, if they had been so noti-
fied by American Life, they would not have liquid-
ated their annuity policy with American Life and
reinvested the proceeds with Idaspe.

The Beechams' complaint asserted causes of
action for negligence (Count I), common-law fraud
and deceit (Count II), violation of the Unfair Insur-
ance Practices Act (Count III), violation of the Un-
fair Trade Practices and Consumer Protection Law
(Count IV), **breach** of **fiduciary duty** (Count V)
and recovery of punitive damages (Count VI).
American Life filed preliminary objections in

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

which it demurred "to the entire complaint" on the grounds that it did not owe the Beechams "a legal duty as would be required to support a viable cause of action" and that the complaint failed "to make out a viable basis for relief in that it is essentially a negligence claim for economic damages only, without injury to person*374 or property, and such a claim is not recognized under Pennsylvania law." (See Dkt. entry no. 6.) American Life also presented individual demurrers to Counts II, III, IV, V and VI of the complaint, as well as paragraphs 44 and 45 demanding damages "for physical harm and pain, mental anguish, and humiliation" and "loss of enjoyment of life." (*Id.*, pp. 2-6.) In its accompanying brief, American Life cited *Spivack v. Berks Ridge Corp. Inc.*, 402 Pa. Super. 73, 586 A.2d 402 (1990), and *Aikens v. Baltimore and Ohio Railroad Co.*, 348 Pa. Super. 17, 501 A.2d 277 (1985), in support of its contention that the economic loss doctrine bars any recovery in this case since no cognizable negligence action can exist which results solely in economic damages unaccompanied by physical injury or property damage. (Dkt. entry no. 7, p. 18.)

By order dated September 2, 1999, Senior Judge Jay W. Myers (specially presiding) sustained American Life's demurrer to the negligence and Unfair Insurance Practices Act claims and paragraphs 44 and 45 seeking recovery for pain and suffering, mental anguish, humiliation and loss of enjoyment of life. However, Judge Myers overruled the preliminary objections in all other respects, including American Life's objections predicated upon the alleged absence of a legal duty, the applicability of the economic loss doctrine, and the legal viability of the Beechams' claims for fraud and deceit, **breach** of **fiduciary duty**, violation of the UTP/CPL and punitive damages. (Dkt. entry no. 13.)

After the parties conducted discovery, American Life filed a motion for **summary judgment** on April 1, 2002, requesting the dismissal of the remaining claims for fraud *375 and deceit, **breach of fiduciary duty**, violation of the UTP/CPL and

punitive damages. (*Id.*, no. 22, ¶¶34-38.) American Life's supporting brief renewed its earlier challenges premised upon the purported absence of a legal duty or causal connection, (*id.*, no. 20, pp. 12-25), the application of the economic loss doctrine (*id.*, pp. 25-26), and the validity of the Beechams' legal theories for fraud and deceit, **breach** of **fiduciary duty**, violation of the UTP/CPL and punitive damages. (*Id.*, pp. 26-36.)

By memorandum and order dated January 17, 2003, Judge Carmen D. Minora concluded "that material questions of fact exist and that each count of the complaint is appropriate for submission to a **jury**." Hence, Judge Minora denied American Life's motion for **summary judgment** "on all bases." (Dkt. entry no. 28, p. 14.) In his comprehensive analysis of the parties' legal duty issue, FN1 Judge Minora remarked:

> FN1. The determination of whether a duty exists in a particular case involves the weighing of several discreet factors, including: (1) the relationship between the parties; (2) the social utility of the defendant's conduct; (3) the nature of the risk imposed and the foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the defendant; and (5) the overall public interest in the proposed solution. *Sharpe v. St. Luke's Hospital*, 573 Pa. 90, 96, 821 A.2d 1215, 1219 (2003); *R.W. v. Manzek*, 838 A.2d 801, 807 n.9 (Pa. Super. 2003). No single factor is dispositive and a duty will be found to exist where the balance of these five factors weighs in favor of placing such a burden on a defendant. *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1008-1009 (Pa. 2003).

"This court finds that American did owe the Beechams a duty to disclose based upon the above referenced real estate scenario [in *Bortz v. Noon*, 556 Pa. 489, 502, 729 A.2d 555, 562 (1999)]. American had access to Mr. Idaspe's clients, they knew of his allegedly deceptive *376 practices and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2003 WL 23580348, 65 Pa. D. & C.4th 370
**(Cite as: 2003 WL 23580348 (Pa.Com.Pl.), 65 Pa. D. & C.4th 370)**

they certainly knew of his termination; American was clearly in a better position than were the Beechams. The Beechams are not without some degree of fault, they too had a responsibility to verify Mr. Idaspe's credibility, however, from the instant facts, it appears as though American should have disclosed whatever information they had to Mr. Idaspe's clients, particularly his termination. . . .

