IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FIRST SEALORD SURETY | : | CIVIL ACTION |
| | : | NO.  10-832 |
| v. | : | |
| | : | |
| DURKIN & DEVRIES INSURANCE | : | |
| AGENCY | : | |
| v. | : | |
| HELLER & SMITH CORPORATION | : | |
| O'NEILL, J. | | JANUARY 17, 2013 |

## <u>MEMORANDUM</u>

Presently before me are three fully briefed motions.  For the purposes of clarity, I will list the motions and their accompanying memoranda and briefly summarize the arguments contained in each.  First, there is defendant Durkin & Devries Insurance Agency's motion to dismiss plaintiff First Sealord Surety's negligent misrepresentation claim (ECF No. 40), First Sealord's response thereto (ECF No. 46), Durkin's reply to the response (ECF No. 48), First Sealord's supplemental declaration in opposition to Durkin's motion to dismiss (ECF No. 52) and Durkin's letter brief in further support of its motion to dismiss (ECF No. 54).  Durkin argues that it made no misrepresentations to First Sealord, that even if it did make misrepresentations, that the misrepresentations were not the proximate cause of any of the losses in this case, and alternatively, that the negligent misrepresentation claim is barred by Pennsylvania's economic loss doctrine and the statute of limitations.

Second, there is Durkin's motion to quash a third-party subpoena (ECF No. 49) and First Sealord's reply thereto (ECF No. 50).  Durkin argues that the subpoena is untimely and thus prejudicial to Durkin and moreover that the subpoena requires the disclosure of documents subject to a confidential settlement agreement in a prior litigation involving Durkin.  First

Sealord counters that the subpoena's timing is due to factual assertions made in filings Durkin submitted after the close of discovery and the confidentiality agreement does not bar compliance with the subpoena.

Finally, there is Durkin's motion for summary judgment as to First Sealord's breach of contract and breach of fiduciary duty claims (ECF No. 38), First Sealord's response thereto (ECF No. 44), Durkin's reply to the response (ECF No. 47), First Sealord's supplemental declaration in opposition to Durkin's motion for summary judgment (ECF No. 53), Durkin's letter brief in further support of its motion for summary judgment (ECF No. 54), First Sealord's memorandum regarding its breach of fiduciary duty claim (ECF No. 56), Durkin's letter memorandum in further support of its motion for summary judgment as to the breach of fiduciary duty claim (ECF No. 59), and First Sealord's letter memorandum in reply to Durkin's letter memorandum (ECF No. 60). In its motion for summary judgment, Durkin argues that First Sealord cannot demonstrate any material breaches of the contract between the parties and that the decisions which led to First Sealord's alleged damages were made entirely by First Sealord and were unrelated to any communications Durkin made to First Sealord. Moreover, Durkin asserts that it had no fiduciary duties beyond those imposed by the contract and that the fiduciary duty claim is thus duplicative of the breach of contract claim and must fail for that reason. First Sealord argues that Durkin was in breach of provisions of the contract which required that Durkin convey any adverse information about current or prospective clients to First Sealord, maintain accurate and complete records about clients and comply with the standard of care expected of Durkin as dictated by industry custom. First Sealord also argues that the claims are not duplicative because Durkin owed fiduciary duties to First Sealord beyond those imposed by the contract between the parties.

I held oral argument on the three pending motions on October 18, 2012.

**I.      Background Facts and Procedural History**

A.  <u>The Agency Agreement</u>

First Sealord is a Pennsylvania corporation that was engaged in the business of providing

surety bonds.  An Order liquidating First Sealord was entered on February 8, 2012 in the

Commonwealth Court of Pennsylvania and First Sealord is no longer in operation.  Durkin is a

licensed insurance producer with a principal place of business in Massachusetts.  On August 1,

2005, Durkin entered into an Agency Agreement with First Sealord.  Under the Agreement,

Durkin was to "solicit business for the surety bond products offered by [First Sealord] and to

collect and give receipts for premiums or fees due."  Agency Agreement ¶ 1.  Durkin further was

to "act as agent according to the terms and conditions of this agreement."  <u>Id.</u> at ¶ 2.  However,

Durkin had

> no authority to bind or commit [First Sealord] to any undertaking
> to or for the benefit of any client of [Durkin].  Durkin only ha[d]
> authority to issue bonds after receipt of written approval from the
> company [. . . and all bonds] must be within the specific limits of
> authority granted under an approved power-of-attorney. . . [Durkin
> had] no authority to adjust claims or make any representations to
> third parties related to claims on bonds issued by [Durkin].
> [Durkin] must report all claims and any adverse information [to
> First Sealord] as set forth below.

<u>Id.</u> at ¶ 3.  Moreover, in the Agreement Durkin agreed not to "[r]elease a Bond to a client when

anyone within the Agent's organization is aware of a pending or prior claim or loss to any surety,

including [First Sealord], who may have previously issued a bond to such client, unless such

information is provided in writing to and acknowledged by [First Sealord] in advance of delivery

of the bond."  <u>Id.</u> at ¶ 11.  In the Agency Agreement Durkin also

> acknowledge[d] and agree[d] that [Durkin's] loss management and
> control obligations to [First Sealord] are a material obligation
> under this Agreement.  [Durkin] agrees to promptly report any

3

Adverse Information (as the term is hereafter defined) which comes to the attention of any person in [Durkin's] organization about any client of [Durkin] who is either applying for or who has received a bond from the [First Sealord].  Adverse Information includes any information concerning a client's character, financial condition, mental or technical competence in meeting its contractual obligations, including but not limited to: any information about a pending or past claim on or against a bond issued by any surety, including [First Sealord]; or any information which may give rise to a potential claim against a bond issued by any surety, including [First Sealord]; or a threat by an obligee on a surety bond issued on behalf of a client to place any surety, including [First Sealord], on notice of a claim; or a threat by anyone to assert a claim against a payment bond issued by any surety, including [First Sealord], on behalf of a client; or the filing of or threat of filing of a mechanic's lien against the property of an obligee on a surety bond issued by any surety, including [First Sealord], on behalf of a client.  [Durkin] is only authorized to report claims and Adverse Information to [First Sealord].  [Durkin] is not authorized to adjust, settle, negotiate, or deal in any fashion with claims on bonds issued by the Agent.

Id. at ¶ 13.  Further, the Agreement set forth Durkin's obligation to maintain complete and accurate records:

In addition to [Durkin's] compliance with the record keeping requirements imposed by the applicable federal and state laws and regulations, [Durkin] shall keep accurate and complete records of all client accounts who apply for or obtain a bond from the [First Sealord], and shall produce copies thereof and any other information with respect to the account, at [Durkin's] own cost, as requested by [First Sealord] from time to time.

Id. at ¶ 12.  The Agency Agreement also contained a clause by which Durkin agreed to indemnify First Sealord for any losses relating to Durkin's performance under the Agreement, including but not limited to

(1) the Agent having executed or having procured the execution of any bond or bonds contrary to [Durkin's] obligations under this agreement or contrary to the standard of care expected of [Durkin] as dictated by industry custom; (2) [Durkin] failing to perform or comply with any of the covenants or conditions of this Agreement; (3) any payment, compromise, judgment, fine, penalty, or similar

4

> charge paid by [First Sealord]; or (4) [First Sealord] enforcing any
> of the covenants and conditions of this Agreement….

Id. at ¶ 20.  It is the provision requiring behavior consistent with the standard of care as dictated by industry custom that First Sealord in part points to as the source of the independent fiduciary duty that Durkin owed First Sealord.  Pl.'s Opp. Br. p. 3, 5.

First Sealord filed its original complaint on March 1, 2010.  In its complaint First Sealord asserted a breach of contract claim against Durkin for failing to comply with the Agency Agreement.  Specifically, First Sealord alleged that Durkin failed to convey adverse information regarding one of Durkin's clients, Heller & Smith ("H & S"), as required by the Agency Agreement.  First Sealord argues that Durkin's failure to convey adverse information, including cash flow problems, was a material breach of the Agreement and caused First Sealord to issue bonds to H & S that First Sealord otherwise would not have approved.  First Sealord also asserted a claim for breach of fiduciary duty against Durkin contending that Durkin did not conduct itself consistent with the standard of care owed a principal by its agent.

B.  The Agency Questionnaire and the Amended Complaint

Prior to the execution of the Agency Agreement in August 2005, Durkin completed and submitted an Agency Questionnaire which provided general information about the Durkin agency, its owners and employees as well as the scope of Durkin's operations.  First Sealord amended its complaint on June 14, 2012 to assert a negligent misrepresentation claim contending that Durkin made misrepresentations in this Agency Questionnaire.  Specifically, First Sealord alleges that Durkin provided inaccurate information in response to four items on the questionnaire.  First, Question 16 required Durkin to provide the identity of the surety companies Durkin represented in 2002, 2003 and 2004 along with the amount of premiums collected on behalf of those sureties and the amount of any losses sustained by those sureties during those

same years.  See Am. Compl. ¶ 8.  In response to Question 16, Durkin identified CNA as a surety company the agency represented in 2003 and 2004 and Monitor and Hanover as surety companies the agency represented in 2002, 2003 and 2004.  Am. Compl. ¶ 9; see also Agency Questionnaire p. 2.  Question 17 required Durkin to state whether anyone associated with the Durkin agency ever had powers of attorney revoked.  Id. at ¶ 10.  In response to Question 17, Durkin represented that no one associated with the agency had ever had powers of attorney revoked.  Id. at ¶ 11; see also Agency Questionnaire p. 2.  Question 18 required Durkin to state whether anyone associated with Durkin had ever been involved in litigation or claims concerning unauthorized bonds or misuse of powers of attorney.  Am. Compl. ¶ 12.  In response to Question 18, Durkin represented that no one associated with it had ever been involved in litigation or claims concerning unauthorized bonds or misuse of powers of attorney.  Id. at ¶ 13; see also Agency Questionnaire p. 2.  Question 19 required Durkin to state whether Durkin had ever been canceled by a company.  Am. Compl. ¶ 14.  In response to Question 19, Durkin represented that it had never been canceled by a company.  Id. at ¶ 15; see also Agency Questionnaire p. 2.  First Sealord alleges that it "relied upon the Agency Questionnaire and the representations and warranties made by [Durkin] therein in its determination to execute the Agency Agreement and to appoint [Durkin] as its agent to solicit business for the surety bond products offered by First Sealord."  Am. Compl. ¶ 18.