"An annuity policy carried by a particular company requires more attention and input than does a life insurance policy. While carrying an annuity policy for the benefit of its recipients, the company must exercise its best judgment in determining how to protect and increase the recipients' investment. This court believes that this distinction mandates a closer relationship between the beneficiary of an annuity and the company carrying that annuity than is mandated between an insured and the insurance company; the annuity carrier must act for the benefit of the policyholder. As such, we find that a fiduciary relationship does exist when an annuity, rather than a life insurance policy, is involved." (*Id*., pp. 11-12.)

Following Judge Minora's denial of American Life's motion for **summary judgment**, American Life presented an application seeking to have Judge Minora certify his ruling for an interlocutory appeal pursuant to Pa.R.A.P. 1311(b) and 42 Pa.C.S. §702(b). On February 13, 2003, Judge Minora denied American Life's request for certification of an interlocutory order for appeal. (*Id*., nos. 29-31.) Approximately two weeks later, American Life filed the instant motion for partial **summary judgment** on February 28, 2003. (*Id*., no. 33.) Before the Beechams had an opportunity to respond to that motion, American*377 Life filed an additional motion for **summary judgment** on April 21, 2003. (*Id*., no. 38.) By notice dated July 16, 2003, the court administrator assigned American Life's motions to the undersigned for oral argument on October 29, 2003.

The gravamen of American Life's motion for partial **summary judgment** is that Judge Minora

allegedly found the Beechams contributorily negligent as a matter of law by virtue of the above-quoted paragraphs of his memorandum dated January 17, 2003. Specifically, American Life submits that "[a]s a result of the aforesaid finding of law by Judge Minora, plaintiffs are culpable of contributory negligence as a matter of law." (*Id*., no. 33, ¶4.) American Life posits that since the Comparative Negligence Act applies only to actions "for negligence resulting in death or injury to person or property," 42 Pa.C.S. §7102(a), any contributory negligence by the Beechams operates as a total bar to any recovery, except for claims based upon intentional, wanton, willful or reckless conduct. (*Id*., ¶¶5-6.)

American Life's third motion for **summary judgment**, which was filed on April 21, 2003, renews its economic loss doctrine arguments which were previously considered and rejected by Judge Myers and Judge Minora. American Life contends that the holding in *Adams v. Copper Beach Townhome Communities*, 816 A.2d 301 (Pa. Super. 2003) , which was issued one week after Judge Minora's ruling constitutes an intervening change in the controlling law warranting the grant of **summary judgment**. In that vein, American Life asserts that the *Adams* court "altered the law in this Commonwealth and has ruled that the economic loss doctrine bars claims based *378 on fraud, intentional conduct, or statutory fraud under the Unfair Trade Practices and Consumer Protection Law." (Dkt. entry no. 38, ¶5.) Thus, American Life once again seeks the dismissal of all claims in this matter. (*Id*., ¶¶7-9.) The Beechams have submitted a brief in opposition to the **summary judgment** motions and American Life has filed an initial brief, "supplemental brief," "second supplemental brief" and "third supplemental brief." (*Id*., nos. 34-35, 39-40, 42.) Following the completion of oral argument on October 29, 2003, this matter was submitted for a decision.

## II. DISCUSSION
### (A) *Standard of Review*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2003 WL 23580348, 65 Pa. D. & C.4th 370
(Cite as: 2003 WL 23580348 (Pa.Com.Pl.), 65 Pa. D. & C.4th 370)

**Summary judgment** is appropriate only where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1004 (Pa. 2003). When considering a motion for **summary judgment**, the record must be viewed in a light most favorable to the non-moving party with all doubts as to the existence of a factual issue being resolved against the movant. *Federal National Mortgage Association v. Citiano*, 834 A.2d 645, 647 (Pa. Super. 2003). **Summary judgment** may be granted only if it is clear and free from doubt that the moving party is entitled to judgment in its favor. *Brotech Corp. v. Delmarva Chemicals Inc.*, 831 A.2d 613, 615 (Pa. Super. 2003); *Ryan v. Asbestos Corp. Ltd.*, 829 A.2d 686, 688 (Pa. Super. 2003).