First Sealord alleges that Durkin's responses to the above questions were inaccurate. Specifically, First Sealord contends that Durkin: (i) failed to identify other surety companies it had represented, including St. Paul Fire and Marine Insurance Company; (ii) failed to disclose that St. Paul allegedly revoked Durkin's powers of attorney in 2004; (iii) failed to disclose a claim asserted by St. Paul against Durkin relating to an alleged unauthorized bond; and (iv)

failed to disclose that St. Paul had canceled Durkin as its agent.  <u>Id.</u> at ¶ 48; <u>see also</u> <u>id.</u> at ¶¶ 29-30.  First Sealord alleges that Durkin acted negligently in responding to the Agency Questionnaire because Durkin knew or should have known that each of its responses to questions 16-19 were false when made.  <u>Id.</u> at ¶ 49.  First Sealord asserts that these misrepresentations were meant to induce First Sealord into entering into an agency relationship with Durkin and that First Sealord's reliance upon Durkin's responses to the Agency Questionnaire was justifiable.  <u>Id.</u> at ¶ 50-51.  First Sealord also argues that, had it known at the time it entered the Agency Agreement that St. Paul had previously claimed that Durkin had issued unauthorized bonds and that St. Paul had revoked Durkin's power of attorney and canceled Durkin as its agent, First Sealord would not have entered into the Agency Agreement or appointed Durkin its agent to solicit business.  <u>Id.</u> at ¶ 52.

In support of these contentions, First Sealord avers the following facts.  In 1998, Durkin entered into an agency agreement with St. Paul, another surety company.  <u>Id.</u> at ¶ 24.  Under that agreement, which became effective January 1, 1999, Durkin was authorized to issue surety bonds for St. Paul.  <u>Id.</u>  Pursuant to the St. Paul Agreement, on May 7, 2003, St. Paul issued a power of attorney to Durkin.  <u>Id.</u> at ¶ 25.  During 2002, 2003 and the first part of 2004, Durkin represented St. Paul as an agent for purposes of soliciting business for the surety bond products offered by St. Paul.  <u>Id.</u> at ¶ 26.  In April or May 2004, a dispute arose between Durkin and St. Paul regarding a Performance Bond issued by Durkin securing the performance by Eastern Contractors, Inc. of a construction contract with the City of Lawrence, Massachusetts.  <u>Id.</u> at ¶ 27.  The Lawrence Bond, which was issued by Durkin sometime in November or December 2003, was in the amount of $77,252,000.00.  <u>Id.</u>  By letter dated May 3, 2004 addressed to Thomas P. Durkin, Durkin's managing partner, a St. Paul Senior Vice President advised Durkin of St. Paul's

position that the Lawrence Bond had been issued without St. Paul's authority. <u>Id.</u> at ¶ 28. Specifically, the letter advised that there had been explicit approval conditions associated with approval of the Lawrence Bond that had not been satisfied prior to the bond issuance. <u>Id.</u>[1] By letter dated May 6, 2004, Thomas Durkin responded to St. Paul addressing, among other issues, the explicit approval conditions set by St. Paul regarding the City of Lawrence Performance Bond. <u>Id.</u> at ¶ 29.[2] First Sealord contends that as of the date of this letter, at the latest, Durkin understood that St. Paul was claiming that the Lawrence Bond was unauthorized. <u>Id.</u>

Moreover, First Sealord asserts that on or around June 30, 2004, as a result of Durkin's unauthorized issuance of the Lawrence Bond, and on other grounds, St. Paul revoked and terminated Durkin's power of attorney. <u>Id.</u> at ¶ 30. First Sealord contends that neither the fact of Durkin's representation of St. Paul during the 2002 to 2004 timeframe nor the facts surrounding St. Paul's claim that Durkin issued an unauthorized bond nor the alleged subsequent termination of Durkin's power of attorney by St. Paul were "disclosed to First Sealord prior to First Sealord's execution of the Agency Agreement with Durkin or reflected in Durkin's responses to the Agency Questionnaire." <u>Id.</u> at ¶ 31. Finally, First Sealord states that St. Paul ultimately filed suit against Durkin in the United States District Court for the District

---

[1] A copy of St. Paul's letter to Durkin dated May 3, 2004 was attached to the Amended Complaint as Exhibit 3.

[2] A copy of Durkin's letter to St. Paul dated May 6, 2004 was attached to the Amended Complaint as Exhibit 4.

of Massachusetts asserting causes of action for breach of contract, negligence, breach of fiduciary duty, contractual indemnity and common law indemnity.  Id. at ¶ 32.[3]

C. The H & S Bonds

In October 2005, after appointing Durkin as its agent, First Sealord alleges that Durkin contacted First Sealord about H & S, a utility construction firm located in Massachusetts, as a potential client.  Id. at ¶ 34; see also Def.'s Statement of Undisputed Material Facts, p. 4. Allegedly touting H & S's financial strength, Durkin "aggressively sought performance and payment bonds for H & S' projects from First Sealord."  Am. Compl. ¶ 35.  "As part of its duties as First Sealord's agent, [Durkin] provided information concerning [H & S] to First Sealord to be used by First Sealord in conjunction with making determinations whether to issue bonds for [H & S.]"  Pl.'s Opp. Br. (ECF No. 44) p. 6.  First Sealord issued bid bonds and payment bonds for H & S beginning in November 2005 with the last one being issued in September 2008.  Id. Beginning in July 2006, First Sealord began to receive claims against bonds that it had issued for H & S.  Id.; see also Barbour Decl. Ex. D.

First Sealord alleges that Durkin

> at all times provided an optimistic picture of H & S' financial well-being to First Sealord, including its cash flow and work in progress.  At no time during these three years did [Durkin] present any negative information to First Sealord with regard to H & S' finances or ability to perform under its bonded contracts.

Am. Compl. ¶ 36.  First Sealord further alleges that despite Durkin's "repeated assurances as to the financial health and strength of H & S, H & S frequently defaulted on projects bonded between 2006 and 2007 by First Sealord."  Id. at ¶ 38.  Additionally, "[d]espite mounting

---

[3] Copies of St. Paul's First Amended Complaint and Durkin's Answer in the Massachusetts litigation were attached as exhibits 5 and 6 to First Sealord's Amended Complaint.

9

claims against H & S and a declining financial situation, [Durkin] continued to request that First Sealord issue additional bonds on behalf of H & S." Id. at ¶ 41. First Sealord alleges that as a result of Durkin's misrepresentations it suffered losses in connection with the H & S bonds. Id. at ¶ 54. It is these losses that are First Sealord's claimed damages in the instant litigation.

Durkin contends that in August 2007 "First Sealord began to receive an increasing number of payment claims against bonds issued to H & S" and that on "August 21, 2007 Durkin advised First Sealord that H & S was two months behind its prior cash flow projections." Def.'s Statement of Undisputed Material Facts (ECF No. 38), p. 7.[4] "On September 4, 2007, First Sealord placed the H & S bonds on hold pending some resolution of the claims activity as well as the completion of an interim financial statement." Id. Despite this action, sometime in September 2007, First Sealord approved a bid bond for H & S on a construction project and subsequently approved a final performance bond for the project on December 17, 2007. Id. at 8. On November 16, 2007 Durkin forwarded to First Sealord an interim financial statement prepared by McGladrey, an independent accounting firm, on behalf of H & S. Id. at 7. In March 2008, First Sealord placed H & S in "jobs control," meaning that contractors in H & S projects were "directed to send payment on H & S contracts directly to First Sealord to be held in escrow, and First Sealord would in turn pay claims and other job-related expenses on behalf of H & S out of the escrowed funds." Id. at 8.

Despite being First Sealord's agent, on April 30, 2008, Durkin sent a letter to an attorney describing the interactions between First Sealord and H & S, asserting that H & S was

---

[4] In support of these statements, Durkin submits excerpts of deposition testimony of Matthew Swanick, a First Sealord underwriter and one of two witnesses produced by First Sealord in May 2012 pursuant to Federal Rule of Civil Procedure 30(b)(6). See e.g., Def.'s Statement of Undisputed Material Facts, p. 7.

proceeding under "the duress of a funds control arrangement" imposed by First Sealord which "effectively precludes [H & S's] ability to successfully satisfy [its] suppliers and places [it] in jeopardy of defaulting on [its] bank loan." See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Dec., Ex. E, p. 1. In the letter Durkin further stated that

> the issue involves [First Sealord's] apparent takeover of a company which was not in default of any of its contracts. . . . At this point [H & S] has been hobbled by [First Sealord] even though [H & S] was not in violation of any of the contracts which remain outstanding. . . . I think a great deal has gone wrong here with the way [First Sealord] approached the entire situation. . . . [There] appears to be merit for [legal action] against [First Sealord's] claims department. They refuse to cooperate with me as [H & S's] agent in order to achieve a successful resolution of this matter.

Id. at p. 2.

I will begin by addressing Durkin's motion to dismiss the negligent misrepresentation claim, next review Durkin's motion to quash the St. Paul subpoena, and conclude by deciding the merits of Durkin's motion for summary judgment as to First Sealord's breach of contract and breach of fiduciary duty claims.

## II. Durkin's Motion to Dismiss the Negligent Misrepresentation Claim in the Amended Complaint

Durkin has moved to dismiss the negligent misrepresentation claim amended to the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and argues that: 1) there were no misrepresentations in its responses to the Agency Questionnaire, 2) that, even if there were misrepresentations, First Sealord cannot demonstrate that these misrepresentations were the proximate cause of the H & S bond issuance, which Durkin characterizes as the "relevant loss" in the case, 3) that the claim is barred by Pennsylvania's economic loss doctrine, and 4) that the claim is barred by the statute of limitations. See Def.'s Mot. Dismiss p. 9-22.