***379** (B) *Contributory Negligence Defense*

The Comparative Negligence Act, 42 Pa.C.S. §7102, applies only to negligence actions which result in death or injury to person or property and is inapplicable to negligence claims involving purely monetary loss which is unaccompanied by personal injury or property damage. *Gorski v. Smith*, 812 A.2d 683, 701-702 (Pa. Super. 2002) (*reargument denied*, January 7, 2003); *Rizzo v. Michener*, 401 Pa. Super. 47, 53-54, 584 A.2d 973, 976 (1990). If the Comparative Negligence Act does not apply due to the absence of personal injury or property damage, the parties revert to the doctrine of contributory negligence which bars recovery if the plaintiff's negligence has contributed in any way to the economic loss. *Wescoat v. Northwest Savings Association*, 378 Pa. Super. 295, 302-303, 548 A.2d 619, 623 (1988). It is undisputed that the Beechams have not suffered personal injury or damage to tangible property such that 42 Pa.C.S. §7102 does not govern their claims. American Life submits that Judge Minora found the Beechams contributorily negligent as a matter of law as a result of which they are precluded from recovering damages except for intentional or wanton conduct. See *Hutchison ex rel. Hutchison v. Luddy*, 763 A.2d 826, 848 (Pa. Super. 2000) (when willful or wanton misconduct is

involved, contributory or comparative negligence should not be applied), *appeal denied*, 567 Pa. 743, 788 A.2d 377 (2001).

Contrary to American Life's contention, Judge Minora did not expressly find the Beechams to be contributorily negligent. In fact, the issue of the Beechams' alleged negligence was not even raised by American Life's first ***380** motion for **summary judgment** and, as such, would not have been an appropriate subject for determination via the **summary judgment** ruling. See *Rogers v. Williams*, 420 Pa. Super. 396, 400, 616 A.2d 1031, 1033 (1992) (a trial court may not raise a defense sua sponte on behalf of a party and enter **summary judgment** on that basis). More importantly, in light of the contributory negligence issue raised by American Life in its motion for partial **summary judgment**, Judge Minora has filed an "Order of clarification" on this date confirming beyond any doubt that his memorandum "never indicated that plaintiffs were culpable of contributorily negligent conduct as a matter of law nor were plaintiffs judicially determined to be at fault which could arguably require a threshold finding of fact within the sole province of a **jury's** fact-finding responsibility." (Dkt. entry no. 44, ¶8.) As Judge Minora has aptly noted in his clarification order, "[w]hile the plaintiffs had a responsibility to verify Mr. Idaspe's credibility, the best information for making an intelligent judgment as to Mr. Idaspe's credibility was knowingly and intentionally withheld from plaintiffs and all of Mr. Idaspe's other clients by the defendant. Thus, plaintiffs were denied their best chance to judge the deceased Mr. Idaspe's credibility." (*Id.*, ¶11.) See also, *Gorski*, 812 A.2d at 703 ("[i]t is not contributory negligence to fail to guard against the lack of ordinary care by another.")

There may be a judicial declaration of contributory negligence "only in clear cases where the facts are indisputably fixed and there can be no reasonable doubt as to the inferences properly to be drawn from them." *Sargeant v. Ayers*, 358 Pa. 393, 397, 57 A.2d 881, 883 (1948). If there is any evid-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2003 WL 23580348, 65 Pa. D. & C.4th 370
**(Cite as: 2003 WL 23580348 (Pa.Com.Pl.), 65 Pa. D. & C.4th 370)**

ence upon which reasonably minded *381 individuals might disagree as to whether the plaintiff was chargeable with negligence which contributed to the ultimate loss, then the question of such contributory negligence is for the **jury**, not the court, to determine. *Heffernan v. Rosser*, 419 Pa. 550, 555, 215 A.2d 655, 658 (1966); *Hawthorne v. Dravo Corp., Keystone Division*, 313 Pa. Super. 436, 445, 460 A.2d 266, 270 (1983). Judge Minora's reference to the Beechams' responsibility was, at most, explanatory dictum in his legal duty analysis, (see n.1, *supra*), and was never intended to constitute a conclusive finding of contributory negligence. Inasmuch as Judge Minora has clearly stated that he did not make such a finding of contributory negligence, American Life's motion for partial **summary judgment** will be denied.

### (C) *Economic Loss Doctrine*

In its other motion for **summary judgment**, American Life seeks to revisit the economic loss doctrine arguments which were previously rejected by Senior Judge Myers and Judge Minora. Under the coordinate jurisdiction rule, a judge involved in the later phases of a case generally should not reopen or entertain motions which have been decided by another judge of the same court at an earlier stage of the case. *Zane v. Friends Hospital*, 575 Pa. 236, 836 A.2d 25, 29 (2003); *Argenta*, 104 Lacka. Jur. 430, 443 (2003). Departure from this rule is allowed only in exceptional circumstances such as when there has been an intervening change in the controlling law or facts, *Rivera v. Home Depot*, 832 A.2d 487, 491-92 (Pa. Super. 2003), or the prior holding was clearly erroneous and would create a manifest injustice if followed. *382Zane, supra*, 836 A.2d at 29; *Safe Harbor Water Power Corp. v. Williams*, 825 A.2d 733, 741 (Pa. Commw. 2003).