A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss all or part of an action for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  Typically, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," though plaintiff's obligation to state the grounds of entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true (even if doubtful in fact)."  Id. (citations omitted).  The complaint must state "'enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 321 (3d Cir. 2008), quoting Twombly, 550 U.S. at 556.  The Court of Appeals has made clear that after Ashcroft v. Iqbal, 556 U.S. 662 (2009), "conclusory or 'bare-bones' allegations will no longer survive a motion to dismiss: 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'  To prevent dismissal, all civil complaints must now set out 'sufficient factual matter' to show that the claim is facially plausible."  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009), quoting Iqbal, 556 U.S. at 678.  The Court also set forth a two part-analysis for reviewing motions to dismiss in light of Twombly and Iqbal:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief."

Id. at 210-11, quoting Iqbal, 556 U.S. at 679.  The Court explained "a complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts."  Id., citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008).  At the 12(b)(6) phase, I must also accept as true all well-pled factual allegations as well as all reasonable inferences that can be drawn from them, and construe those allegations in the light most favorable to the plaintiff.  Mayer v. Belichick, 605 F.3d 223, 229-30 (3d Cir. 2010).  However, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–that the pleader is entitled to relief.'"  Iqbal, 556 U.S. at 679.

B.  <u>First Sealord Has Stated a Claim for Negligent Misrepresentation</u>

Under Pennsylvania law, a common law negligent misrepresentation claim has four elements: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and 4) which results in injury to a party acting in justifiable reliance on the misrepresentation."  Smith v. Lincoln Ben. Life Co., 395 F. App'x 821, 824 (3d Cir. 2010), citing Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 277 (2005).

To establish liability

> under Section 552 of the Restatement (Second) of Torts a plaintiff must show, pursuant to subsection (1), that: the defendant is in the business of supplying information for the guidance of others and the information provider must have a pecuniary interest in the transaction; the information provided is false; the information was justifiably relied upon; and the defendant failed to exercise reasonable care in obtaining or communicating the information.  Subsection (2) serves to limit the scope of such liability to those persons (a) the information provider knows exist, (b) who are contemplating a specific commercial transaction the information provider knows about, and (c) whom the information provider intends to influence in that transaction by using the provider's information.

Excavation Techs. Inc. v. Columbia Gas Co. of Pa., 936 A.2d 111, 115-16 (Pa. Super. Ct. 2007),

aff'd, 985 A.2d 840 (2009).[5]  Liability extends only to injuries suffered by those who justifiably

rely on information and whose reliance the defendant could have reasonably foreseen.  See Bilt–

Rite, 866 A.2d at 286–87.  Finally, plaintiff must show causation, that is, that the

misrepresentations were a substantial factor in causing the harm.  Id. at 280; see also

Restatement (Second) of Torts § 433 (1965).

       *i.*     *Misrepresentations of Material Fact*

     In the complaint First Sealord alleges Durkin made material misrepresentations in its

responses to four questions in the Agency Questionnaire, the document Durkin filled out prior to

becoming First Sealord's agent.  Specifically, First Sealord contends that: 1) Durkin failed to

disclose the identity of all surety companies it represented in 2002-2004; 2) Durkin did not

disclose that Durkin had previously had its power of attorney revoked; 3) Durkin failed to reveal

that Durkin had previously had claims made against it concerning unauthorized bonds or misuse

of powers of attorney; and 4) Durkin misrepresented that the agency had never been canceled by

a company.  Am. Compl. ¶¶ 8-15, 48.

     In support of these allegations, First Sealord has attached to the amended complaint

materials that establish that in May 2004 a dispute arose between Durkin and St. Paul, a surety

that Durkin represented at the time, over whether a particular bond had been issued without St.

---

     [5] There is no apparent conflict between the elements of the common law tort and the
elements in Section 552 of the Restatement (Second) of Torts.  See e.g. Teledyne Technologies
Inc. v. Freedom Forge Corp., No. 3398 May Term 2000, 2002 WL 748898, at *9 (Pa. Ct. Com.
Pl. Phila. Cnty. Apr. 19, 2002).  However, the Bilt-Rite and Excavation Technologies decisions
clarify that negligent misrepresentation claims brought against those in the business of supplying
information to others for pecuniary gain are exempt from the economic loss doctrine.  Bilt-Rite,
581 Pa. at 471, 866 A.2d at 287 ("We emphasize that we do not view Section 552 as supplanting
the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the
tort as it applies to those in the business of providing information to others.").

Paul's authorization.  See Am. Compl. Ex. 3.  First Sealord also attaches a complaint filed by St. Paul against Durkin in the United States District Court for the District of Massachusetts which asserts that Durkin issued bonds without St. Paul's knowledge or authorization.  See Am. Compl. Ex. 5 ¶¶ 14-17.  In that complaint, St. Paul alleged that "as a result of Durkin's unauthorized issuance of the Project Bonds, and failure to report the Project Bonds and remit the premium, St. Paul terminated Durkin's Power-of-Attorney."  Id. at ¶ 20.  First Sealord also attaches Durkin's answer to St. Paul's complaint, in which Durkin denies that the bonds were unauthorized but admits that St. Paul "terminated [Durkin's] Power-of-Attorney in or around June 30, 2004."  Am. Compl. Ex. 6 ¶ 20.[6]  First Sealord also appends a letter dated May 3, 2004 to its complaint from St. Paul to Durkin which expresses concerns that Durkin had issued a bond without notifying St. Paul and without St. Paul's "explicit approval conditions" in October 2003.  See Am. Compl. Ex. 3.  First Sealord argues that as of the date of this letter, at the latest, Durkin understood that St. Paul was claiming that the Performance Bond issued to the City of Lawrence was unauthorized.  Am. Compl. ¶ 29.

These materials establish that St. Paul claimed that Durkin issued unauthorized bonds, and that it is plausible that St. Paul canceled its agency relationship with Durkin and terminated Durkin's power of attorney on or around June 30, 2004 and prior to the execution of the Agency Agreement between First Sealord and Durkin.  Thus, First Sealord has plausibly shown that Durkin made misrepresentations in its responses to the Agency Questionnaire.

---

[6] Durkin contends however that "[t]he pleading submitted in the St. Paul litigation was prepared by counsel and incorrect."  See Def.'s Reply in Support of Mot. to Dismiss, p. 4. (ECF No. 48).  While this may be true, I note that Durkin in its amended answer in the Massachusetts litigation, filed approximately 14 months after its initial answer, also admitted that "[St. Paul] terminated [Durkin's] Power-of-Attorney in or around June 30, 2004."  See St. Paul v. Durkin, No. 07-10096 (D. Mass), Dkt. No. 27, Def.'s Am. Answer to Pl.'s First Am. Compl.

  ii.  *Durkin Ought to Have Known Whether Questionnaire Responses Were Accurate*
      *and that First Sealord Would Rely on Durkin's Responses in Deciding to Appoint*
      *Durkin at Its Agent*

    Durkin knew whether its responses to the Agency Questionnaire were accurate, and that

First Sealord was basing its decision to enter into the Agency Agreement with Durkin in part on

the responses to the Agency Questionnaire and because Durkin certified that the responses in the

questionnaire were accurate.  See Am. Compl. ¶ 50; see also Barbour Decl. Ex. A, "Agency

Questionnaire," p. 2 (in which Durkin certified that "I have reviewed the information contained

in the questionnaire, and to the best of my knowledge I am not aware of any discrepancies or

inaccuracies.").  These facts support the inference that First Sealord was relying on the

questionnaire responses in its decision to appoint Durkin as its agent.  See also Supplemental

Barbour Decl., Ex. B, ECF No. 52, Mucchetti Dep. 247:22-248:11 ("when we get the

information back, for example, the agency history questions, we're relying on the accuracy of

those questions in appointing the agent."); see also id. at 251:15-17 ("If [Durkin] checked off yes

to having [its] powers revoked, we wouldn't have appointed [it]."); and id. at 279:2-281:11

(stating that truthfulness of the agent was a substantial factor in First Sealord's decision to trust

the agent to issue bonds on its behalf and that if First Sealord had discovered that an agent had

been accused of issuing an unauthorized bond or had its powers of attorney revoked First Sealord

would have "issued a termination").

  iii.  *First Sealord's Reliance on the Answers in the Questionnaire was Justified*

    Finally, the materials appended to First Sealord's amended complaint also support the

inference that First Sealord's reliance was justified, as Durkin certified that its responses to the

Agency Questionnaire were accurate.  The questionnaire was being submitted for the purpose of

having Durkin appointed as First Sealord's agent, a fiduciary relationship that requires candor

and trust, and thus Durkin's responses and any inaccuracies contained within, whether deliberate

or negligent, plausibly had an impact on First Sealord's decision to enter into the agency

relationship with Durkin.

>    iv.    *First Sealord Has Established That Durkin's Misrepresentations Were A
>    Substantial Factor in Causing First Sealord's Losses*

Proximate cause is an essential element of First Sealord's negligent misrepresentation

claim.  <u>Allegheny Gen. Hosp. v. Philip Morris, Inc.</u>, 228 F.3d 429, 445 (3d Cir. 2000).  In

determining whether Durkin's alleged acts or omissions can be considered the proximate cause

of First Sealord's harm, I must ascertain whether the "defendant's acts or omissions were a

'substantial factor' in bringing about the plaintiff's harm."  <u>Bouriez v. Carnegie Mellon Univ.</u>,

585 F.3d 765, 772 (3d Cir. 2009), <u>citing</u> <u>First v. Zem Zem Temple</u>, 454 A.2d 18, 21 n.2 (Pa.

1996).  In evaluating whether an act or omission is a substantial factor in causing a harm

Pennsylvania courts consider:

> a) the number of other factors which contribute in producing
> the harm and the extent of the effect which they have in producing
> it;
>
> b) whether the actor's conduct has created a force or series of
> events which are in continuous and active operation up to the time
> of the harm, or has created a situation harmless unless acted upon
> by other forces for which the actor is not responsible; and
>
> c) lapse of time.