Generally, the "economic loss doctrine" prohibits plaintiffs from recovering in tort for economic losses which flow only from a contract. *Debbs v. Chrysler Corp.*, 810 A.2d 137, 164 n.32 (Pa. Super. 2002), *appeal denied*, 574 Pa. 742, 829 A.2d 311 (2003). In *Aikens, supra*, the Superior Court con-

cluded that recovery would not be allowed in a negligence action for purely economic loss that was not accompanied by physical injury or damage to tangible property. In so holding, the *Aikens* court specifically held that "[t]he reason a plaintiff cannot recover stems from the fact that the negligent actor has no knowledge of the contract or prospective relation and thus has no reason to foresee any harm to the plaintiff's interest." *Aikens*, 348 Pa. Super. at 21, 501 A.2d at 279. Instantly, American Life had knowledge of the annuity contract and business relation between the Beechams and Idaspe, and after it was notified of Idaspe's fraudulent conduct, American Life arguably had a reason to foresee potential harm to the Beechams' interest. Presumably for that reason, American Life's economic loss doctrine arguments were rejected by Senior Judge Myers and Judge Minora.

American Life asserts that the holding in *Adams* reflects a substantial change in the controlling law and warrants departure from the coordinate jurisdiction rule. According to American Life, *Adams* held "that the economic loss doctrine bars claims based on fraud, intentional conduct, or statutory fraud under the Unfair Trade Practices and Consumer Protection Law." (Dkt. entry no. 38, ¶5.) Based upon our careful reading of *Adams*, we do *383 not accept American Life's proffered interpretation of the *Adams* decision.

In *Adams*, employees of a tire manufacturing plant brought an action under the Storm Water Management Act (SWMA) against the plant's neighboring property owners who allegedly had caused water damage to the plant which precipitated a temporary closure and resulted in lost wages for the employees. In the words of the *Adams* court, the "sole issue" presented for review was "whether the common-law economic loss doctrine applied to bar a statutory cause of action under the SWMA." *Adams*, 816 A.2d at 304. Following its analysis of the legislative intent and express language of the SWMA, the Superior Court found that the employees' claims for loss of wages and benefits do not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2003 WL 23580348, 65 Pa. D. & C.4th 370
**(Cite as: 2003 WL 23580348 (Pa.Com.Pl.), 65 Pa. D. & C.4th 370)**

fall within the scope of the term "injury" as used by the SWMA inasmuch as "[t]he language of the SWMA is clear that the legislature did not intend to provide a remedy for purely economic damages in the absence of physical injury of property damage." *Id.* at 307. To that end, the *Adams* court cited *Aikens* for the proposition that "the economic loss doctrine is enforced to bar purely economic claims because the tort-feasor has no knowledge of the contract or prospective relation and, therefore, no reason to foresee any harm to the plaintiff's interest." *Id.*

*Adams* constitutes an amplification of the economic loss doctrine only to the extent that it applied that doctrine to claims under the SWMA. It is beyond cavil that the Beechams are not advancing claims under the SWMA, and for that reason, *Adams* does not justify reconsideration of the previous **summary judgment** ruling under the coordinate jurisdiction rule. American Life's **\*384** subsequent reliance upon *David Pflumm Paving & Excavating Inc. v. Foundation Services Co.*, 816 A.2d 1164 (Pa. Super. 2003), is likewise misplaced since that decision does not stand for the proposition that the economic loss doctrine precludes "claims based on fraud, intentional conduct, or statutory fraud." Quite to the contrary, the *Foundation Services* court distinctly stated that:

"There are no Pennsylvania Supreme Court or Superior Court cases that indicate that the economic loss doctrine bars a claim for fraudulent misrepresentation. However, for the reason stated in the text, we need not address that issue in this case." (*Id.* at 1171 n.2.)

Consequently, since it *still* is not clear and free from doubt that American Life is entitled to judgment in its favor as a matter of law, the motion for **summary judgment** based upon the economic loss doctrine will once again be denied.

#### ORDER
And now, December 19, 2003, upon consideration of the motion for partial **summary judgment**

of defendant American Life and Casualty Insurance Co. and the motion for **summary judgment** of defendant American Life and Casualty Insurance Co., the memoranda of law submitted by the parties and the oral argument of counsel on October 29, 2003, and based upon the reasoning set forth in the foregoing memorandum, it is hereby ordered and decreed that:

(1) defendant's motion for partial **summary judgment** is denied; and

(2) defendant's motion for **summary judgment** is denied.

Pa.Com.Pl. 2003.
Beecham v. American Life and Cas. Ins. Co.
2003 WL 23580348, 65 Pa. D. & C.4th 370

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.