<u>Bouriez</u>, 585 F.3d at 772, <u>quoting</u> Restatement (Second) of Torts § 433 (1965).  Although § 433

of the Restatement instructs courts to consider the effect of "other factors" on a plaintiff's alleged

injury, it is well established that a "substantial factor need not be . . . the only factor" in bringing

about the relevant harm.  <u>Bouriez</u>, 585 F.3d at 772.

17

The questions relevant to First Sealord's negligent misrepresentation claim are not whether Durkin's misrepresentations were a substantial factor in causing the issuance of the H & S bonds, but 1) whether the misrepresentations were a substantial factor in causing First Sealord's entrance into the agency relationship with Durkin, and 2) whether the entrance into that agency relationship was a substantial factor in First Sealord's subsequent losses.  I find that the complaint and its appended materials constrain me to answer each question in the affirmative.  It was foreseeable that Durkin's responses to questions as to whether it had ever been canceled by a client, had its power of attorney revoked by a client, or been involved with litigation or claims concerning unauthorized bond issuance or misuse of power of attorney would be a substantial factor in First Sealord's decision to appoint Durkin as an agent.  See Supplemental Barbour Decl., Dkt. No. 52, Ex. B, Mucchetti Dep. 247:22-248:11, 251:15-17, 279:2-281:11, quoted supra in section II(b)(ii).

Applying the Restatement factors, I also conclude that parties' entrance into the agency relationship was a substantial factor in causing the harm.  "An agency relationship is a fiduciary one, and the agent is subject to a duty of loyalty to act only for the principal's benefit."  Basile v. H & R Block, Inc., 761 A.2d 1115, 1120 (Pa. 2000).  Durkin, as First Sealord's agent, was required to "act with the utmost good faith in furthering and advancing the principal's interests."  Health Robotics, LLC v. Bennett, No. 09-0627, 2009 WL 5033966, at *4 (E.D. Pa. Dec. 22, 2009), quoting Basile v. H & R Block, Inc., 761 A.2d at 1120.  Durkin's initial misrepresentations thus "created a force or series of events which are in continuous and active operation up to the time of the harm" because the misrepresentations contributed to Durkin's appointment as First Sealord's agent and, as a fiduciary, Durkin was required to act for the benefit of First Sealord over the course of the agency relationship.  Restatement (Second) of

Torts § 433 (1965).  The communications between First Sealord and Durkin alleged in the

complaint suggest that Durkin played an ongoing role in First Sealord's decision to issue bonds

to H & S.  While it is true that some time passed before the bonds that caused First Sealord's

losses were issued, and that other factors contributed to H & S's solvency and cash flow

problems, First Sealord alleges that Durkin's representations about H & S made after becoming

First Sealord's agent were a substantial factor in First Sealord's decision-making.  See Pl.'s Opp.

to Def.'s Mot. Dismiss (ECF No. 46), p. 22.  Because Durkin was applying to be a fiduciary in

its responses to the Agency Questionnaire and its responses there resulted in Durkin being

appointed First Sealord's agent, and given that the issue of causation being one better and

typically resolved by juries, see e.g. Hamil v. Bashline, 392 A.2d 1280, 1284-85 (Pa. 1978),  I

find that First Sealord has submitted sufficient materials to show that Durkin's representations on

the Agency Questionnaire plausibly were a substantial factor in First Sealord's decision to

appoint Durkin as its agent, and in First Sealord's subsequent decision to issue bonds to H & S,

and thus First Sealord has sufficiently alleged proximate causation to state a claim for negligent

misrepresentation.

   C.   First Sealord's Negligent Misrepresentation Claim is Not Barred by Pennsylvania's
        Economic Loss Doctrine

      Durkin argues that even if First Sealord can state a claim for negligent misrepresentation

such a claim is barred by Pennsylvania's economic loss doctrine.  I disagree.  "The economic

loss doctrine 'prohibits plaintiffs from recovering in tort economic losses to which their

entitlement flows only from a contract.'"  Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d

Cir. 2002), quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir.

1995).  It provides that "no cause of action exists for negligence that results solely in economic

damages unaccompanied by physical or property damages."  Howe v. LC Philly, LLC, No. 10-

5495, 2011 WL 1465446, at *5 (E.D. Pa. Apr. 15, 2011), citing Duquesne Light Co., 66 F.3d at

618.  The purpose of the economic loss doctrine is "to prevent claims based in tort that only

allege economic losses [from] proceeding, in part because those losses can be compensated

through contract remedies."  Howe, 2011 WL 1465446, at *5 (quotation and citation omitted.[7]

"Unfortunately, there is much confusion in the Pennsylvania cases as to the scope and breadth of

the economic loss doctrine."  Zwiercan v. Gen. Motors Corp., 58 Pa. D. & C. 4th 251 (Pa. Ct.

Com. Pl. Phila. Cnty. 2002).  The parties here agree that there are exceptions to this doctrine, but

disagree as to the scope and application of those exceptions to this case.

     Durkin argues that in Bilt-Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d

270 (Pa. 2005), "the Pennsylvania Supreme Court has carved out a limited exception to the

[economic loss] doctrine for negligent misrepresentation claims . . . that exception is very

narrowly limited to design professionals in construction cases and does not apply here."  Def's

Mot. Dimiss. Br. p. 19.  This argument misinterprets the scope of the holding in Bilt-Rite, which

permits the type of negligent misrepresentation claim advanced by plaintiffs to proceed.  Bilt-

Rite, 866 A.2d at 288 ("[W]e hold that the economic loss rule does not apply to claims of

negligent misrepresentation sounding under Section 552.").  In Bilt-Rite, the Pennsylvania

Supreme Court allowed a negligent misrepresentation claim brought by a contractor against an

architecture firm to proceed when the contractor's reliance on misrepresentations by the firm

---

    [7] "The Supreme Court [first] adopted the doctrine in an admiralty products liability case,
holding that 'a manufacturer in a commercial context has no duty under either negligence or
strict-liability theory to prevent a product from injuring itself.'"  Werwinski, 286 F.3d at 671,
quoting East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871 (1986).  Though
it recognized the need for products liability law to protect consumers from dangerous products,
the Court expressed concern that if products liability remedies "were to progress too far, contract
law would drown in a sea of tort."  Werwinski, 286 F.3d at 671, quoting East River S.S. Corp.,
476 U.S. at 866.

during the bidding process for a construction project caused the contractor solely economic

losses.  Id. at 272.  In doing so, the Court adopted

> Section 552 [of the Second Restatement of Torts] as the law in
> Pennsylvania in cases where information is negligently supplied by
> one in the business of supplying information . . . and where it is
> foreseeable that the information will be used and relied upon by
> third persons, even if the third parties have no direct contractual
> relationship with the supplier of information.  In so doing, we
> emphasize that we do not view Section 552 as supplanting the
> common law tort of negligent misrepresentation, but rather, as
> clarifying the contours of the tort as it applies to those in the
> business of providing information to others.

Id. at 287.[8]  The Court explained that "Section 552 sets forth the parameters of a duty owed

when one supplies information to others, for one's own pecuniary gain, where one intends or

---

[8] First Sealord appears to argue against its own interest when it asserts that the Bilt-Rite exception only applies "in limited circumstances where a party relies on the representations of a third party with whom it has no contractual relationship."  Pl.'s Opp. Br. (ECF No. 46) p. 34. This too reads the Bilt-Rite exception too narrowly.  The section of the Restatement regarding negligent misrepresentation which the Bilt-Rite Court adopts makes no mention of limiting potential plaintiffs to third parties who are not in privity with the defendant.  In pertinent part, Restatement 552 states:

> (1) One who, in the course of his business, profession or employment, or in any other
> transaction in which he has a pecuniary interest, supplies false information for the
> guidance of others in their business transactions, is subject to liability for pecuniary loss
> caused to them by their justifiable reliance upon the information, if he fails to exercise
> reasonable care or competence in obtaining or communicating the information.

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to
> loss suffered

> > (a) by the person or one of a limited group of persons for whose benefit and
> > guidance he intends to supply the information or knows that the recipient intends
> > to supply it; and

> > (b) through reliance upon it in a transaction that he intends the information to
> > influence or knows that the recipient so intends or in a substantially similar
> > transaction.

Restatement (Second) of Torts § 552 (1977).  The Court of Appeals, in recognizing that Pennsylvania has "carved out an exception to the economic loss doctrine for claims of negligent misrepresentation asserted pursuant to Section 552 of the Restatement (Second) of Torts" has stated that

> Pennsylvania has not limited the applicability of the economic loss doctrine to situations in which the parties are bound by a contractual relationship or are otherwise in privity with one another.  Rather, . . . Pennsylvania's economic loss doctrine may apply even in the absence of a contractual duty.

Bouriez v. Carnegie Mellon Univ., 430 F. App'x 182, 187 (3d Cir. 2011); see Azur v. Chase Bank, 601 F.3d 212, 223–24 (3d Cir. 2010) (stating "contention that the Bilt-Rite exception encompasses all cases in which the plaintiff has no contractual remedy is without support"); Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 180 (3d Cir. 2008) (explaining that Bilt-Rite's application is not limited to situations in which "plaintiff has no available contract remedy"); see also Am. Stores Props., Inc. v. Spotts, Stevens & McCoy, Inc., 648 F. Supp. 2d 707, 713 (E.D. Pa. 2009) (collecting cases and noting that "controlling Federal and Pennsylvania state law hold that privity of contract is not required for application of the economic loss doctrine to [ ] negligence claims" and holding that "Bilt–Rite does not preclude the application of the economic loss doctrine to all negligent or tortious conduct alleged against parties involved in a construction project.  Its holding only applies to a claim for negligent misrepresentation under Section 552 of the Restatement (Second) of Torts (1977)."); Excavation Techs., Inc. v. Columbia Gas Co. of Pa., 985 A.2d 840, 843 (2009) ("privity was not a prerequisite for maintaining an action under § 552, and since there is no privity requirement, 'the economic loss rule does not apply to claims of negligent misrepresentation sounding under Section 552.'"), quoting Bilt-Rite, 866 at 288.

Additionally, both parties agree that "there is a limited fraudulent inducement exception to the economic loss doctrine.  It only applies if the fraud is extraneous to and not interwoven with the alleged breach of contract."  Def's Reply Br. (ECF No. 48), p 12., citing Werwinski, 286 F.3d at 676; see also Pl.'s Opp. Br. (ECF No. 46), p. 29, citing Werwinski 286 F.3d at 676-77 ("The first exception [to the economic loss doctrine] applies to claims of fraud in the inducement or negligent misrepresentation where one party fraudulently or negligently induces another party to enter into a contract, and the fraudulent/negligent misrepresentation claim arises independent of the underlying contract.").  In discussing this exception, however, the parties seem to misinterpret dicta in Werwinski in which the Court of Appeals discusses reasoning from other jurisdictions articulating exceptions to the economic loss doctrine for fraud in the inducement claims.  See Werwinski, 286 F.3d at 676 (in reviewing other decisions considering exceptions to the economic loss doctrine the Court of Appeals stated "we find most persuasive the well-developed federal and state case law interpreting Michigan and Wisconsin law regarding the economic loss doctrine.  We particularly are influenced by an emerging trend in these and other jurisdictions 'recogniz[ing] a limited exception to the economic loss doctrine for fraud claims, but only where the claims at issue arise independent[ly] of the underlying contract.' Raytheon Co. v. McGraw-Edison Co., Inc., 979 F. Supp. 858, 870 (E.D. Wis. 1997).  The

knows that the information will be used by others in the course of their own business activities."

Id. at 285-86.[9]  In subsequent discussion of the Bilt-Rite exception, the Pennsylvania Supreme

---

leading case is Huron Tool & Engineering Co. v. Precision Consulting Services, Inc., 209 Mich. App. 365, 532 N.W.2d 541, 545 (1995), in which a Michigan state appellate court recognized an exception for fraud-in-the-inducement claims, but only if the fraud is "extraneous to the contract," not "interwoven with the breach of contract.").

        Despite this discussion of the exception embraced by other jurisdictions, the Werwinski Court ultimately did not adopt an exception to the economic loss doctrine for fraudulent inducement claims.  Rather the Court of Appeals held:

> The economic loss doctrine is designed to place a check on
> limitless liability for manufacturers and establish clear boundaries
> between tort and contract law.  Carving out an exception for
> intentional fraud would eliminate that check on liability and blur
> the boundaries between the two areas of law, thus exposing
> manufacturers to substantially greater liability.  In light of these
> realities, we select the path that limits liability by rejecting
> appellants' request for an intentional fraud exception.  Based on
> these reasons, we believe the district court correctly applied the
> economic loss doctrine to appellants' fraudulent concealment
> claims.

Werwinski, 286 F.3d at 680-81.  Thus, Werwinski provides no support for an exception to the economic loss doctrine for fraudulent concealment claims.

        First Sealord also argues that in Werwinski the Court of Appeals stated that there is no reason to treat fraud in the inducement claims differently from negligent misrepresentation claims for purposes of the economic loss doctrine.  Pl.'s Opp. Br. (ECF No. 46), p. 30 n.4, citing Werwinski 286 F.3d at 676-77.  Because I find that the Bilt-Rite exception applies in this case and that Werwinski is not controlling, I need not resolve whether negligent and intentional misrepresentation claims are treated identically for the purposes of the economic loss doctrine.

        [9] The Pennsylvania Supreme Court continued:

> Indeed, to apply the economic loss doctrine in the context of a
> Section 552 claim would be nonsensical: it would allow a party to
> pursue an action only to hold that, once the elements of the cause
> of action are shown, the party is unable to recover for its losses.
> Thus, we hold that the economic loss rule does not apply to claims
> of negligent misrepresentation sounding under Section 552.

Bilt-Rite, 866 A.2d at 288.  In extending liability to those information providers who supply such information for pecuniary gain "the Pennsylvania Supreme Court never suggested that it

Court clarified that the Bilt-Rite holding imposes liability upon parties "in the business of providing information for pecuniary gain."  See Excavation Techs., Inc. v. Columbia Gas Co. of Pa., 985 A.2d 840, 843 (Pa. 2009) (holding that plaintiff's complaint alleging negligent misrepresentation "fails to state a claim within the parameters of Section 552(1) and (2) because [defendant, a utility facility owner,] is not a defendant who is akin to the architect in Bilt-Rite who was a professional information provider.  The relationship between utilities and contractors bears no resemblance to the relationships discussed in Bilt-Rite. . . [and a] facility owner . . . does not engage in supplying information to others for pecuniary gain.").

Here, Durkin, like the architectural firm in Bilt-Rite, "engages in supplying information to others for pecuniary gain," Azur v. Chase Bank, 601 F.3d 212, 223-24 (3d Cir. 2010), quoting Bilt-Rite, 866 A.2d at 286, and "enjoys an economic benefit from providing accurate information about" its history with other clients, Excavation Techs., 985 A.2d at 842.  Durkin plainly also has a pecuniary interest in being appointed First Sealord's agent and collecting premiums on the bonds that it intermediates.  The Pennsylvania Supreme Court has carved out an exception to the economic loss doctrine for negligent misrepresentation claims brought by third parties against information suppliers where it is foreseeable that the information supplied will be used and relied upon.  Bilt-Rite, 866 A.2d at 287.  I find that given that holding it follows a fortiori that First Sealord, whose reliance was also foreseeable and to whom the alleged misrepresentations were made directly by Durkin, is a proper plaintiff and that that Durkin is a proper defendant within the exception to the economic loss doctrine for claims of negligent misrepresentation contemplated in Bilt-Rite and clarified in Excavation Technologies.

---

intended to severely weaken or undermine the economic loss doctrine. . . .  It simply carved out a narrow exception when losses result from the reliance on the advice of professionals."
Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 177-78 (3d Cir. 2008).

   D.   First Sealord's Negligent Misrepresentation Claim is Not Barred by the Statute of
        Limitations

       Durkin argues that First Sealord's negligent misrepresentation claim is barred by the

statute of limitations.  I disagree.  The statute of limitations for any action to recover damages for

injury to person or property which is founded on negligent, intentional, or otherwise tortious

conduct or any other action or proceeding sounding in trespass is two years.  Toy v. Metro. Life

Ins. Co., 928 A.2d 186, 193 (2007), citing 42 Pa. Cons. Stat. Ann. § 5524(7).  This two-year

limitations period begins to run from the time the cause of action accrues, that is, "as soon as the

right to institute and maintain a suit arises, which generally is when the injury was inflicted."

Drelles v. Mfr. Life Ins. Co., 881 A.2d 822, 831 (Pa. Super. 2005), citing Fine v. Checcio, 870

A.2d 850, 857 (Pa. 2005).  While "mistake, misunderstanding, or lack of knowledge . . . do not

toll the running of the statute," however, the discovery rule can toll the limitations period where

"the injury or its cause was neither known nor reasonably knowable."  Drelles, 881 A.2d at 831,

citing Fine, 870 A.2d at 857-58.  In other words, the discovery rule applies to toll the statute of

limitations where an injured party is unable "despite the exercise of reasonable diligence, to

know that he has been injured and by what cause."  Drelles, 881 A.2d at 831, citing Fine, 870

A.2d at 858.

       Reasonable diligence as used in the discovery rule means "a reasonable effort to discover

the cause of an injury under the facts and circumstances present in the case,"  Toy v. Metro. Life

Ins. Co., 863 A.2d 1, 7 (Pa. Super. Ct. 2004), quoting Crouse v. Cyclops Indus., 745 A.2d 606,

611 (Pa. 2000), where the party "has been given reason to inform himself of the facts upon

which his right to recovery is premised."  Drelles, 881 A.2d at 831, citing Fine, 870 A.2d at 858.

While there "are very few facts which diligence cannot discover . . . there must be some reason

to awaken inquiry and direct diligence in the channel in which it would be successful."  Toy, 863

A.2d at 7, quoting Crouse, 745 A.2d at 611.  Although reasonable diligence is an objective

standard, the analysis must "take into account the differences between persons and their capacity

to meet certain situations and the circumstances confronting them at the time in question."  Toy,

863 A.2d at 7, quoting Crouse, 745 A.2d at 611.

> Durkin argues that First Sealord admits in its Amended Complaint that

>> Durkin identified St. Paul as a surety company as to which it had
>> placed bonds for H & S before turning to First Sealord.  Durkin's
>> cover letter submitted to First Sealord with the H & S Contractor
>> Questionnaire in October 2005 stated that Durkin had represented
>> H & S since its inception in 2002, and that 'H & S was bonded' by
>> St. Paul before St. Paul was taken over by another surety company.

Def's Mot. Dismiss (ECF No. 40) p. 19; see also Torkelson Decl., Ex. I.  The contractor

questionnaire is not before the Court.  Durkin argues that this letter constitutes a disclosure of

Durkin's relationship with St. Paul that "would have led it to conduct an independent

investigation" and thus "any effort to bring a misrepresentation claim expired in 2007."  Def's

Mot. Dismiss (ECF No. 40) p. 19.  I disagree.  While the October 25, 2005 letter does express

optimism about H & S's financial outlook and describe H & S's prior relationship with St. Paul

("H & S was bonded by St. Paul until Travelers took them over and then with Acadia") the letter

says nothing about Durkin's relationship with St. Paul, which is the subject of the alleged

misrepresentations.  See Torkelson Decl., Ex. I.  Moreover nothing in the letter would suggest to

First Sealord that St. Paul terminated Durkin's power of attorney, canceled Durkin as an agent,

or made claims concerning unauthorized bond issuance or misuse of powers of attorney.  I find

nothing else in the record that arguably should have alerted First Sealord that Durkin's responses

to the Agency Questionnaire may have been inaccurate or spurred First Sealord to conduct an

independent investigation into Durkin's prior relationship with St. Paul.  Therefore, the statute of

limitations does not bar First Sealord's negligent misrepresentation claim and I will deny Durkin's motion to dismiss.

### III.      Durkin's Motion to Quash the Subpoena to St. Paul

Durkin moves to quash First Sealord's subpoena to St. Paul requesting that St. Paul produce "[a]ny and all documents and correspondence reflecting or otherwise pertaining to [Durkin] and the issuance of a Bid Bond and Performance Bond for Eastern Contractors, Inc. [and] [a]ny and all documents and correspondence reflecting or otherwise pertaining to St. Paul's agency file for [Durkin]." See Def.'s Mot. to Quash (ECF No. 49), Torkelson Decl. Ex. B.

Durkin argues that First Sealord's delay in issuing the subpoena until after the close of fact discovery is without justification and thus First Sealord's request is untimely and will require that Durkin take new discovery relating to this subpoena, which constitutes an undue burden. Def.'s Mot. to Quash (ECF No. 49) p. 6-7. Moreover Durkin contends that the subpoena seeks documents that are subject to a confidential settlement agreement that ended litigation between St. Paul and Durkin in 2007. Id. at 6. First Sealord counters that the delay will not prejudice Durkin and that Durkin first asserted that the pleading submitted in the St. Paul litigation in which Durkin admitted that St. Paul terminated Durkin's power of attorney "was prepared by counsel and incorrect" after the close of discovery and fairness requires that they be able to take discovery regarding this issue. See Pl.'s Opp. to Def.'s Mot. to Quash (ECF No. 50), p. 3, 5, quoting Def.'s Reply Br. (Dkt. No. 48) at p. 4; see also Am. Compl., Ex. 6, ¶ 20. Further First Sealord argues that the confidentiality agreement between Durkin and St. Paul, if it exists, does not bar compliance with the subpoena. Pl.'s Opp. to Def.'s Mot. to Quash (ECF No. 50), p. 4.

### A.  Standard of Review and Discussion

Rule 45 of the Federal Rules of Civil Procedure establishes the rules for discovery directed to individuals and entities that are not parties to the underlying lawsuit.  Fed. R. Civ. P. 45.  A subpoena under Rule 45 "must fall within the scope of proper discovery under Fed. R. Civ. P. 26(b)(1)."  OMS Invs., Inc. v. Lebanon Seaboard Corp., No. 08-2681, 2008 WL 4952445, at * 2 (D.N.J. Nov. 18, 2008).  Generally, "'a party does not have standing to quash a subpoena served on a third party.'"  Thomas v. Marina Assocs., 202 F.R.D. 433, 434 (E.D. Pa. 2001) (citations omitted).  "Ordinarily, only the non-parties whom were served with the subpoenas may move to have them quashed under Federal Rule of Civil Procedure 45(c)(3)(A)." Davis v. General Accident Ins. Co. of America, No. 98-4736, 1999 WL 228944, at *2 (E.D. Pa. April 15, 1999) (citations omitted).  An exception to this rule permits a party to move to quash when it "claims 'some personal right or privilege in respect to the subject matter of a subpoena duces tecum directed to a nonparty.' Id., quoting Dart Indus., Inc. v. Liquid Nitrogen Proc. Corp. of Cal., 50 F.R.D. 286, 291 (D. Del. 1970)).[10]

Rule 45(c)(3)(A) authorizes a court to quash or modify a subpoena if it  requires disclosure of privileged or other protected matter,  Fed. R. Civ. Pro. 45, if it risks "unfair prejudice to persons who are the subject of a subpoena's commands," Lefta Associates v. Hurley, No.09-2487, 2011 WL 1793265, at *2 (M.D. Pa. May 11, 2011), or subjects a party to an undue burden.  Pepsi-Cola Metro. Bottling Co., Inc. v. Ins. Co. of N. Am., Inc., No. 10-222,

---

[10] In some cases, a party's personal right or interest in the documents themselves confers standing.  Savant Sys., LLC v. Crestron Electronics, Inc., No. 12-51, 2012 WL 987404, at *3 (E.D. Pa. Mar. 22, 2012); see, e.g., New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc., No. 98–775, 2000 WL 62315, at *5 (E.D. Pa. Jan.13, 2000) (conferring party standing to challenge subpoenas issued to non-parties where it alleged personal rights in the requested documentation which contained confidential research, development and commercial information).

2011 WL 239655, at *3 (E.D. Pa. Jan. 25, 2011).[11]  However, courts have significant discretion when resolving discovery disputes.  Taggart v. Wells Fargo Home Mortg., Inc., 10-00843, 2012 WL 4462633, at *2 (E.D. Pa. Sept. 27, 2012), citing Gallas v. Supreme Court of Pa., 211 F.3d 760, 778 (3d Cir. 2000) (explaining that a trial court's discovery ruling will only be disturbed if "the court's action made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible").

A party seeking discovery bears the initial burden of demonstrating the requested discovery is relevant to its claim or defense.  Morrison v. Phila. Housing Auth., 203 F.R.D. 195, 196 (E.D. Pa. 2001).[12]  Once that initial burden is met, "the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the

---

[11] Rule 45(c)(3)(A) also authorizes the Court to quash a subpoena if it requires the production of confidential commercial information.  Pepsi-Cola Metro. Bottling Co., Inc. v. Ins. Co. of N. Am., Inc., No. 10-222, 2011 WL 239655, at *3 (E.D. Pa. Jan. 25, 2011).

[12] Under Rule 26(b)(1), "discovery need not be confined to matters of admissible evidence but may encompass that which 'appears reasonably calculated to lead to the discovery of admissible evidence.'"  Foster v Berwind Corp., No. 90-0857, 1990 WL 209288, at *6 (E.D. Pa. Dec. 12, 1990).  Courts have interpreted the relevancy requirement under Rule 26 broadly:

> Relevancy is to be broadly construed for discovery purposes and is not limited to the precise issues set out in the pleadings or to the merits of the case.  Rather, discovery requests may be deemed relevant if there is any possibility that the information may be relevant to the general subject matter of the action.  As a result, discovery rules are to be accorded broad and liberal construction. . . . [W]here there is doubt over relevance, the rule indicates that the court should be permissive.

Id. at *6 (citations omitted); see also Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978) (relevance "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case").

ordinary presumption in favor of broad disclosure." McConnell v. Canadian Pac. Realty Co., 280 F.R.D. 188, 193 (M.D. Pa. 2011). In considering a motion to quash or modify a subpoena, a court may also grant such a motion if it finds that the movant has met the "heavy burden of establishing that compliance with the subpoena would be 'unreasonable and oppressive.'" Id., quoting Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enters., Inc., 160 F.R.D. 70, 72 (E.D. Pa. 1995). This burden is "particularly heavy to support a motion to quash as contrasted to some more limited protection" such as a protective order. Pepsi-Cola, 2011 WL 239655, at *3, quoting Westinghouse Elec. Corp. v. City of Burlington, 351 F.2d 762, 766 (D.C. Cir. 1965). In applying Rules 26 and 45, I must balance several competing factors: "(1) relevance, (2) need, (3) confidentiality, and (4) harm." Mannington Mills, Inc. v. Armstrong World Indus., Inc., 206 F.R.D. 525, 529 (D. Del. 2002). "[E]ven if the information sought is relevant, discovery is not allowed where no need is shown, or where compliance is unduly burdensome, or where the potential harm caused by production outweighs the benefit." Id.; see also Fed. R. Civ. P. 26(b)(2)(C).

Mindful of these considerations I will deny Durkin's motion to quash the subpoena directed to St. Paul. I find that Durkin has standing to move to quash the subpoena directed to St. Paul as it legitimately claims a personal right or privilege in the information sought in the subpoena. However, I also find that the requested documents will likely show whether Durkin had its power of attorney revoked by St. Paul, whether St. Paul canceled Durkin as its agent and whether St. Paul made any claims concerning unauthorized bonds or misuse of powers of attorney against Durkin. This information is plainly relevant to First Sealord's negligent misrepresentation claim, specifically as to whether Durkin's representations were in fact inaccurate and whether Durkin knew them to be. See Smith v. Lincoln Ben. Life Co., 395 F.

App'x 821, 824 (3d Cir. 2010); Bilt-Rite, 866 A.2d at 277.  To the extent that the disclosure of these documents risks disturbing a settlement agreement or requires St. Paul to produce confidential information, a protective order could be requested to manage these risks.[13]  Durkin does not articulate any specific harm that might arise from the production of these documents and I find Durkin's argument that the untimeliness of the subpoena to St. Paul is prejudicial to Durkin to be unavailing.  Therefore I will deny the motion to quash the subpoena and require that St. Paul produce any and all documents responsive to the subpoena.

### IV.   First Sealord Has Demonstrated Issues of Material Fact Exist Sufficient to Resist Summary Judgment on its Breach of Contract and Breach of Fiduciary Duty Claims

Durkin moves for summary judgment contending that there are no material facts in dispute regarding either First Sealord's breach of contract or breach of fiduciary duty claims and that Durkin is entitled to judgment as a matter of law.  Durkin advances the following arguments in support of its motion.  First, in support of its motion for summary judgment as to First Sealord's breach of contract claim in connection with the H & S bonds, Durkin argues that First Sealord cannot demonstrate that Durkin possessed any adverse information about H & S that it either did not convey or was not also known to First Sealord.  Def.'s Mot. Summ. J. (ECF No. 38), p. 9.  "Given that circumstance, First Sealord can never establish that Durkin withheld information that would have affected its decision to issue the H & S bonds."  Id. at 9-10.

---

[13] Durkin argues that the "broad scope of the Subpoena would necessarily encompass documents and information that are subject to a confidentiality agreement between Durkin and St. Paul."  Def.'s Mot. to Quash (ECF No. 49) p. 6.  For this proposition, Durkin submits deposition testimony from Thomas Durkin, in which he avers that there is a non-disclosure agreement that forbids him from discussing the St. Paul dispute.  See Def.'s Mot. to Quash (ECF No. 49) Ex. C.  However, any such agreement is not before me and therefore I cannot determine whether the terms of the agreement do indeed forbid disclosure of the documents sought in the subpoena.  In the event that there is such an agreement that precludes disclosure, a protective order could be entered to ensure that no confidential or sensitive information is unnecessarily disclosed.

Second, Durkin argues that First Sealord's decisions to issue the H & S Bonds ultimately rested with determinations made by First Sealord's own underwriters, which were not determinations based on analysis provided by Durkin.  Id. at 12-14.

Durkin argues that First Sealord's breach of fiduciary duty claim must fail for the same reasons, namely that First Sealord cannot show that the losses from the H & S bonds occurred because of Durkin's failure to convey any adverse information and that First Sealord decided to issue the H & S Bonds because of its own internal analysis of H & S, and not because of anything Durkin communicated to First Sealord.  Id. at 15.  Durkin also contends that the claims are duplicative and that the breach of fiduciary duty claim should be dismissed on that ground. Id.

First Sealord responds that the record reveals Durkin failed to disclose adverse information regarding H & S's financial condition, namely that H & S had cash flow problems in 2006.  Pl.'s Opp. Br. (ECF No. 44), p. 10-11.  Additionally, First Sealord argues that Durkin in communications to First Sealord portrayed H & S "in a very positive light"[14] and conveyed optimism about H & S's financial outlook, but that these representations were in fact "rooted in baseless and unverified information regarding [H & S's] financial condition and technical competence"[15] and thus amounted to a material breach of the Agency Agreement and violated Durkin's fiduciary duty as an agent.  Id. at 12-14.  Moreover, First Sealord asserts that Durkin did not maintain accurate and complete records regarding H & S, which constitutes an independent breach of the Agency Agreement.  Id. at 21-24.  First Sealord also contends that Durkin's behavior failed to comply with "the standard of care expected of the Agent as dictated

---

[14] Pl.'s Opp. Br., p. 18

[15] Pl.'s Opp. Br., p. 12

by industry custom" and thus breached both the Agency Agreement and Durkin's independent fiduciary duty to First Sealord as the surety's agent.  Id. at 25, quoting Agency Agreement ¶ 20.

Finally, First Sealord maintains that the breach of contract claim is separate from the breach of fiduciary duty claim in that Durkin had independent duties as an agent beyond those imposed by the contract that Durkin also breached.  See First Sealord's Ltr. Memo. (ECF No. 56), p. 3.  First Sealord asserts that the record demonstrates that Durkin was not acting at all times as First Sealord's agent, but rather had "split allegiances."  Pl.'s Opp. Br. (ECF No. 44), p. 26.  This in turn caused Durkin to go so far as communicating with outside attorneys on H & S's behalf regarding the actions First Sealord took in response to H & S's cash flow problems, which, First Sealord claims, was a breach of Durkin's fiduciary duty to First Sealord.  Id. at 27; see also Barbour Decl. Ex. E.

A.  Standard of Review

Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment bears the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex, 477 U.S. at 322-23.  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  A fact is "material" if it might affect the outcome of the case under governing law. Id.

33

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

B. First Sealord Has Submitted Evidence that Demonstrates Issues of Material Fact on the Breach of Contract Claim

A plaintiff asserting a breach of contract claim under Pennsylvania law must establish three elements: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[ ] and (3) resultant damages."  Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003).  There is no dispute that the Agency Agreement was a contract between the parties, nor that First Sealord suffered losses.  The only remaining issues are whether Durkin was in breach of that contract and whether that breach resulted in First Sealord's losses.  I find that First Sealord has submitted materials that demonstrate a genuine issue of material fact as to 1) whether Durkin conveyed all adverse information in its possession regarding H & S to First Sealord and 2) whether Durkin complied with the recordkeeping obligation imposed by the

34

Agency Agreement.  Further I find that First Sealord has submitted sufficient materials to create issues of material fact as to whether Durkin's failure to convey all adverse information and maintain complete and accurate records regarding H & S caused First Sealord's losses such that summary judgment on the breach of contract claim is inappropriate.

i.     *Durkin's Obligation to Convey Adverse Information*

The Agency Agreement specifies that Durkin must convey any adverse information regarding any of Durkin's clients to First Sealord.  Agency Agreement ¶ 13.  Adverse information is defined broadly and "includes any information concerning a client's character, financial condition, mental or technical competence in meeting its contractual obligations, including but not limited to: any information about a pending or past claim on or against a bond issued by any surety."  Id.  Failure to convey adverse information is a material breach of the agreement.  Id.  First Sealord submits deposition testimony that establishes an issue of fact as to whether Durkin was aware of H & S's cash flow problems before the August 21, 2007 date when it submitted such concerns to First Sealord.  John Mahoney, one of two Durkin corporate deponents and the employee "who served as the primary contact for the [H & S] account," testified that he was aware that H & S was experiencing cash flow problems as early as 2006.  Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), p. 10; see also Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 38), Barbour Decl. Ex. G, Mahoney Dep. 171:16-24.  Mahoney however was unable to describe any instance in which he conveyed such information to First Sealord.  Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. G, Mahoney Dep. 70:8-71:15.  Thomas Durkin, Durkin's other corporate representative and managing partner, testified that H & S's cash flow was a "recurrent theme" in his conversations with H & S, and that he had discussed cash flow problems with H & S in 2006 and 2007.  See Pl.'s Opp. to Def.'s Mot.

Summ. J. (ECF No. 44), Barbour Decl. Ex. F, Durkin Dep. 251:6-252:10, 257:10-15.  However, he too could not recall instances in which he reported adverse information regarding H & S to First Sealord.  Id. at 225:11-16.

First Sealord also submits internal Durkin documents summarizing Durkin's monitoring of H & S's insurance policies.  These reveal that sometime in November 2005 and then again in June 2007, one or more companies threatened to cancel H & S's insurance policies for lack of payment, and at least one company did cancel its insurance policy with H & S.  See e.g. Supplemental Barbour Decl. (ECF No. 53), Ex. A. (Durkin Activity List for H & S), p. 114, 150-51.  While Durkin told First Sealord of H & S's cash flow problems at least by August 21, 2007, it did so only in response to a request by First Sealord to Durkin regarding H & S's financial condition after First Sealord learned that a company was planning to sue H & S for delinquent payment.  See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. M.  First Sealord has thus demonstrated an issue of material fact as to whether Durkin conveyed this information in a manner that conformed with its obligations under the Agreement.  See Agency Agreement ¶ 13 ("[Durkin] agrees to promptly report any Adverse Information …which comes to the attention of any person in [Durkin's] organization about any client of [Durkin] who . . . has received a bond from [First Sealord].")

 ii. *Durkin's Optimistic Portrayal of H & S's Outlook and Abilities*

First Sealord has also submitted materials that permit an inference that Durkin was embellishing H & S's abilities and financial condition while downplaying H & S's struggles to make payments on its insurance policies.  In a letter dated October 25, 2005, Durkin wrote to First Sealord about bonding H & S.  See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. B.  Despite H & S's inability to get bonded for jobs over $500,000, Durkin averred that H & S had enjoyed much recent success, touted that "[p]roduction is H & S's

trademark," and provided an optimistic projection of H & S's next quarter gross.  Id.  ("With the work completed since June and the current backlog, December of 05' [sic] will show excellent working capital and net worth.").  Yet when deposed about this letter, Durkin's corporate representative and the author of the October 25, 2005 letter, Jack Mahoney, could not recall why he represented that H & S had had recent success, or the reasons underlying his optimistic projection of H & S's future earnings.  See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. G, Mahoney Dep. 97:5-22; 99:2-25; see also Barbour Decl. Ex. F, Durkin Dep. 261:3-22.  First Sealord also submits a cover letter to a fax sent by Mahoney on October 31, 2005 containing the bid results for a project H & S was vying for in which Mahoney stated: "I know this is not an ideal way to start a bond relationship but as I told you, I've been with [H & S] since [it] opened [its] doors and have tracked [its] progress closely.  [H & S's] edge against [its] competitors is productivity [and] overhead."  See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. I.  However, when questioned about these statements in his deposition, Mahoney was not able to articulate any reasons for those statements apart from the fact that he was repeating something that H & S had told him; Mahoney also acknowledged that he never sought to verify the accuracy of his statements regarding the advantages in productivity or overhead that H & S had over its competitors.  See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. G, Mahoney Dep. 111:4-112:19.  Durkin's other corporate deponent, managing partner Thomas Durkin, similarly acknowledged that Durkin never sought to verify if in fact H & S had any sort of comparative advantage over its competitors in terms of productivity or overhead costs.  See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. F, Durkin Dep. 218:3-24.

Additionally, Mahoney wrote to First Sealord on November 16, 2005 stating that there was a "job coming out the end of the month . . . that will fit in perfectly with [H & S's] workload for '06."  See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. H.  But at his deposition, Mahoney could not articulate any reason why he opined that a particular project if bonded by First Sealord would "fit perfectly" into H & S's workload for the coming year.  Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. G, Mahoney Dep. 104:2-106:10.  Moreover, in his deposition, Mahoney admitted that he had a "duty to confirm information" about H & S before passing it on to First Sealord.  See id. at 95:9-12.  However, Mahoney did not always do so.  Id. at 95:13-17.  In his deposition, Thomas Durkin similarly admitted that the agency never undertook any analysis of H & S's business or financial condition.  See e.g. Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. F, Durkin Dep. 217:2-218:24; 253:7-24; 261:8-13 ("I did not verify [what H & S told me regarding its cash position]").  These statements taken together demonstrate an issue of material fact as to whether Durkin, in making these optimistic representations regarding H & S, was complying with its obligations under the Agency Agreement.  See Agency Agreement ¶ 20 (Durkin was obliged not to "procure[ ] the execution of any bond or bonds contrary to . . . to the standard of care expected of [Durkin] as dictated by industry custom").

### iii.   Durkin's Recordkeeping Obligations

First Sealord has also submitted materials that suggest that Durkin failed to keep accurate and complete records regarding the H & S bonds, an obligation under the Agency Agreement.  See Agency Agreement ¶ 12.  For example, in discovery Durkin was unable to produce any of the Certificates of Insurance that Durkin made for H & S because a former Durkin employee apparently took them with him when he left the company.  Pl.'s Opp. to Def.'s Mot. Summ. J.

(ECF No. 44), Barbour Decl. Ex. F, Durkin Dep. 26:2-17.  Similarly, when questioned about its

document retention policy, Durkin affirmed that those policies and procedures also were on the

same former employee's computer and those too left with him.  Id. at 161:16-162:11; see also

Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. G, Mahoney Dep. 52:2-

55:19 (Mahoney discussing that he cannot produce nor recall any notes he took during any of his

discussions with individuals at H & S or First Sealord).  This testimony demonstrates an issue of

material fact as to whether Durkin was in breach of the recordkeeping provisions of the Agency

Agreement.  And because whether H & S maintained adequate insurance coverage due to its cash

flow problems and whether and when First Sealord knew about these issues are material issues

as to the breach of contract claim, summary judgment must be denied.

  iv.  *Whether Durkin's Actions Caused First Sealord's Losses*

  In evaluating the causal relationship between Durkin's actions and First Sealord's losses I

am guided by the Pennsylvania Supreme Court's succinct exposition of a court's role in

assessing causation at the summary judgment stage of a case:

> '[w]hether in a particular case [plaintiff's burden of preponderance
> of the evidence] has been met with respect to the element of
> causation is normally a question of fact for the jury; the question is
> to be removed from the jury's consideration only where it is clear
> that reasonable minds could not differ on the issue.  In establishing
> a Prima [sic] facie case, the plaintiff need not exclude every
> possible explanation [. . .]; it is enough that reasonable minds are
> able to conclude that the preponderance of the evidence shows
> defendant's conduct to have been a substantial cause of the harm to
> plaintiff.'

Summers v. Certainteed Corp., 997 A.2d 1152, 1163-64 (Pa. 2010), quoting Hamil v. Bashline,

392 A.2d 1280, 1284–85 (Pa. 1978).  In light of this guidance from the Pennsylvania Supreme

Court, I find that First Sealord has submitted sufficient materials to raise an issue of material fact

as to whether Durkin's failure to convey adverse information regarding H & S, Durkin's

embellishments regarding H & S's abilities and financial condition and Durkin's failure to maintain complete and accurate records regarding H & S were substantial factors in First Sealord's damages.  Based upon the record I find that a reasonable jury could conclude that Durkin's actions were a substantial factor in causing First Sealord's losses, and as such summary judgment is inappropriate as to First Sealord's breach of contract claim.

C.  First Sealord Has Submitted Evidence Demonstrating Issues of Material Fact on the Breach of Fiduciary Duty Claim

Durkin argues that there are no issues of material fact regarding the breach of fiduciary claim and that it is entitled to judgment as a matter of law.  Durkin argues first that the claim is duplicative of the breach of contract claim and should be disposed of upon that ground.  Def.'s Mot. Summ. J. (ECF No. 38), p. 15.  Durkin further argues that since it had no authority to bind First Sealord, Durkin was not First Sealord's agent and as such no fiduciary relationship existed. Def.'s Letter Memo. (ECF No. 59), p. 1-3.  Finally, Durkin argues that First Sealord does not allege a breach of fiduciary duty apart from the breach of the contract, and that no damages resulted from any alleged breaches of fiduciary duty separate from those stemming from the alleged breach of contract, and thus the claim must fail.  Id. at p. 4.  I find these arguments to be unavailing and so will deny Durkin's motion for summary judgment as to the breach of fiduciary duty claim.

When a person authorizes another to act as his or her agent, the relationship between the two may be characterized as a fiduciary relationship.  Sutliff v. Sutliff, 528 A.2d 1318, 1323 (Pa. 1987), citing Restatement (Second) of Agency § 387 (1958); Sylvester v. Beck, 178 A.2d 755 (Pa. 1962); Garbish v. Malvern Fed. Sav. & Loan Ass'n, 517 A.2d 547, 553-54 (Pa. Super. Ct.

1986).[16]  "Under Pennsylvania law, the duty of an agent to his principal is one of loyalty in all

matters affecting the subject of his agency and 'the agent must act with the utmost good faith in

the furtherance and advancement of the interests of his principal.'"  Garbish, 517 A.2d at 553-54,

quoting Sylvester v. Beck, 178 A.2d 755, 757 (Pa. 1962).  Merely because the terms of an

agency relationship are spelled out in a written agreement does not mean that the agent does not

also owe, as a matter of law, a duty of loyalty to the principal.  McDermott v. Party City Corp.,

11 F. Supp. 2d 612, 627 (E.D. Pa. 1998).[17]

An action for breach of fiduciary duty may be maintained by pleading and proving

> "(1) that the defendant negligently or intentionally failed to act in
> good faith and solely for the benefit of the plaintiff in all matters
> for which he or she was employed; (2) that the plaintiff suffered
> injury; and (3) that the agent's failure to act solely for the
> plaintiff's benefit was a real factor in bringing about plaintiff's
> injuries."

Meyers v. Sudfeld, No. 05-2970, 2006 WL 401855, at *6 (E.D. Pa. Feb. 21, 2006), quoting

McDermott, 11 F. Supp. 2d at 626 n.18.  The Agency Agreement clearly established an agency

relationship between First Sealord and Durkin.  Durkin acknowledges as much in deposition

testimony.  Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. F, Durkin Dep.

118:3-20.  Indeed in the same deposition Durkin also admitted that his company was not an

agent for H & S.  Id. at 118:21-119:12.  Thus it is clear that an agency relationship existed

---

[16] The Restatement provides that "[u]nless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement (Second) of Agency § 387 (1958); see also In re Shahan, 631 A.2d 1298, 1303 (Pa. Super. Ct. 1993) ("This duty is the same as that of fiduciary which has been described as the duty to act for the benefit of another as to matters within the scope of the relation.").

[17] "In other words, the contract between the parties may serve to inform and define the agent's fiduciary duty imposed by law.  Thus, for example, an agent who embezzles from his principal may be in breach of both the contract between the parties which spelled out his authority and functions, as well as the agent's duty imposed by operation of law." McDermott, 11 F. Supp. 2d at 627.

Case 2:10-cv-00832-TON   Document 61   Filed 01/17/13   Page 42 of 44

between First Sealord and Durkin and that Durkin as an agent owed fiduciary duties to First Sealord beyond those imposed by the contract.  McDermott, 11 F. Supp. 2d at 627.[18]

However, the record reveals issues of material fact as to whether Durkin acted at all times solely for First Sealord's benefit and with the utmost good faith and loyalty owed a principal by an agent.  Garbish, 517 A.2d at 553-54; see also Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No. 44), Barbour Decl. Ex. G, Mahoney Dep. 76:19-21 (admitting that Mahoney believed Durkin was also serving H & S's interests).  Much of the record evidence that demonstrates a material issue of fact as to whether Durkin breached the Agency Agreement also raises an issue of fact as to whether Durkin acted in accordance with its duties as fiduciary to First Sealord.  Conveying adverse information about a prospective or current client to the principal, maintaining complete and accurate records on the clients that the agent interacted with on behalf of the principal, and refraining from making unverified assertions about the financial condition and technical capabilities of prospective and current clients all would be consistent with the duties owed by an agent to its principal.  The present record therefore is sufficient to create issues of material fact as to whether Durkin breached its fiduciary duties and whether these breaches resulted in losses to First Sealord, and I will deny summary judgment as to that claim.

---

[18] Durkin argues that since the Agency Agreement expressly prevented Durkin from binding First Sealord to any bonds absent First Sealord's authorization, that Durkin was not a true agent and thus had no fiduciary duty to First Sealord.  Def.'s Letter Memo. (ECF No. 59), p. 1-3.  I disagree.  An agent can bind a principal even without express authorization to do so.  See Azur v. Chase Bank, 601 F.3d 212, 221 (3d Cir. 2010) ("Apparent authority is power to bind a principal which the principal has not actually granted but which he leads persons with whom his agent deals to believe that he has granted.").  Had Durkin issued an unauthorized bond on First Sealord's behalf, First Sealord might well have been bound because Durkin was cloaked in the apparent authority to issue such a bond.  See Leidigh v. Reading Plaza Gen'l, Inc., 636 A.2d 666, 667-68 (Pa. Super. Ct. 1994) ("[T]his court has found apparent authority to be established with a showing of (1) limited authority given to the agent by the principal; and (2) conduct of the agent which demonstrates to the third-party the agent's apparent authority to bind the principal.").

I also note that there is a letter that supports both the breach of contract claim and the breach of fiduciary duty claim that demonstrates an issue of material fact as to whether Durkin acted chiefly with First Sealord's interests in mind. On April 30, 2008, Durkin sent a letter to an attorney describing the interactions between First Sealord and H & S, asserting that H & S was proceeding under "the duress of a funds control arrangement" imposed by First Sealord which "effectively precludes [H & S's] ability to successfully satisfy [its] suppliers and places [it] in jeopardy of defaulting on [its] bank loan." See Pl.'s Opp. to Def.'s Mot. Summ. J. (ECF No.44), Barbour Dec., Ex. E, p. 1. In the letter Durkin further stated that

> the issue involves [First Sealord's] apparent takeover of a company which was not in default of any of its contracts . . . At this point [H & S] has been hobbled by [First Sealord] even though [it] was not in violation of any of the contracts which remain outstanding. . . . I think a great deal has gone wrong here with the way [First Sealord] approached the entire situation. . . . [There] appears to be merit for [legal action] against the claims department. They refuse to cooperate with me as [H & S's] agent in order to achieve a successful resolution of this matter.

Id. at p. 2. While it is unclear what the purpose of this letter was, it is clear that Durkin was confused about its role as First Sealord's agent; Durkin even refers to itself as an agent of H & S in the letter. Further, whatever Durkin's purpose in sending this letter, discussing the intimate details of the relationship between Durkin's principal and H & S with a third party is not consistent with the duties owed First Sealord by Durkin as a fiduciary.

Durkin argues that even if the April 2008 letter was a breach of the agency relationship, it produced no damages to First Sealord because no bonds were issued to H & S after December 2007. Def.'s Letter Memo. (ECF No. 59), p. 4. I will reserve judgment as to the admissibility of this letter, and I will deny Durkin's motion for summary judgment as to the breach of fiduciary duty claim.

An appropriate Order follows.